# EXHIBIT 1

FILED

**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff - Appellee,<br><br>v.<br><br>HAI WAKNINE,<br><br>     Defendant - Appellant. | No. 09-50360<br><br>D.C. No. 2:04-cr-00373-R-1<br><br>MEMORANDUM[*] |

Appeal from the United States District Court
for the Central District of California
Manuel L. Real, District Judge, Presiding

Argued and Submitted October 5, 2010
Pasadena, California

Before: CUDAHY,[**] WARDLAW and W. FLETCHER, Circuit Judges.

Hai Waknine appeals the district court's denial of his July 1, 2009, motion to

withdraw the guilty plea he entered on June 13, 2006, to one count of RICO

---

[*]     This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36-3.

[**]     The Honorable Richard D. Cudahy, Senior United States Circuit Judge for the Seventh Circuit, sitting by designation.

conspiracy in violation of 18 U.S.C. § 1962(d).  We have jurisdiction pursuant to 28 U.S.C. § 1291.  We reverse.

## I.

The district court abused its discretion by failing to identify and apply the correct "fair and just reason" standard for requesting the withdrawal set forth in Fed. R. Crim. P. 11(d)(2)(B).  *See United States v. Ruiz*, 257 F.3d 1030, 1031 (9th Cir. 2001) (en banc); *United States v. Hinkson*, 585 F.3d 1247, 1261-62 (9th Cir. 2009) (en banc).  Rule 11(d)(2)(B) was the correct standard because on appeal the Ninth Circuit had vacated the previously imposed sentence and remanded for resentencing.  Therefore, there was no sentence imposed when Waknine moved to withdraw his guilty plea.

The district court also clearly erred by incorrectly finding that the July 23, 2008, Second Superseding Indictment, which repeatedly describes Waknine as a co-conspirator and which in part focuses on the extortion that served as the factual basis for Waknine's plea, had nothing to do with Waknine's case.  *See United States v. Showalter*, 569 F.3d 1150, 1154 (9th Cir. 2009).

## II.

The record does not support any reason for affirming the district court's denial of Waknine's motion.  *See, e.g., Griffin v. Arpaio*, 557 F.3d 1117, 1121 (9th

Cir. 2009). After Waknine pleaded guilty he obtained newly-discovered evidence in the form of conversations, which were described in the Second Superseding Indictment, corroborating his claimed defense of duress. *See Showalter*, 569 F.3d at 1154 (9th Cir. 2009) ("Fair and just reasons for withdrawal include . . . newly discovered evidence . . . .") (quoting *United States v. McTiernan*, 546 F.3d 1160, 1167 (9th Cir. 2008)); *United States v. Garcia*, 401 F.3d 1008 (9th Cir. 2005). These intercepted conversations were the only independent evidence (apart from his own testimony, or the testimony of his family members) that Waknine had acted under duress, and therefore it is plausible that a reasonable person in Waknine's position would not have pleaded guilty had he known about the newly-translated intercepts before he entered the plea. *See, e.g., Garcia*, 401 F.3d at 1011-12.

There is no indication on the record that (as the government argues) Waknine delayed for three years, that Waknine's reasons for withdrawal were not bona fide, or that the government would suffer great prejudice from allowing Waknine to withdraw his plea. *See Garcia*, 401 F.3d at 1013. The Second Superseding Indictment was not filed until July 23, 2008. Waknine's appeal was pending before the Ninth Circuit until the mandate issued on October 8, 2008, thus depriving the district court of jurisdiction to act until after that date. In the nine

3

months between October 8, 2008, and July 1, 2009, Waknine reasonably and properly sought and received continuances to prepare a sentencing memorandum and further investigate the facts underlying the Second Superseding Indictment. In February of 2009, Wakine and the government together sought and received a three-month continuance, in part to negotiate restitution issues. The only prospective prejudice to the government is that which normally accompanies retrial following an appeal.

### III.

In order to preserve the appearance of justice, we "exercise [our] supervisory power under 28 U.S.C. § 2106 to reassign this case to a different district court judge on remand." *Living Designs, Inc. v. E.I. Dupont De Nemours & Co.*, 431 F.3d 353, 372 (9th Cir. 2005). We therefore reverse and remand to the Clerk of the Central District of California for this case to be reassigned to a different district court judge and for consideration of whether the Second Superseding Indictment, filed under the same criminal docket number, should be reassigned to the same judge.

REVERSED AND REMANDED.

# EXHIBIT 2

FILED

2008 JUL 23 PM 2:47

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

December 2007 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 04-373(B)-R |
| Plaintiff, | **S E C O N D** |
| v. | **S U P E R S E D I N G** |
| ITZHAK ABERGIL, | **I N D I C T M E N T** |
| aka Itzhak Abergel, | |
| aka Yitzhak Abergel, | [18 U.S.C. § 1962(d): Racketeer |
| aka the Friend, | Influenced and Corrupt |
| aka the Big Friend, | Organizations Conspiracy; |
| aka the Man From the | 18 U.S.C. § 371: Conspiracy |
| South, | to Commit Extortion; 18 U.S.C. |
| MEIR ABERGIL, | § 894: Collection of Extensions |
| aka Meir Abergel, | of Credit by Extortionate Means; |
| SASSON BARASHY, | 18 U.S.C. § 1951: Interference |
| aka Sasson Barashi, | with Commerce by Threats of |
| YORAM EL-AL, | Violence; 18 U.S.C. § 1956(h): |
| aka Yoram Alal, | Conspiracy to Commit Money |
| aka the Wounded, | Laundering; 18 U.S.C. |
| MOSHE MALUL, | § 1956(a)(1)(B): Laundering of |
| aka Eliyahu Ben Naim, | Monetary Instruments; 18 U.S.C. |
| aka Eli Adawi, | § 1957: Engaging in Monetary |
| aka Yochay Malul, | Transactions in Property Derived |
| aka Shimon Ohana, | from Specified Unlawful Activity; |
| aka Moses Malul | 18 U.S.C. §§ 1959(a)(1), (a)(5): |
| ISRAEL OZIFA, | Violent Crimes in Aid of |
| aka Israel the Tall, | Racketeering Activity; 21 U.S.C. |
| aka the Tall One, | § 846: Conspiracy to Distribute |
| LUIS SANDOVAL, | MDMA; 21 U.S.C. § 952(a): |
| aka Barney Twin, | Importation of Controlled |
| aka Hog, | Substances; 21 U.S.C. |
| | § 963: Conspiracy to Import |
| Defendants. | Controlled Substances; 18 U.S.C. |
| | § 2: Aiding and Abetting; |
| | Causing an Act to Be Done] |

403

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

December 2007 Grand Jury

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR 08-1033 |
| | ) | |
| Plaintiff, | ) | (formerly, No. CR 04-373(B)-R) |
| | ) | |
| v. | ) | I N D I C T M E N T |
| | ) | |
| ITZHAK ABERGIL, | ) | [18 U.S.C. § 1962(d): Racketeer |
| aka Itzhak Abergel, | ) | Influenced and Corrupt |
| aka Yitzhak Abergel, | ) | Organizations Conspiracy; |
| aka the Friend, | ) | 18 U.S.C. § 371: Conspiracy |
| aka the Big Friend, | ) | to Commit Extortion; 18 U.S.C. |
| aka the Man From the | ) | § 894: Collection of Extensions |
| South, | ) | of Credit by Extortionate Means; |
| MEIR ABERGIL, | ) | 18 U.S.C. § 1951: Interference |
| aka Meir Abergel, | ) | with Commerce by Threats of |
| SASSON BARASHY, | ) | Violence; 18 U.S.C. § 1956(h): |
| aka Sasson Barashi, | ) | Conspiracy to Commit Money |
| YORAM EL-AL, | ) | Laundering; 18 U.S.C. |
| aka Yoram Alal, | ) | § 1956(a)(1)(B): Laundering of |
| aka the Wounded, | ) | Monetary Instruments; 18 U.S.C. |
| MOSHE MALUL, | ) | § 1957: Engaging in Monetary |
| aka Eliyahu Ben Naim, | ) | Transactions in Property Derived |
| aka Eli Adawi, | ) | from Specified Unlawful Activity; |
| aka Yochay Malul, | ) | 18 U.S.C. §§ 1959(a)(1), (a)(5): |
| aka Shimon Ohana, | ) | Violent Crimes in Aid of |
| aka Moses Malul | ) | Racketeering Activity; 21 U.S.C. |
| ISRAEL OZIFA, | ) | § 846: Conspiracy to Distribute |
| aka Israel the Tall, | ) | MDMA; 21 U.S.C. § 952(a): |
| aka the Tall One, | ) | Importation of Controlled |
| LUIS SANDOVAL, | ) | Substances; 21 U.S.C. |
| aka Barney Twin, | ) | § 963: Conspiracy to Import |
| aka Hog, | ) | Controlled Substances; 18 U.S.C. |
| | ) | § 2: Aiding and Abetting; |
| Defendants. | ) | Causing an Act to Be Done] |
| | ) | |
| | ) | |

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 1962(d)]

RICO CONSPIRACY

A.   THE RACKETEERING ENTERPRISE

At times relevant to this Second Superseding Indictment:

1.   Defendants ITZHAK ABERGIL, also known as ("aka") Itzhak Abergel, aka Yitzhak Abergel, aka the Friend, aka the Big Friend, aka the Man From the South ("ITZHAK ABERGIL"), MEIR ABERGIL, aka Meir Abergel ("MEIR ABERGIL"), SASSON BARASHY, aka Sasson Barashi ("BARASHY"), YORAM EL-AL, aka Yoram Alal, aka the Wounded ("EL-AL"), and others known and unknown to the Grand Jury, were members and associates of a criminal organization engaged in, among other things, bank embezzlement, extortion, kidnaping, and money laundering.  At all relevant times, this criminal organization contained members and associates of the "Abergil Family" and the "Jerusalem Network."  This criminal organization operated in the Central District of California and elsewhere.

2.   The criminal organization, including its leadership, membership and associates, constituted an "enterprise," as defined by Title 18, United States Code, Section 1961(4) (hereinafter "the Enterprise"), that is, a group of individuals associated in fact.  The Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise. The Enterprise was engaged in, and its activities affected, interstate and foreign commerce.

2

B.   GENERAL BACKGROUND OF THE RACKETEERING ENTERPRISE

At times relevant to this Second Superseding Indictment:

1.   The Abergil Family was among the most powerful crime families in Israel.  The Abergil Family engaged in bank embezzlement, loan sharking, money laundering, and illegal gambling in California, Florida, other parts of the United States, Israel, and Europe.  Although the Abergil Family was comprised of relatively few members, it wielded substantial power among other Israeli crime families because of its propensity for violence in Israel and around the world.

2.   The Jerusalem Network was a powerful criminal organization that conducted loan sharking, extortion, money laundering, and illegal gambling in Israel and Europe, and has worked to expand its influence over illegal activity conducted in other parts of the world including California, Nevada, Florida, and other parts of the United States.  The Jerusalem Network was formed through alliances and associations with crime families in Israel.  It has gained influence in the United States by cultivating ties with criminal elements in California, Florida, and Nevada, members of the business and legal community, as well as Israeli-born business persons, some of whom have been victimized by extortion rackets jointly controlled by the Enterprise.

3.   Members and associates of the Jerusalem Network and the Abergil Family, including defendant ITZHAK ABERGIL, defendant MEIR ABERGIL, and defendant BARASHY, joined forces and were jointly involved in the largest bank embezzlement scheme in the history of Israel.  As the Abergil Family is more powerful than

3

the Jerusalem Network, members and associates of the Enterprise followed the directives of defendant ITZHAK ABERGIL. The Enterprise engaged in illegal activities in the United States, in part, as an attempt to launder the proceeds from the embezzlement of funds from bank accounts in Israel and their respective illegal gambling and loan sharking activities in Europe and Israel. Members and associates of the Enterprise conducted extortion, loan sharking, and money laundering in California, Nevada, Florida, other parts of the United States, Israel, and Europe.

4. Defendant ITZHAK ABERGIL was the leader of the Abergil Family and the Enterprise. To further the power and influence of the Abergil Family, defendant ITZHAK ABERGIL conducted criminal activities in Israel and around the world through the use of, and alliances with, other criminal organizations based in Israel, including the Jerusalem Network. For instance, the Abergil Family allied itself with the Jerusalem Network in order to embezzle millions of dollars worth of funds from the Tel Aviv Trade Bank located in Israel and, later, to loan part of these embezzled funds to businessmen in the United States and to extort repayment of these loans from the businessmen.

5. Defendant MEIR ABERGIL, the brother of defendant ITZHAK ABERGIL, aided defendant ITZHAK ABERGIL in running the Abergil Family and the Enterprise. Defendant MEIR ABERGIL, among others, was responsible for handling the finances of the Abergil Family, including collecting debts owed to the Abergil Family.

6. Co-conspirator Gabriel Benharosh ("Benharosh") was among the highest ranking members of the Jerusalem Network and

4

the Enterprise.  Benharosh directed the criminal activities of other members and associates of the Jerusalem Network, including defendant BARASHY, defendant EL-AL, and co-conspirator Hai Waknine ("Hai Waknine").  Benharosh made loans of monies belonging to the Enterprise to businessmen in the United States. Benharosh also updated defendants ITZHAK ABERGIL and MEIR ABERGIL about the joint criminal activities of the Enterprise.

7.   Defendant BARASHY, defendant EL-AL, Hai Waknine, and others known and unknown to the Grand Jury, were part of and were directly associated with the Enterprise.  Defendant BARASHY and Hai Waknine made loans of monies belonging to the Enterprise to businessmen in the United States.  Defendant EL-AL was an enforcer for the Enterprise who intimidated businessmen in the United States in order to extort repayment of loans provided to the businessmen by defendant BARASHY and Hai Waknine, on behalf of the Enterprise.

8.   The Enterprise promoted discipline among its members and associates by the use of intimidation, violence, and threats of violence against persons who pose a threat to the Enterprise. The Enterprise also used intimidation, violence, and threats of violence to maintain their positions of power among other Israeli crime families.  Persons who cooperated with law enforcement authorities against the Enterprise were subject to intimidation, violence, and threats of violence.

C.   PURPOSES OF THE ENTERPRISE

1.   Among the purposes of the Enterprise were the following:

a.   Enriching the members and associates of the Enterprise through, among other things, embezzlement, extortion,

5

loan sharking, and money laundering.

b.    Preserving, protecting, and expanding the power of the Enterprise through the use of intimidation, violence, and threats of violence.

c.    Promoting and enhancing the Enterprise and the activities of its members and associates.

D.    MEANS AND METHODS OF THE ENTERPRISE

1.    Among the means and methods by which the defendants and their associates conducted and participated in the conduct of the affairs of the Enterprise were the following:

a.    In Israel, defendant ITZHAK ABERGIL, defendant MEIR ABERGIL, defendant BARASHY, Benharosh, and others, would take over the gambling debts that an individual named Ofer Maximov ("Maximov") owed to creditors.  They thereafter would collect these debts from Maximov and from his sister, Esther Alon. Esther Alon would embezzle funds from the Tel Aviv Trade Bank located in Israel (hereinafter "the embezzled funds"), in order to pay off her brother's debts to defendant ITZHAK ABERGIL, defendant MEIR ABERGIL, defendant BARASHY, and Benharosh.  Some of the embezzled funds would be deposited in bank accounts controlled by defendant BARASHY and Benharosh.  In order to conceal the embezzled funds from the Israeli authorities, defendant ITZHAK ABERGIL, defendant MEIR ABERGIL, defendant BARASHY, and Benharosh would transfer the stolen money to co-conspirator Assaf Waknine ("Assaf Waknine") and to others, including to individuals in the United States.  Defendant BARASHY, Benharosh, and Hai Waknine would use the embezzled funds to engage in loan sharking activities by making loans to

individuals in the United States, including Eliyahu Hadad ("Hadad") and Yosef Atia ("Atia") in Miami, Florida, and to Viken Keuylian ("Keuylian") in Los Angeles, California.  After the funds were transferred to the individuals in Florida and California, and to Assaf Waknine, defendant ITZHAK ABERGIL, defendant MEIR ABERGIL, defendant BARASHY, defendant EL-AL, and others, would use intimidation and threats of violence to collect repayment of the money.

b.    In order to conceal it from law enforcement authorities, the Enterprise would provide approximately $1,350,000 in United States currency from the embezzled funds to Assaf Waknine in Israel.  After the funds were transferred to Assaf Waknine in Israel, defendant ITZHAK ABERGIL, defendant MEIR ABERGIL, defendant BARASHY, defendant EL-AL, and others, would use intimidation and threats of violence against Assaf Waknine to collect repayment of the money from Assaf Waknine.

c.    Members of the Enterprise and their associates would use, attempt to use, and conspire to use extortion, affecting interstate and foreign commerce, for the purpose of generating and acquiring money and other things of value.

d.    Members of the Enterprise and their associates would commit, attempt to commit, and threaten to commit physical acts of violence, kidnaping, and extortion to protect and expand the criminal operations of the Enterprise.

e.    Members of the Enterprise and their associates would promote a climate of fear through threats of physical violence against individuals and in retaliation for failure to pay legal and illegal debts.  Members and their associates would

7

commit such acts: (i) to enrich the Enterprise and its associates and members by acquiring things of value including cash, luxury vehicles, and real estate; (ii) to enforce discipline and loyalty among associates and members of the Enterprise; (iii) to protect the Enterprise and its associates and members from retaliation by others, and from detection, apprehension, and prosecution by law enforcement; and (iv) to promote and enhance the reputation and standing of the Enterprise and its associates and members.

f. Defendant ITZHAK ABERGIL, the principal leader of the Enterprise, would direct other members of the Enterprise in carrying out unlawful and other activities in furtherance of the conduct of the Enterprise's affairs.

g. Defendant MEIR ABERGIL, a leader of the Enterprise, would direct other members of the Enterprise in carrying out unlawful and other activities in furtherance of the conduct of the Enterprise's affairs. Defendant MEIR ABERGIL would approach Maximov in Israel about repayment of debts Maximov owed to the Enterprise, and would receive in return the embezzled funds that he knew had been embezzled from the Tel Aviv Trade Bank in Israel. Defendant MEIR ABERGIL also would receive from Hai Waknine repayment of the embezzled funds that the Enterprise provided to Assaf Waknine.

h. Benharosh, a leader of the Enterprise, would direct other members of the Enterprise in carrying out unlawful and other activities in furtherance of the conduct of the Enterprise's affairs. Benharosh would align a faction of the Jerusalem Network with the Abergil Family.

i. Defendant BARASHY, defendant EL-AL, and Hai

8

Waknine would participate in unlawful and other activities in furtherance of the conduct of the Enterprise's affairs.

j.    After receiving embezzled funds in payment of Maximov's debt owed to the Enterprise, defendant BARASHY, Hai Waknine, and other members of the Enterprise would loan those funds to individuals in the United States.

k.    Defendant ITZHAK ABERGIL, defendant MEIR ABERGIL, defendant EL-AL, defendant BARASHY, and other members of the Enterprise would collect repayment of loans that defendant BARASHY and Hai Waknine made to individuals in the United States.

l.    In order to intimidate victims, defendant ITZHAK ABERGIL, defendant EL-AL, and other members of the Enterprise would accompany defendant BARASHY in extorting the repayment of loans from debtors in the United States.

m.    Defendant BARASHY, defendant EL-AL, and other members and associates of the Enterprise would then launder the extortion proceeds back overseas to defendant MEIR ABERGIL, defendant ITZHAK ABERGIL, Benharosh, and other members and associates of the Enterprise.

E.    THE RACKETEERING CONSPIRACY.

1.    Beginning on an unknown date and continuing to in or about September 2004, in Los Angeles County, within the Central District of California, and elsewhere, defendant ITZHAK ABERGIL, defendant MEIR ABERGIL, defendant BARASHY, and defendant EL-AL, together with others known and unknown to the Grand Jury, being persons who were employed by and associated with the Enterprise, which engaged in, and the activities of which affected, interstate and foreign commerce, knowingly and intentionally

9

conspired to violate 18 U.S.C. § 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity, as that term is defined in Sections 1961(1) and 1961(5) of Title 18, United States Code, consisting of multiple acts indictable under the following provisions of federal law:

a. Title 18 U.S.C. § 894 (collection of extensions of credit by extortionate means);

b. Title 18 U.S.C. § 1951 (interference with commerce by threats of violence);

c. Title 18 U.S.C. § 1952(a) (interstate and foreign travel or transportation, or use of a facility in interstate or foreign commerce, in aid of racketeering enterprises);

d. Title 18 U.S.C. § 1956(a)(1)(B) (laundering of monetary instruments);

e. Title 18 U.S.C. § 1956(h) (conspiracy to launder monetary instruments);

f. Title 18 U.S.C. § 1957 (engaging in monetary transactions in property derived from specified unlawful activity);

and multiple acts involving extortion, which is chargeable under California Penal Code §§ 519, 31, and 182.

2. It was part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

F.  OVERT ACTS

10

In furtherance of the conspiracy, the defendants, and other co-conspirators known and unknown to the Grand Jury, committed the following overt acts, among others, on or about the following dates, within the Central District of California and elsewhere:

1.   Beginning on or about March 6, 1997, to approximately April 25, 2002, Esther Alon embezzled approximately 250 million New Israeli Shekels ("NIS") from the Tel Aviv Trade Bank to help her brother, Maximov, cover his gambling debts owed to various criminal groups in Israel, including the Enterprise.  Esther Alon caused the embezzled funds to be transferred to members of the Enterprise, among others.

2.   On January 21, 2002, in Israel, defendant BARASHY directed that two bank checks totaling 1,980,000 NIS, worth approximately $450,000 in United States currency, be deposited into bank accounts controlled by defendant BARASHY.

3.   On January 22, 2002, by telephone in Israel, unindicted co-conspirators ("UC-1" and "UC-2") discussed Maximov delivering bank checks approximating 300,000 NIS in increments of 100,000 NIS.

4.   On January 22, 2002, by telephone in Israel, UC-1 and UC-2 discussed the fact that Benharosh was in charge of collecting all of Maximov's debts on behalf of all illegal creditors.

5.   On January 23, 2002, by telephone in Israel, UC-1 told UC-2 that Benharosh wanted them to "protect" Maximov.

6.   On January 24, 2002, in Israel, defendant BARASHY caused 100,000 NIS to be deposited into a account under the control of UC-1.

11

7.   On January 30, 2002, by telephone in Israel, UC-2 told a creditor of Maximov's that Benharosh would transfer 700,000 NIS into the creditor's account.

8.   On January 31, 2002, Benharosh caused a 700,000 NIS check made payable to a creditor of Maximov's to be drawn on his "Amir Elad Limited" account at Bank Hapoalim.

9.   In February 2002, by telephone, Benharosh spoke to Maximov.

10.   On February 3, 2002, defendant BARASHY and Benharosh drove with Maximov to the Sheraton City Tower Hotel in Ramat-Gan, Israel.

11.   On February 3, 2002, defendant BARASHY and Benharosh drove with Maximov to the David Citadel Hotel in Jerusalem, Israel.

12.   On February 5, 2002, at the David Citadel Hotel, Jerusalem, Israel, Benharosh met Maximov.

13.   On February 5, 2002, defendant MEIR ABERGIL, UC-1, Benharosh, and others met at the David Intercontinental Hotel in Tel Aviv, Israel.

14.   On February 6, 2002, UC-1 entered the lobby of the David Citadel Hotel, Jerusalem, Israel.

15.   On February 7, 2002, defendant BARASHY reserved rooms at the Inbal Hotel in Jerusalem, Israel.

16.   On February 11, 2002, Maximov departed Israel for Romania.

17.   On February 18, 2002, by telephone from Acapulco, Mexico, Benharosh told UC-1 that Maximov needed to be held until "he solve[d] his problems."

12

18. On March 11, 2002, by telephone, defendant BARASHY and Benharosh discussed a person who, on behalf of the Enterprise, was watching Maximov in Bucharest, Romania.

19. On April 24, 2002, in Bucharest, Romania, Benharsosh met with UC-1, Maximov, and others at the Marriott Grand Hotel.

20. On April 26, 2002, defendant BARASHY left Israel for the Netherlands.

21. On April 27, 2002, Benharosh left Israel for the Netherlands.

22. On April 29, 2002, defendant BARASHY and Benharosh arrived in Miami, Florida, on Northwest Airlines Flight 57, and met with Hai Waknine.

23. In May 2002, in Israel, co-conspirators gave Assaf Waknine $1,350,000 in proceeds from the embezzlement from the Tel Aviv Trade Bank.

24. On May 2, 2002, defendant ITZHAK ABERGIL and defendant MEIR ABERGIL left Israel for Romania.

25. On May 2, 2002, from a bank in Mexico, Benharosh and Hai Waknine wire-transferred $75,000 to Commercial Bank of Florida, account number #XXXXXXXX91, in the name of Hadad.

26. On or about May 3, 2002, Benharosh caused the transfer of $280,000 and $920,000, approximately, from a Bank Hapoalim account in Israel, in the name of "Amir Elad," to a Bank Hapoalim account in Miami, Florida.

27. On or about May 5, 2002, in Miami, Florida, Benharosh provided Hadad and Atia with approximately $250,000.

28. On May 6, 2002, in Miami, Florida, Benharosh threatened to kill Atia if he did not repay the $250,000 that had been

13

loaned to him on May 5, 2002.

29. On May 7, 2002, Benharosh gave Hadad a $250,000 check drawn on a Bank Hapoalim account number XXXXXXX006 in the name "Amir Elad."

30. On or about May 7, 2002, from a Bank Hapoalim account in the name "Amir Elad," Benharosh caused a wire transfer in the amount of $500,000 to be sent to Comerica account number XXXXX238 an account belonging to Nettie Becker Escrow Company in Los Angeles, California.

31. On May 9, 2002, from a Bank Leumi account in Jerusalem, Israel, Benharosh caused a wire transfer in the amount of $450,000 to be sent to the City National Bank account of 522 Landfair LLC, 400 North Roxbury Drive, Beverly Hills, California.

32. On May 10, 2002, Hai Waknine instructed an employee at Nettie Becker Escrow Company to send a company check in the amount of $500,000 to Exclusive, Inc., Los Angeles, California.

33. On May 13, 2002, Hai Waknine and Benharosh caused $500,000 to be deposited into Wells Fargo Bank, account number XXXX-XXXX483, in the name of Exclusive, Inc.

34. On May 15, 2002, Maximov possessed the phone number of defendant MEIR ABERGIL.

35. On May 22, 2002, Hai Waknine and Benharosh caused a wire transfer of $450,000 from the 522 Landfair LLC account at City National Bank to Wells Fargo Bank, account number XXXX-XXXX483, in the name of Exclusive, Inc.

36. On June 28, 2002, Hai Waknine caused Hadad to wire-transfer $45,000 from Commercial Bank of Florida, account number #XXXXXXX891, to Banco De Credito Del Peru, for the benefit of

14

Enrique Itamar Con Noldauer, account #XXXXXXXXXXX154.

37. On July 15, 2002, Hai Waknine caused the Commercial Bank of Florida to process check #929, in the amount of $180,000, drawn on Commercial Bank of Florida, account number #XXXXXXX891, in the name of Hadad.

38. On July 15, 2002, Hai Waknine caused the Commercial Bank of Florida to issue cashier's check number #086218, in the amount of $180,000, and made payable to the client trust account of a California attorney.

39. On July 25, 2002, Hai Waknine caused check #979, in the amount of $80,000, drawn on Commercial Bank of Florida, account number #XXXXXXX891, in the name of Eli Hadad, to be made payable to the client trust account of a California attorney.

40. On or about December 1, 2002, by telephone, defendant ITZHAK ABERGIL, Benharosh, and a female discussed the testimony of Maximov and that Maximov stated that he was not kidnaped.

41. On December 2, 2002, Hai Waknine purchased round trip airline tickets for defendant MEIR ABERGIL and for himself in order to travel from Acapulco, Mexico, to Mexico City, Mexico.

42. On December 3, 2002, defendant MEIR ABERGIL and Hai Waknine traveled together from Acapulco, Mexico, to Mexico City, Mexico and then returned to Acapulco, Mexico.

43. On February 12, 2003, Hai Waknine caused check number #413, in the amount of $174,983, drawn on City National Bank, account number #XXXX705, a California attorney's client trust account, to be made payable to "Gabriel Harroch."

44. On April 3, 2003, defendant ITZHAK ABERGIL and an unindicted co-conspirator ("UC-3") arrived in Miami, Florida on

15

Swiss Air Flight 64 from Zurich, Switzerland.

45.   On April 13, 2003, defendant EL-AL arrived in Atlanta, Georgia, aboard Delta Airlines flight #109 from Madrid, Spain.

46.   On April 13, 2003, defendant EL-AL arrived in Los Angeles, California, aboard Delta Airlines flight #459 from Atlanta, Georgia.

47.   On April 14, 2003, by telephone in Las Vegas, Nevada, Benharosh instructed defendant BARASHY that Benharosh had sent defendant EL-AL to Los Angeles to collect money.

48.   On April 21, 2003, by telephone, defendant BARASHY and Hai Waknine confirmed plans to travel from Los Angeles, California, to Miami, Florida, the following day.

49.   On April 21, 2003, by telephone, defendant BARASHY and Benharosh discussed defendant ITZHAK ABERGIL being in Miami, Florida, waiting for defendant BARASHY to arrive.   Benharosh directed defendant BARASHY to update defendant ITZHAK ABERGIL.

50.   On April 21, 2003, in Miami, Florida, defendant ITZHAK ABERGIL obtained a driver's safety certificate from the State of Florida.

51.   On April 23, 2003, defendant BARASHY and Hai Waknine arrived in Las Vegas, Nevada, aboard America West flight #879 from Los Angeles, California.

52.   On April 24, 2003, defendant BARASHY, defendant EL-AL, and Hai Waknine arrived in Miami, Florida, aboard America West flight #559 from Las Vegas, Nevada.

53.   On April 24, 2003, by telephone, defendant BARASHY updated Benharosh by telling Benharosh that defendant ITZHAK ABERGIL was there and defendant ITZHAK ABERGIL knew his job.

16

54. On April 24, 2003, by telephone, defendant ITZHAK ABERGIL instructed defendant BARASHY to tell Hadad that defendant ITZHAK ABERGIL did not care with whom Hadad was friendly, that defendant ITZHAK ABERGIL was friendly with Benharosh, and that Hadad should bring the money he owed.

55. On April 24, 2003, by telephone, defendant BARASHY and Hai Waknine spoke to defendant ITZHAK ABERGIL about the collection of money from Hadad and how Hadad had put up his house as collateral for debts owed to the Enterprise.

56. On April 24, 2003, by telephone, defendant BARASHY told Benharosh that defendant ITZHAK ABERGIL settled the collection of money from Hadad, and that Hadad took responsibility for the debts owed by Hadad and Atia to the Enterprise.

57. On April 25, 2003, in the lobby of the Sheraton Bal Harbour Hotel, Bal Harbour, Florida, defendant ITZHAK ABERGIL, defendant BARASHY, defendant EL-AL, and others met with Hadad.

58. On April 25, 2003, defendant BARASHY and Hai Waknine, in the company of Hadad, entered the SunTrust Bank Building on Hollywood Boulevard, Hollywood, Florida.

59. On April 25, 2003, by telephone, defendant BARASHY told Benharosh that Hadad would pay "the entire fund, every shekel that you gave him, and he signed his house." Benharosh then instructed defendant BARASHY to update defendant ITZHAK ABERGIL on Hadad's agreement to pay the money owed to the Enterprise.

60. On April 25, 2003, by telephone in Miami, Florida, defendants BARASHY and EL-AL spoke to Benharosh about obtaining a check and about defendant EL-AL's excitement over defendant ITZHAK ABERGIL being present with them.

61.  On April 25, 2003, by telephone, Hai Waknine left a voicemail message on the home answering machine of Keuylian.

62.  On April 27, 2003, defendant BARASHY arrived in Las Vegas, Nevada, aboard America West flight #774 from Miami, Florida.

63.  On April 28, 2003, defendant EL-AL and Hai Waknine visited Keuylian at his place of business in and around Beverly Hills, California.

64.  On April 29, 2003, by telephone, Benharosh told defendant BARASHY to tell Keuylian that Keuylian should stand by his word and pay the debt.

65.  On April 29, 2003, by telephone, defendant BARASHY urged Keuylian's father to pay off his debt to Benharosh and told Keuylian's father that Keuylian would have to answer to Benharosh even though defendant BARASHY did not like that Keuylian's father had received threats against both himself and his family.

66.  On April 29, 2003, by telephone, defendant BARASHY told Hai Waknine that Keuylian said that Keuylian deposited $650,000 in a bank in order to pay Benharosh and that Hai Waknine threatened to kill Keuylian's wife and son.

67.  On April 30, 2003, Hai Waknine caused a $652,852 wire transfer to issue from Wells Fargo Bank, account number #XXXXXXX736, in the name of "Keuylian Children's Trust," to City National Bank, account number #XXXX705, a California attorney's client trust account.

68.  On May 1, 2003, by telephone, an unindicted co-conspirator ("UC-4") told defendant BARASHY that defendant EL-AL and UC-4 did not consider Keuylian's debt to have been paid, and

18

that Hai Waknine did not consider the Keuylian matter to be closed.

69.    On May 1, 2003, by telephone, defendant BARASHY and UC-4 discussed that Keuylian had given Hai Waknine $650,000 of the $1.6 million that Keuylian owed to Benharosh.  Defendant BARASHY also told UC-4 that Keuylian would provide two cars to Hai Waknine and one car to Benharosh.

70.    On May 1, 2003, by telephone, defendant BARASHY and Benharosh discussed that Keuylian still owed money and perhaps should travel to Spain.

71.    On May 2, 2003, by telephone, defendant BARASHY and defendant EL-AL discussed their efforts in collecting money from Keuylian.

72.    On May 2, 2003, Hai Waknine caused check number #417, in the amount of $652,812, to be drawn on City National Bank, account number #XXXX705, a California attorney's client trust account, and made payable to "Gabriel Harroch."

73.    On May 6, 2003, in Los Angeles, California, defendant ITZHAK ABERGIL applied for a California Driver's License in the name "Itzhak Abergel."

74.    On May 6, 2003, by telephone, defendant BARASHY told his wife about getting a driver's license that day for the "Big Friend."

75.    On May 6, 2003, Hai Waknine caused $45,000 to be wire-transferred from Wells Fargo Bank, account number #XXXXXXX736, in the name "Keuylian Children's Trust," to City National Bank, account number #XXXX705, a California attorney's client trust account.

19

76. On May 7, 2003, Hai Waknine caused check number #418, in the amount of $44,988, to be drawn on City National Bank, account number #XXXX705, a California attorney's client trust account, and made payable to "Gabriel Harroch."

77. On May 10, 2003, by telephone, defendant BARASHY told Hai Waknine that defendant BARASHY would dissuade Keuylian's father from going to the police.

78. On May 10, 2003, by telephone, defendant BARASHY told Hai Waknine that Keuylian's father was not going to the police. Defendant BARASHY told Hai Waknine that Keuylian's father cannot tell the police anything.

79. On May 17, 2003, by telephone in Spain, Benharosh and defendant BARASHY discussed that Hai Waknine owed money and that Benharosh and defendant BARASHY needed to maintain pressure on Hai Waknine in order to make Hai Waknine pay his entire debt.

80. On May 17, 2003, by telephone in Spain, Benharosh, and Hai Waknine discussed transferring $150,000 from Hai Waknine's bank account to Benharosh's BBVA bank account in Spain.

81. On May 18, 2003, by telephone, defendant BARASHY and Benharosh discussed that Hai Waknine had sent money to Benharosh, and that Hai Waknine told defendant ITZHAK ABERGIL that Hai Waknine would write a check by Friday.

82. On May 19, 2003, Hai Waknine arrived in Miami, Florida, aboard America West flight #555 from Las Vegas, Nevada.

83. On May 20, 2003, by telephone, Hai Waknine complained to defendant BARASHY that Hadad only had $100,000 that Hadad was prepared to give in two installments to Hai Waknine.

84. On May 21, 2003, by telephone, Benharosh told defendant

20

BARASHY that Hai Waknine needed to bring him $2,000,000 and then Benharosh would see how much Hai Waknine still owed.

85.   On May 21, 2003, by telephone in Spain, Benharosh told an unindicted co-conspirator that Benharosh's partners were defendant ITZHAK ABERGIL and defendant MEIR ABERGIL.

86.   On May 22, 2003, by telephone in Spain, Benharosh told his wife that Maximov had received money from Benharosh and had not paid it back.

87.   On May 22, 2003, by telephone, defendant EL-AL told Benharosh, in Spain, that Hai Waknine collected $100,000 in Miami.

88.   On May 22, 2003, by telephone in Spain, Benharosh told defendant EL-AL that Hai Waknine promised defendant ITZHAK ABERGIL that Hai Waknine would repay the money owed by Hai Waknine to the Enterprise, and that defendant ITZHAK ABERGIL should pressure Hai Waknine to repay the money.

89.   On May 22, 2003, Hai Waknine and Beharosh caused a City National Bank cashier's check, dated May 21, 2003, in the amount of $50,000, to be deposited in the client trust account of a Florida attorney.

90.   On May 27, 2003, Hai Waknine and Benharosh caused City National Bank cashier's check #XXXXXX374, in the amount of $500,000, made payable to "Gabriel Harroch," to be deposited in an account at the Banco de Andalucia in Spain.

91.   On May 27, 2003, Hai Waknine and Benharosh caused City National Bank cashier's check #XXXXXX375, in the amount of $152,812, made payable to "Gabriel Harroch," to be deposited in an account at the Banco de Andalucia in Spain.

21

92. On May 27, 2003, Hai Waknine and Benharosh caused City National Bank cashier's check #XXXXXX411, in the amount of $44,988, made payable to "Gabriel Harroch," to be deposited in an account at the Banco de Andalucia in Spain.

93. On May 27, 2003, by telephone, defendant BARASHY told UC-4 that defendant BARASHY would bring defendants ITZHAK ABERGIL and EL-AL into the discussion regarding money loaned by the Enterprise.

94. On May 28, 2003, by telephone, UC-4 told defendant BARASHY that Keuylian's check in the amount of $700,000 had bounced.

95. On May 28, 2003, by telephone, defendant BARASHY told Hai Waknine to call Benharosh and determine whether the problem with the bounced check had to do with Benharosh's account in Spain.

96. On May 28, 2003, by telephone in Las Vegas, Nevada, defendant BARASHY told Hai Waknine that defendant ITZHAK ABERGIL had checked his accounts and had spoken with defendant MEIR ABERGIL and that Hai Waknine still owed $1,350,000.

97. On May 30, 2003, by telephone in Spain, Benharosh and defendant BARASHY discussed amounts of money "they" gave to Hai Waknine, Keuylian, Hadad, Atia, and a jeweler in Los Angeles, California.

98. On June 2, 2003, Hai Waknine arrived in Los Angeles, California aboard America West flight #29 from Miami, Florida.

99. On June 3, 2003, by telephone in Los Angeles, California, defendant EL-AL spoke to Hai Waknine about how Assaf Waknine needed to take responsibility for the money he had lost.

22

100. On June 4, 2003, by telephone, defendant BARASHY asked his wife to read to him figures written on a collections tally sheet.

101. On June 4, 2003, by telephone in Spain, Benharosh told defendant EL-AL to fix the problem with Hai Waknine for him and to collect as much of the money as defendant EL-AL could.

102. On June 5, 2003, by telephone, Hai Waknine asked a California attorney to contact a Florida attorney and provide wire transfer instructions to the Florida attorney.

103. On June 8, 2003, by telephone in Spain, Benharosh, told defendant MEIR ABERGIL the status of the money loaned to Atia in Florida and the attempts by members of the Enterprise to get the money back.

104. On June 16, 2003, by telephone in Las Vegas, Nevada, defendant BARASHY spoke with Hai Waknine and Benharosh, who were traveling to Morocco, and Benharosh instructed defendant BARASHY to speak with Keuylian and either transfer a car to Benharosh, or send Benharosh a check for the amount of the car.

105. On June 18, 2003, Hai Waknine caused $50,000 to be wire-transferred from Union Bank of Florida, account number #XXXX59, in the name of a Florida attorney, to a California attorney's client trust account.

106. On June 19, 2003, Hai Waknine and Benharosh arranged to have $147,000 wire transferred from City National Bank, account number #XXXXX05, a California attorney's client trust account, to Banque BMCI, Marrakesh, Morocco, account number #XXXXXXXXXXXXXXXXXXXXXX27, in the name of "Ben Harosh Gabriel."

107. On June 24, 2003, Hai Waknine and Benharosh caused

23

$147,000 to be wire transferred from City National Bank, account number #2105705, a California attorney's client trust account, to BBVA Bank, Plaza De Africa, 1 Pont 29600, Marbella, Malaga, Spain, account number #XXXXXXXXXXXXXXXXXXXX32, in the name "M. Gabriel Harroch."

108. On July 12, 2003, by telephone in Spain, Benharosh spoke to defendant ITZHAK ABERGIL about getting someone in Los Angeles to take care of "problems," and told defendant ITZHAK ABERGIL about the status of the loans to Keuylian, whom Benharosh referred to as one of the "Armenians."

109. On July 14, 2003, by telephone, defendant EL-AL told Benharosh, in Spain, that Hai Waknine would pay $15,000 per month of interest until he returned the $1,000,000 he owed. Benharosh told defendant EL-AL that if Hai Waknine did not pay, then their friend, defendant ITZHAK ABERGIL, "would take care of it."

110. On July 15, 2003, defendant ITZHAK ABERGIL arrived in Belgium from Malaga, Spain, on Virgin Airlines flight #841.

111. On July 23, 2003, by telephone in Los Angeles, California, Hai Waknine and defendant BARASHY spoke to Benharosh in Spain. Defendant BARASHY told Benharosh that defendant BARASHY was going to Keuylian "to finish the issue," and Benharosh told defendant BARASHY to explain to Keuylian that Hai Waknine owed lots of money to Benharosh, and that the car was a form of payment to Benharosh.

112. On July 30, 2003, by telephone, defendant BARASHY spoke to Hai Waknine and discussed the creation of a document to reflect how much money Hai Waknine paid and how much Hai Waknine owed to Benharosh.

24

113.   On July 31, 2003, by telephone, defendant BARASHY spoke to Hai Waknine and told Hai Waknine that defendant BARASHY wanted a written list of how much money Hai Waknine owed to Benharosh.   Hai Waknine informed defendant BARASHY that Hai Waknine would provide defendant BARASHY with money the following day.

114.   On August 5, 2003, by telephone, defendant EL-AL informed Benharosh, in Spain, that defendant EL-AL was solving the problem with Assaf Waknine and was speaking to Hai Waknine to finish the issue.

115.   On August 6, 2003, by telephone, Hai Waknine asked a California attorney about a promissory note in the amount of $400,000 from Hadad.

116.   On August 6, 2003, by telephone in Israel, Assaf Waknine spoke to defendant EL-AL about Assaf Waknine being called to a meeting with defendant MEIR ABERGIL, and trying to arrange for a $300,000 payment to defendant MEIR ABERGIL.

117.   On August 6, 2003, by telephone in Spain, Benharosh told defendant MEIR ABERGIL and Assaf Waknine about Assaf Waknine receiving $1,350,000 and not returning the money.   Benharosh wanted defendant MEIR ABERGIL to collect the money from Assaf Waknine.

118.   On August 7, 2003, by telephone in Spain, defendant ITZHAK ABERGIL spoke to an unindicted co-conspirator ("UC-5") regarding how some people received money that belonged to other people.   Defendant ITZHAK ABERGIL described how his brother, defendant MEIR ABERGIL, told people that defendant MEIR ABERGIL keeps defendant ITZHAK ABERGIL's money and how defendant ITZHAK

25

ABERGIL is upset because "his brother is not in charge of his money."

119. On August 7, 2003, by telephone in Los Angeles, Hai Waknine told his brother, Assaf Waknine, that they would be killed if they did not pay the $1,350,000 owed to the Enterprise.

120. On August 8, 2003, by telephone, defendant ITZHAK ABERGIL in Spain told defendant MEIR ABERGIL he had criminals around him all day, and that only criminals and other things yield results.

121. On August 10, 2003, by telephone, defendant BARASHY told Hai Waknine that defendant BARASHY acted as a "diplomat" for Hai Waknine with Benharosh. Defendant BARASHY also told Hai Waknine that defendant ITZHAK ABERGIL, defendant MEIR ABERGIL, and Benharosh were under a lot of pressure.

122. On August 10, 2003, by telephone, defendant BARASHY told Hai Waknine that after defendant BARASHY left the United States, Hai Waknine's problems with Benharosh would be seven times more difficult.

123. On August 10, 2003, by telephone in Israel, Assaf Waknine spoke to his mother about being in trouble with people and owing money because of his brother, Hai Waknine. Assaf Waknine told his mother that Assaf Waknine needed $300,000 to $400,000 quickly and asked his mother to help him find money in the United States to save his life.

124. On August 12, 2003, by telephone in Los Angeles, California, Hai Waknine told Assaf Waknine that "he" wanted Hai Waknine to pay $1,350,000.

125. On August 12, 2003, by telephone in Los Angeles,

26

California, Assaf Waknine told Hai Waknine that defendant MEIR ABERGIL wanted all the money returned in "one shot" on the next day.

126.    On August 13, 2003, by telephone in Los Angeles, California, Hai Waknine told Assaf Waknine about Assaf Waknine being called to a meeting with "both of your friends" about the money.

127.    On August 13, 2003, by telephone in Los Angeles, California, Hai Waknine told defendant EL-AL that Hai Waknine owed $1,350,000 and that Hai Waknine would pay $350,000 and $15,000 per month until the debt was paid.

128.    On August 13, 2003, by telephone, defendant EL-AL told Hai Waknine, in Los Angeles, California, that defendant EL-AL would give $300,000 so that "they" do not kill Assaf Waknine.

129.    On August 14, 2003, by telephone, defendant EL-AL informed Benharosh, in Spain, that he finalized the issue and Benharosh will receive $350,000 the next day.

130.    On August 14, 2003, defendant BARASHY arrived in Zurich, Switzerland, aboard American Airlines flight #17 from New York, New York.

131.    On August 16, 2003, by telephone, defendant BARASHY and Benharosh discussed with Hai Waknine, in Los Angeles, California, that time had expired for Hadad to repay his debts, and that Hai Waknine needed to take Hadad's house so that Hadad and his family would sleep in the streets.

132.    On August 18, 2003, by telephone in Spain, defendant ITZHAK ABERGIL told defendant EL-AL that in every gang, each person has a role and that role comes naturally, without anyone

27

assigning roles.

133. On August 18, 2003, by telephone in Spain, defendant ITZHAK ABERGIL told defendant EL-AL that when someone wanted to kill defendant EL-AL with a bomb, the police did not find the bombers and they have to watch over defendant EL-AL.

134. On August 18, 2003, by telephone in Spain, defendant ITZHAK ABERGIL directed an unindicted co-conspirator to get money from others and distribute it among other members of the Enterprise.

135. On August 18, 2003, by telephone in Israel, Assaf Waknine explained to a businessman in Arizona that Assaf Waknine and Hai Waknine owed $1.35 million, that Assaf Waknine and Hai Waknine took $1,000,000 to Los Angeles, and that Assaf Waknine lost $350,000.

136. On August 21, 2003, by telephone in Los Angeles, California, Hai Waknine told an unindicted co-conspirator ("UC-6") and UC-6's father that Hai Waknine had big problems with Benharosh and other co-conspirators, and that Assaf Waknine had been grateful for the $100,000 given to Assaf Waknine by UC-6 and UC-6's father so that Assaf Waknine would not be killed.

137. On August 21, 2003, by telephone, Hai Waknine told Hadad that he was "sick in the head" for trying to re-negotiate repayment of a loan.

138. On August 22, 2003, by telephone in Spain, defendant ITZHAK ABERGIL told an unindicted co-conspirator ("UC-7") that people, including defendant ITZHAK ABERGIL's brother, defendant MEIR ABERGIL, needed to know who gives the orders.

139. On August 22, 2003, by telephone in Spain, defendant

28

ITZHAK ABERGIL told UC-7 that defendant ITZHAK ABERGIL knew how to manage criminal operations and that defendant ITZHAK ABERGIL would use force against rivals.

140.  On September 3, 2003, by telephone, Hai Waknine discussed with an unindicted co-conspirator ("UC-8") a plan to interfere with Keuylian's car dealership.

141.  On September 5, 2003, by telephone, Hai Waknine and UC-8 discussed the need to talk to a DMV investigator about Keuylian's car dealership.

142.  On September 7, 2003, by telephone in Los Angeles, California, Hai Waknine told Benharosh about a plan to revoke Keuylian's dealership license.

143.  On September 8, 2003, by telephone in Los Angeles, California, Hai Waknine told defendant MEIR ABERGIL that Hai Waknine would send defendant MEIR ABERGIL money the next day and apologized for the problems caused by Assaf Waknine.

144.  On September 9, 2003, by telephone in Los Angeles, California, Hai Waknine and Benharosh told Hadad that if Hadad did not then come up with $33,000, Hadad's house would be sold.

145.  On September 19, 2003, by telephone, Hai Waknine and Benharosh told Hadad that Hadad had to pay all of the money and Hai Waknine and Benharosh did not care about Hadad's situation.

146.  On September 19, 2003, a cashier's check from a Florida bank in the amount of $25,000 was drawn and, then, later, delivered to the client trust account of an attorney in Florida.

147.  On September 23, 2003, by telephone, Hai Waknine told Hadad that Hai Waknine just wanted to deliver the money owed by Hadad to Benharosh so that Benharosh would take the pressure off

29

Hai Waknine.

148. On September 23, 2003, by telephone, Hai Waknine told a Florida attorney, in reference to Hadad, that Hai Waknine was going to put a "note on his ass too, with interest," and Hai Waknine would just "double" it.

149. On September 25, 2003, Hadad delivered four checks, in the amounts of $250,000, $25,000, $8,000 and $3,000, to a Florida attorney.

150. On September 30, 2003, $250,000 was wire-transferred from the client trust account of an attorney in Florida to "M. Ben Harosh Gabriel."

151. On October 16, 2003, a check drawn on the client trust account of an attorney in Florida, in the amount of $8,995, was deposited in to a Bank Leumi account number XXXXXXX606 in the name of Hai Waknine.

152. On October 18, 2003, by telephone in Los Angeles, California, Hai Waknine told Assaf Waknine that Hai Waknine received a message that if Assaf Waknine did not return the money, "they" were going to kill Assaf Waknine.

153. On October 18, 2003, by telephone, Hai Waknine told defendant MEIR ABERGIL that the money was available to him in Israel and promised to pay defendant MEIR ABERGIL the next day.

154. On November 1, 2003, by telephone, Hai Waknine spoke to Benharosh about how much money had been received by Benharosh and that Hai Waknine had been collecting money in the United States in order to send Benharosh a large amount of money.

155. On November 1, 2003, by telephone, defendant ITZHAK ABERGIL was informed by Hai Waknine that defendant ITZHAK ABERGIL

should receive "the thing" in the mail any day now.  Defendant ITZHAK ABERGIL told Hai Waknine to keep his head into work and that if Hai Waknine continued to work with defendant ITZHAK ABERGIL and Benharosh, defendant ITZHAK ABERGIL would give Hai Waknine whatever he needed.

156.  On November 5, 2003, by telephone, Benharosh and Waknine agreed to collect money for defendant BARASHY's bail in a criminal case in Israel.

157.  On November 5, 2003, by telephone in Los Angeles, California, Hai Waknine told the wife of BARASHY, in Israel, to inform defendant BARASHY that Hai Waknine would send money for defendant BARASHY's bail in a criminal case in Israel.

158.  On November 12, 2003, defendant ITZHAK ABERGIL, defendant MEIR ABERGIL, and Benharosh caused Hai Waknine to issue a check from First International Bank in Tel Aviv in the amount of $330,000, with the funds drawn from a Citibank account in New York, New York.

159.  On May 5, 2004, by telephone, defendant ITZHAK ABERGIL and defendant EL-AL discussed a news article about the criminal charges against defendant BARASHY, defendant EL-AL, Benharosh, and Hai Waknine, and how defendant EL-AL was wanted in the case.

160.  On May 31, 2004, by telephone, defendant ITZHAK ABERGIL, in Belgium, called Israel to inquire about the new law in Israel on organized crime.

161.  In September 2004, in Belgium, defendant ITZHAK ABERGIL possessed the criminal complaint against defendant BARASHY, defendant EL-AL, Benharosh, and Hai Waknine, filed in the United States District Court for the Central District of

31

California.

All in violation of Title 18, United States Code, Section 1962(d).

# EXHIBIT 3

PROB 72
(11/96)

## UNITED STATES PROBATION OFFICE
## CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA | CASE NUMBER |
|---|---|
| Plaintiff | CR- 04-00373 |
| vs. | |
| Waknine, Hai | **DECLARATION OF VICTIM LOSSES** |
| Defendant | |

I, Viken Keuylian _____, residing at _(withheld for safety concerns)_, in the city (or county) of_____, in the state of _____, zip____, am a victim in the above-referenced case and I believe that I am entitled to restitution in the total amount of $ _275,000.00_ .

My specific losses as a result of this offense are summarized as follows (attach receipts whenever possible):

_____ I have been compensated by insurance or another source with respect to all or a portion of my losses in the amount of $_____0_____. The name and address of my insurance company and the claim number for this loss is as follows:

I declare under penalty of perjury that the foregoing is true and correct.

_____
(Signature)

_(withheld for safety concerns)_
(Telephone No.)

Executed on
_29_ day of _July_, _2010_

(Additional Pages May be Attached)

170283

## DECLARATION OF VIKEN KEUYLIAN

I, Viken Keuylian, declare as follows:

1.    I am the same person described in Attachment A to the plea agreement for defendant Hai Waknine. Mr. Waknine, introduced me to Gabi Benharosh, as a successful Israeli businessman rather than an organized crime member who was attempting to hide stolen money from the Israel National Police. At the time I was looking for investors to provide funds to purchase vehicles, and Mr. Benharosh agreed to invest in my company and gave my company $950,000, by wire and check. Per the agreement, I purchased six vehicles with the funds, but was unable to sell them for the profit that was contemplated due to changing market conditions.

2.    As described in Waknine's plea agreement, in March 2003 I was visited at my dealership by Mr. Waknine and three other thugs who came to collect the loan I had received from Benharosh. Their appearance was ominous and El-Al showed me scars on his leg from a bomb and implied that if I did not immediately repay the money something similar would happen to me. Later in a voice mail, Waknine told me that if I didn't immediately pay, they would come and take two million dollars from me.

3.    In response to these threats, in April 2003, at the direction of Waknine, I transferred substantial sums as described in Attachment A.

4.    A the time that I accepted the loan from Benharosh, I did not know that I was dealing with the Israeli organized crime, commonly called the Israeli mafia. I genuinely believed that I could purchase automobiles with the funds

170284

loaned to me, sell them at a profit, share the profit with Benharosh, and repay the loan. The multiple transfers made by me after the visits from the "thugs" were a direct result of the threats made to me.

5.      As the court can see from Attachment A, it turns out that I received illegal money from Israel through the Israeli mafia that disguised itself as legitimate businessmen. After I had been threatened, I engaged in multiple transfers of money back to the very people who gave me the original money. From the outside, it would appear that I was engaged in some form of money laundering disguising illegal money from Israel and returning the money to various members of the Israeli mafia. In fact, I was a victim of extortion and serious threats.

6.      As a result of the transactions in which I engaged under threat of injury, I was investigated by the United States government which believed at that time that I might be a party to money laundering. Because of these transactions, I was charged with serious federal felonies which could have resulted in me spending the rest of my life in prison.

7.      I was not in Los Angeles at the time that an arrest warrant was issued for me and federal agents came to my home. When I learned of the arrest warrant, I knew that I had to retain reputable criminal counsel to defend me against the charges which I faced. These charges were an understandable and predictable result of the various financial transaction in which I engaged as a result of the threats from the Israeli mafia.

8.      I retained Joseph Cavallo, a well known Orange County criminal

2

lawyer, to handle the entire matter. Mr. Cavallo charged me a flat, non-refundable
retainer of $275,000 for legal representation and investigative services. Mr.
Cavallo contracted to handle the entire matter whether it got dismissed, settled, or
tried to a full trial. There was no arrangement for Mr. Cavallo to be paid by the
hour. Mr. Cavallo immediately intervened in the case, and after meetings with
agents and the United States Attorney's Office, convinced the government that I
was in fact an innocent victim of extortion and not a member of Israeli organized
crime. Mr. Cavallo obtained the dismissal of all charges against me, and arranged
for me to become a government witness. Mr. Cavallo met with government
agents and me while I was debriefed in preparation for testimony.

9.      At the trial Hai Waknine in front of the Honorable Manuel L. Real,
I testified as a government witness, thereby seriously endangering my safety and
the safety of my family. I testified and during the trial, Mr. Waknine entered a
guilty plea to two charges as part of a case settlement.

10.     At Mr. Waknine's sentencing, Judge Real ordered $275,000 of
restitution for me to compensate me for the legal services and investigative
services required as a result of Mr. Waknine's conspiracy and extortion. Due to
the passage of time, I have difficulty in producing paperwork evidencing the entire
$275,000 payment, however, I remember clearly that the total amount of money
paid Mr. Cavallo was $275,000.

11.     I have attached proof of $200,000 which I paid Mr. Cavallo. The
court will see my bank statement of April 30, 2004, which shows three checks,
2552, 2553, and 2554, totaling $150,000. Also attached are the three cashier's

3

170286

checks which were purchased with the three $50,000 withdrawals. The statement also shows an April 13, 2004, withdrawal of $50,000 which was purchased with the $50,000 April 13th cash withdrawal. The notation on the cashier's check that it replace check 2553 is incorrect. The documentation indicates that check 2553 cleared the account on April 9, 2004, whereas the $50,000 withdrawal occurred four days later on April 13, 2004.

12. I have been unable to produce the documentation or reconstruct the balance of $75,000 that I paid Mr. Cavallo. I approached Mr. Cavallo to obtain documentation but he was uncooperative. Through my counsel I inquired of the government whether it could produce the original paperwork used to make a submission to Judge Real, but the government seemed neither to be able to locate it or recall where that documentation would be. However, there is no question in my mind that the total amount paid to Mr. Cavallo was $275,000.

13. As the court can see from the scheme outlined in Attachment A, I was put in the middle of an Israeli mafia money laundering scheme which made it appear to the government that I was in fact criminally involved rather than an innocent victim. As a result of the nature of the crimes, I was understandably indicted. I found it absolutely necessary to employ counsel to save me from possibly a lifetime in prison, and had no experience in employing criminal counsel. The arrangement with Mr. Cavallo appears to be similar to many other arrangements of which I now have knowledge, and I understand it is customary for some criminal lawyers in Orange County to charge flat, non-refundable fees. I did not ask for any refund from Mr. Cavallo because I believe he acted

4

170287

competently and efficiently in obtaining a dismissal of the charges against me, and assisting me to cooperate as a government witness.

14.    Because I had to spend $275,000 out of my own funds to protect me as a result of Mr. Hai Waknine's criminal conduct, I ask the court to order Mr. Hai Waknine to pay me $275,000 as restitution.

15.    I understand that Mr. Waknine faces deportation after sentencing in this matter. I ask the court to make sure that Mr. Waknine pays whatever restitution the court orders prior to accepting the plea agreement between the government and Mr. Waknine.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __27__ day of July, 2011, at Los Angeles, California.

_____
VIKEN KEUYLIAN

5

170288

<u>Attachment A to Statement of Hai Waknine</u>

Defendant Hai Waknine ("defendant") admits that, as alleged in count eight of the superseding indictment, in the Central District of California, defendant conspired with others to launder money in violation of 18 U.S.C. §§ 1956(h) and 1956(a)(1)(B)(i). Defendant, Gabi Benharosh, Sasson Barashy, Yoram El-Al and others committed the following overt acts to accomplish the conspiracy and in furtherance of the conspiracy:

In early 2002 and before, Gabi Benharosh ("Benharosh"), Sasson Barashy ("Barashy"), and others, were "gray market" money lenders and debt consolidators. In early 2002, monies that were embezzled from a financial institution in Israel (the "Trade Bank") were laundered to Benharosh and Barashy through a series of financial transactions that occurred in Israel ("embezzled funds"). In early 2002, Benharosh transferred proceeds of embezzled funds from his accounts in Israel to accounts of financial institutions in the United States, and also traveled to the United States with cash representing proceeds of embezzled funds.

With the assistance, aid and agreement of defendant, who was aware that the source of the loans was proceeds from embezzled funds, Benharosh made loans to Eli Hadad and Yossef Atia in, Miami, Florida, and later, to Viken Keuylian, in Los Angeles, California. The source of these loans was, in fact, proceeds of embezzled funds. During all relevant times of the conspiracy, defendant was aware that the loans to Hadad and Keuylian were a means to conceal Benharosh's ownership of the money in order to hide the money from the Israel National Police.

Yosef Atia ("Atia") would testify that in early 2002, in Florida, Atia introduced Benharosh and defendant to Hadad. Hadad tried to get Benharosh and defendant to invest in real estate deals in South Florida. During Benharosh's first visit in March, 2002, Atia was asked to find apartments in Miami for Benharosh, Barashy and defendant. During a second trip with defendant, Hadad took Benharosh and defendant to look at various "real estate projects" while Barashy joined Atia and another person at a United States Customs seized goods auction.

In 2002, Atia owed money to Benharosh and creditors in Israel. After arrangements were made to send money to Israel on Atia's behalf, in 2002, Atia recalls going with Hadad to defendant's apartment in Miami, Florida. After getting to the apartment, defendant, Benharosh, Hadad and Atia went out on the balcony to talk. At some point, Benharosh took Atia aside and told him that Benharosh wanted his money back, stating, "I want



1

you to return my money. You took money from people." Benharosh added that he wanted the money back by the following morning or, as Atia interpreted it, Atia would be harmed.

The next morning, Atia saw Benharosh, who acted like nothing had happened and appeared friendly. A day later, Atia and Hadad took Benharosh to the airport. Atia recalls Benharosh handing a check from a financial institution[1] to Hadad.

At all relevant times during the conspiracy, Atia, like defendant, was aware that Benharosh was loaning money in order for Benharosh to hide the proceeds of embezzled funds that were under Benharosh's control. In early 2002, Atia recalls that the embezzlement from the Trade Bank was reported on an Israeli news channel in the United States around the time of Benharosh's visit to Miami. Four or five days later, Atia received a series of calls from Benharosh renewing his threats if Atia did not repay the money. Micha Aslan, who Atia believed was Benharosh's partner, called Atia and told him to pay the money back. Atia was unable to repay his part of the loan from Benharosh, and fled the United States

Eliyahu Hadad, a real estate investor in Miami, would testify that in May 2002, Atia introduced him to defendant and Benharosh. On May 3, 2002, Hadad would testify he received a wire transfer from a financial institution of $75,000 which was an initial "good faith" loan payment from Benharosh and defendant in support of future business dealings. On May 7, 2002, Hadad received a cashier's check for $250,000 drawn on Benharosh's "Amir Elad" account at a financial institution in Israel. Hadad spent part of these monies on renting apartments in the Miami area and an investment of United States Customs seized clothing. Hadad also learned from Atia, his partner, that Atia had received money from Benharosh in Israel that had been sent to Atia's creditors in Israel.

After Atia fled the United States, Hadad was held responsible for the entire loan amounts given to Atia and Hadad from Benharosh and defendant. In late April 2003, defendant,

---

[1] The terms "financial institution," "City National Bank" and "Wells Fargo Bank" used herein are each a "financial institution" as that term is defined by 18 U.S.C. §§ 1956(c)(6); the term "financial transaction" used herein is a "financial transaction" as that term is defined by 18 U.S.C. § 1956(c)(4); and the term "proceeds" used herein are "profits" as that term is defined by United States v. Santos, 508 U.S. 507 (2008).



2

Barashy, Yoram El-Al, and Thanh Nguyen, came to Florida and summoned Hadad to a meeting at the Sheraton Bal Harbour Hotel. A note was given to Hadad by defendant guaranteeing that he would return from the meeting. At the Sheraton Bal Harbour, a co-conspirator, acted as, among other things, a "mediator," declaring that Hadad would pay $330,000 (at that point, Hadad had already paid part of the money back). Walking out of the mediation, El-Al showed Hadad scars he had sustained from a bomb blast inferring that Hadad could suffer a similar injury if he didn't pay. Following the "mediation," with the aid of defendant, Hadad was taken to Mark Cohen, one of defendant's lawyers, who drafted and executed documents, including a mortgage note, obligating Hadad to pay $336,000 ($6,000 for filing fees) unless the debt was paid after September 25, 2003, in which case the balance would be increased to $500,000. The defendant did not witness these events but accepts them.

DEA agents would testify about surveillance conducted on April 24 and April 25, 2003, including surveillance conducted on meetings between defendant, Barashy, Yoram El-Al, and other co-conspirators and Hadad, at attorney Mark Cohen's office in Miami and at the Sheraton Bal Harbor Hotel, Bal Harbor, Florida. At the hotel, one of the agents saw El-Al yelling at Hadad and pointing his finger at Hadad's chest. The defendant did not witness the yelling by El-Al but does object to these facts.

On May 8, 2002, as evidenced by subpoenaed bank records, Benharosh wire transferred $500,000 from his "Amir Elad" account to an account belonging to Nettie Becker Escrow Company in Los Angeles, California. An employee from the escrow company would testify that defendant had an account at the escrow company relating to real estate investments. On May 9, 2002, Benharosh wire transferred $450,000 to 522 Landfair LLC. Defendant was seeking to invest in real estate through 522 Landfair LLC.

Viken Keuylian, the owner of a Lamborghini car dealership in Beverly Hills, California would testify that in 2002 he told defendant that he was looking for investors to provide funds for the purchase of high-end vehicles. He also told defendant that he could purchase vehicles in Europe, convert them to United States specifications, sell the vehicles at his dealership, and split the profits with the investors.

Keuylian would testify that in May 2002 defendant introduced him to Benharosh and told him that Benharosh was a successful Israeli businessman who was in the construction business. Shortly thereafter, Benharosh agreed to give defendant $950,000 toward the purchase of six vehicles. Keuylian expected to turn a profit of between $40,000 and $70,000 per vehicle. Approximately one week later, defendant caused a wire transfer of

   3

$450,000 to Keuylian from Landfair LLC. Shortly thereafter, Keuylian received a $500,000 check from Nettie Becker Escrow. Keuylian imported the six vehicles and attempted to convert the vehicles, but encountered problems.

In March 2003, defendant, Barashy, El-Al, and Thanh Nguyen came to Keuylian's car dealership to collect the money that had been loaned to Keuylian by Benharosh. While a repayment contract would be drafted by lawyers, the group began to demand immediate repayment. El-Al showed Keuylian scars on his legs from the bomb blast and implied that something similar could happen to him if he did not cooperate with defendant. In a subsequent voicemail message sent to Keuylian's cell phone, defendant told Keuylian that if he didn't pay immediately, "they" would come and take $2,000,000. Keuylian contacted the Orange County Sheriff's Department after he received the threatening voicemail message and similar messages.

On April 30, 2003, in response to the aforementioned threats, at the direction of defendant, Keuylian wire transferred (1) $652,852 from Wells Fargo Bank ("WFB"), account number #XXXXXXX736, in the name of "Keuylian Children's Trust," to City National Bank ("CNB"), account number #XXXX705, of the trust account of a California attorney and (2) on May 6, 2003, Keuylian caused approximately $45,000 to be wire-transferred from WFB, account number #XXXXXXX736, to CNB, account number #XXXX705. In order to launder the funds extorted by Keuylian, as evidenced by subpoenaed bank records, (1) on May 2, 2003, defendant caused check number #417, in the amount of $652,812, to be drawn on CNB, account number #XXXX705, and made payable to "Gabriel Harroch" aka Benharosh and (2) on May 7, 2003, defendant caused check number #418, in the amount of $44,988, to be drawn on CNB, account number #XXXX705, and made payable to "Gabriel Harroch" aka Benharosh.

In order to further launder the extortion proceeds from Keuylian, in May 2003, defendant caused CNB cashier's checks #XXXXXX374, #XXXXXX375 and #XXXXXX411 in the amounts, respectively, of $500,000, $152,812, and $44,988 made payable to "Gabriel Harroch," to be created and, subsequently, delivered to Benharosh in Spain. As evidenced by subpoenaed bank records, Benharosh later deposited these checks in an account at the Banco de Andalucia in Spain.

Defendant knew that the monies that he transferred to and from the aforementioned accounts at CNB, WFB and Banco de Andalucia were proceeds from acts of extortion against Hadad and Keuylian. Defendant also knew that the financial transactions discussed above were designed in whole or in part to conceal or disguise the nature, location, source, and ownership of said proceeds.

4

170292

In March 2003, defendant, Barashy, El-Al, and Thanh Nguyen came to Keuylian's car dealership to collect the money that had been loaned to Keuylian by Benharosh. While a repayment contract would be drafted by lawyers, the group began to demand immediate repayment. El-Al showed Keuylian scars on his legs from the bomb blast and implied that something similar could happen to him if he did not cooperate with defendant. In a subsequent voicemail message sent to Keuylian's cell phone, defendant told Keuylian that if he didn't pay immediately, "they" would come and take $2,000,000. Keuylian contacted the Orange County Sheriff's Department after he received the threatening voicemail message and similar messages.

On April 30, 2003, in response to the aforementioned threats, at the direction of defendant, Keuylian wire transferred (1) $652,852 from Wells Fargo Bank ("WFB"), account number #XXXXXXX736, in the name of "Keuylian Children's Trust," to City National Bank ("CNB"), account number #XXXX705, of the trust account of a California attorney and (2) on May 6, 2003, Keuylian caused approximately $45,000 to be wire-transferred from WFB, account number #XXXXXXX736, to CNB, account number #XXXX705. In order to launder the funds extorted by Keuylian, as evidenced by subpoenaed bank records, (1) on May 2, 2003, defendant caused check number #417, in the amount of $652,812, to be drawn on CNB, account number #XXXX705, and made payable to "Gabriel Harroch" aka Benharosh and (2) on May 7, 2003, defendant caused check number #418, in the amount of $44,988, to be drawn on CNB, account number #XXXX705, and made payable to "Gabriel Harroch" aka Benharosh.

In order to further launder the proceeds from Keuylian, in May 2003, defendant caused CNB cashier's checks #XXXXXX374, #XXXXXX375 and #XXXXXX411 in the amounts, respectively, of $500,000, $152,812, and $44,988 made payable to "Gabriel Harroch," to be created and, subsequently, delivered to Benharosh in Spain. As evidenced by subpoenaed bank records, Benharosh later deposited these checks in an account at the Banco de Andalucia in Spain.

Defendant knew that the monies that he transferred to and from the aforementioned accounts at CNB, WFB and Banco de Andalucia were proceeds from acts of extortion against Hadad and Keuylian. Defendant also knew that the financial transactions discussed above were designed in whole or in part to conceal or disguise the nature, location, source, and ownership of said proceeds.

Defendant admits that United States Sentencing Guidelines § 2B1.1(b)(1)(I) is the value of the laundered funds involved in the conspiracy.





KEUYLIAN SPECIALTY ENTERPRISES LLC

PAGE 2 of 2
Account Number:           600-0337029
Statement End Date:       04/30/04

WITHDRAWALS AND DEBITS ------------------------------------------------------------

| DATE | TRANSACTION DETAIL | AMOUNT |
|---|---|---|
| APR 13 | | |
| APR 13 | WITHDRAWAL MADE IN A BRANCH/STORE | - 50,000.00 |
| APR 15 | | |
| APR 26 | | |
| APR 30 | | |

CHECKS PAID ------------------------------------------------------------

| CHECK # | DATE | AMOUNT | CHECK # | DATE | AMOUNT |
|---|---|---|---|---|---|
| 2487 | APR 19 | | 2565* | APR 05 | |
| 2547* | APR 01 | | 2566 | APR 26 | |
| 2552* | APR 05 | 50,000.00 | 2567 | APR 06 | |
| 2553 | APR 09 | 50,000.00 | 2568 | APR 21 | |
| 2554 | APR 20 | 50,000.00 | 2569 | APR 15 | |
| 2555 | APR 05 | | 2570 | APR 13 | |
| 2556 | APR 08 | | 2572* | APR 26 | |
| 2557 | APR 02 | | 2573 | APR 26 | |
| 2558 | APR 08 | | 2575* | APR 23 | |
| 2559 | APR 07 | | 2576 | APR 27 | |
| 2560 | APR 09 | | 2577 | APR 22 | |
| 2561 | APR 05 | | 2579* | APR 30 | |

* GAP IN CHECK SEQUENCE

DAILY BALANCE SUMMARY ------------------------------------------------------------

WELLS FARGO BANK STATEMENT.

170294



170295



170296

WELLS FARGO

Newport Coast Branch

21103 Newport Coast Dr.
Newport Coast, CA 92657

May 18, 2011

To Whom It May Concern:

We are unable to retrieve a better copy of check number 2553, dated 04/09/04, payable to Joseph G. Cavallo in the amount of $50,000.00.

Unfortunately, the camera was out of focus and a clearer copy is not available.

If you have any further questions, please feel free to contact me at 949-219-0457.

Sincerely,

Sandy Siegeler
Customer Service Manager

170297



**CASHIER'S CHECK**

SERIAL #: ▓▓▓▓▓▓
ACCOUNT #: ▓▓▓▓▓▓

13997    11-24
co AU #    1210(8)

Isser:    KEUYLIAN SPECIALTY ENTERPRISES
taser Account:  6000337029
itor I.D.:    cu011121    cu011121

April 13, 2004

TO THE ORDER OF    ***JOSEPH G. CAVALLO***
***RE: REPLACE CK#2553***

Fifty thousand dollars and no cents***

**$50,000.00**

LS FARGO BANK, N.A.
E CORPORATE BUSINESS CENTER
MAIN ST
E, CA 92614
NQUIRIES CALL (480) 394-3122

NOTICE TO PURCHASER – IF THIS INSTRUMENT IS LOST,
STOLEN OR DESTROYED, YOU MAY REQUEST CANCELLATION
AND REISSUANCE. AS A CONDITION TO CANCELLATION AND
REISSUANCE, WELLS FARGO BANK MAY IMPOSE A FEE AND
REQUIRE AN INDEMNITY AGREEMENT AND BOND.

VOID IF OVER US $  50,000.00

**NON-NEGOTIABLE**

**Purchaser Copy**

M4800

---

3997    11-24
e AU #    1210(8)

**CASHIER'S CHECK**

0399704419

or I.D.:  cu011121    cu011121

April 13, 2004

TO THE ORDER OF    ***JOSEPH G. CAVALLO***
***RE: REPLACE CK#2553***

Fifty thousand dollars and no cents***

**$50,000.00**

S FARGO BANK, N.A.
CORPORATE BUSINESS CENTER
MAIN ST
CA 92614
QUIRIES CALL (480) 394-3122

VOID IF OVER US $  50,000.00

AUTHORIZED SIGNATURE

⑈0399704419⑈ ⑆121000248⑆4861 505295⑈

170299

# EXHIBIT 4

No. 09-50360

IN THE

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

Petitioner-Appellee,

v.

HAI WAKNINE,

Defendant-Appellant.

APPELLANT'S OPENING BRIEF

APPEAL FROM
THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

JAMES W. SPERTUS
AMANDA R. TOUCHTON
LAW OFFICES OF JAMES W. SPERTUS
1990 South Bundy Drive, Suite 705
Los Angeles, California 90025
Telephone: (310) 826-4700

DAVID E. KENNER
THE KENNER LAW FIRM
16633 Ventura Boulevard
Suite 800
Encino, California 91436
Telephone: (818) 995-1195

Attorneys for Defendant-Appellant
HAI WAKNINE

I.

## QUESTION PRESENTED

Did the district court abuse its discretion by denying Appellant Hai Waknine's Motion to Withdraw his Guilty Plea where, due to the district court's repeated refusal to grant Mr. Waknine a necessary continuance to translate foreign language tapes produced on the eve of trial, Mr. Waknine was unable to translate critical, newly produced discovery that was later revealed to contain substantial evidence in support of Mr. Waknine's affirmative defense of duress?

II.

## STATEMENT OF THE CASE

### A.    NATURE OF THE CASE

Hai Waknine was indicted on charges of money laundering, racketeering, and conspiracy in connection with the Jerusalem Network, a deadly Israeli based criminal organization.  (CR 26)[1]  Although Mr. Waknine committed certain acts as alleged in the indictment, he was under threat of death to himself and his family members by members of the Jerusalem Network, during the entire course of the charged conspiracy.  (ER 46; CR 454.)  Shortly before trial, the government provided Mr. Waknine with 70 hours of taped conversations, conducted almost exclusively in Hebrew, between leading members of the Jerusalem Network and various persons, the "Israeli Intercepts."  (ER 54-55.)  It was undisputed that the Israeli Intercepts likely contained evidence that would support Mr. Waknine's duress defense.  Based on the difficulty the government had encountered trying to

---

[1] "CR" refers to the Clerk's Record and is followed by the docket control number. "RT" refers to the Reporter's Transcript of Proceedings, and is preceded by the applicable date and followed by page references.  "ER" refers to the Appellant's Excerpts of Record and is followed by the applicable page references.

1

recover the Israeli Intercepts from the Israeli government, and the time it would take to translate the tapes into English, the parties jointly requested a continuance of the trial date. (ER 61; CR 454.) The district court, the Honorable Manuel Real judge presiding, denied the stipulated request and Mr. Waknine's subsequent efforts to secure the necessary time to translate the Israeli Intercepts and forced Mr. Waknine to proceed to trial. (ER 29; 3/13/06 RT 22; CR 488.) Six days into the trial, Mr. Waknine entered a guilty plea. (CR 255.) At his sentencing, the district court refused to allow the government to be heard and miscalculated the restitution owed. Mr. Waknine appealed. (CR 320.) This Court reversed the district court, vacated Mr. Waknine's sentence and remanded his case to the district court. (CR 437; United States v. Waknine, 543 F.3d 546 (9th Cir. 2008.))

Between the time of Mr. Waknine's initial appeal and his remand for resentencing, the government filed a Second Superseding Indictment. (ER 82; CR 403.) Contained within the Second Superseding Indictment are numerous factual allegations which are clearly based on the Israeli Intercepts and which corroborate Mr. Waknine's duress defense. (ER 82; CR 403.)  For example, the Second Superseding Indictment contained allegations that the Jerusalem Network expected Hai and his brother Assaf Waknine to pay $1,350,000 or Assaf Waknine would be killed. (ER 94, 97; CR 403.) Based on this newly available evidence, Mr. Waknine moved to withdraw his guilty plea before his re-sentencing. (ER 33; CR 454.) The district court, applying an erroneous legal standard, denied Mr. Waknine's motion to withdraw his guilty plea and this appeal followed. (ER 10, 12; 7/1/09 RT 9,11; CR 473.)

## B.    JURISDICTION AND TIMELINESS OF APPEAL

The district court had jurisdiction pursuant to 18 U.S.C. § 3231; this Court has jurisdiction pursuant to 28 U.S.C. § 1291. Judgment was entered on July 1,

2

2009. (ER 1; CR 464.) Appellant filed a timely notice of appeal on July 10, 2009. (ER 32; CR 470.) This brief is filed within the allotted extensions provided by the Ninth Circuit. (CR 487, CR 496.)

### III.

### STATEMENT OF FACTS

#### A.    EARLY PROCEEDINGS

On April 6, 2004, an indictment was returned against Mr. Waknine and four other co-defendants, including Gabriel Benharosh. (CR 26.) Mr. Waknine, Benharosh, and others were charged with being members of the Jerusalem Network. (ER 183; CR 95.) Trial was set and continued for various reasons, including the filing of a First Superseding Indictment, with an eventual trial date of April 18, 2006. (CR 95.)

On March 7, 2006, Mr. Waknine learned for the first time that co-defendant Benharosh, undisputedly the "leader of the enterprise," was cooperating with the government and testifying against him. (ER 64; CR 454; ER 185-186; CR 95.) Mr. Benharosh's transformation from a co-defendant to a government witness generated a number of complex discovery issues, which required a continuance of the April 18, 2006 trial date. Specifically, Benharosh's plea reduced the chance that Benharosh could either retaliate against Mr. Waknine or direct other members of the Jerusalem Network to retaliate against Mr. Waknine's family in Israel. The threat against Mr. Waknine from Benharosh was very real. In December 2005, the case agent contacted Mr. Waknine and told him that the DEA had knowledge of credible death threats having been made against him. (ER 112-113, 8/14/06 RT 30-31.) After receiving information from the Government that his life was in danger, Mr. Waknine hired private security to protect him. (ER 108-110, 8/17/06 RT 20-22.) After Benharosh's guilty plea, Mr. Waknine's counsel alerted the

3

government and the district court of the nature of Mr. Waknine's intended duress
defense:

> . . . Waknine intends to assert that the conduct in the
> Superseding Indictment was the direct result of threats
> made by Benharosh toward Waknine and members of his
> family, including his brother Assaf Oiknine.[2]  In
> response to these threats, Waknine engaged in conduct
> which, while arguably unlawful, was designed both to
> placate Benharosh and prevent Benharosh from
> committing even more egregious offenses, including
> murder.

(ER 152-153; CR 229.)

## B.   THE ISRAELI INTERCEPTS WERE REQUESTED BY THE DEFENSE

In and around the time of Benharosh's plea, the government, for the first
time, informed the defense that it had access to intercepted conversations between
Benharosh and others that contained threats against Mr. Waknine and against Mr.
Waknine's brother, Assaf Waknine.  (ER 28; 3/13/06 RT 21; CR 488.)  The Israeli
government, however, had not yet provided the Israeli Intercepts to the
government.  (ER 70, CR 454.)  Mr. Waknine's counsel made a timely request to
the government for the production of the Israeli Intercepts.  (ER 169-170; CR 229.)

Initially, the government provided "line notes" of the Israeli Intercepts, but
not the Intercepts themselves.  (ER 70; CR 454)  The line notes clearly revealed
that the Israeli Intercepts contained threats by Benharosh to kill Mr. Waknine and
his brother if Mr. Waknine did not "assist" him in certain activities described in the
indictment.  (ER 155; CR 229.)  The line notes also revealed multiple calls
between Mr. Waknine's brother, Assaf Waknine, and others where Assaf Waknine

---

[2] Hai Waknine's brother is known as both Assaf Waknine and Assaf Oiknine and
both Mr. Waknine and the government used both names interchangeably in the
court below.

4

described being afraid for his life because of money he owed to Benharosh and others. (ER 71-73; CR 454.) The line notes, therefore, evidenced that the Israeli Intercepts were critical to establishing that Mr. Waknine acted under "an immediate threat of death or serious bodily injury to [himself] or a family member if he did not participate in the commission of the crime." Ninth Circuit Model Manual Jury Instructions No. 6.5. Duress (2009).

The defense repeatedly requested that the government provide the underlying tapes. (ER 70; CR 454.) The government agreed to provide the Israeli Intercepts, but had substantial difficulty recovering the Israeli Intercepts from Israeli officials. (ER 70, CR 454.)

## C.   THE PARTIES STIPULATED TO A CONTINUANCE TO ENABLE MR. WAKNINE TO RECEIVE AND TRANSLATE THE ISRAELI INTERCEPTS

Less than one month before the trial of this case, the government had yet to provide the Israeli Intercepts, or any other discovery relating to Benharosh required to be produced pursuant to Giglio v. United States, 405 U.S. 150, 154 (1972) or Brady v. Maryland, 373 U.S. 83, 87 (1963). (ER 64-65; CR 454.) Acknowledging that the defense was greatly hampered by the recent transformation of Benharosh from defendant to cooperator, and the need to produce significant additional materials, including the Israeli Intercepts, the government prepared a joint stipulation to continue the trial date from April 18, 2006 to August 14, 2006. In that stipulation, the government stated:

> Counsel for Mr. Waknine have been given the line sheets
> from a Title 3 wiretap in a related case . . . . Counsel for
> Mr. Waknine know that there is evidence contained in
> the tapes from that wiretap which will be helpful as
> impeaching material for Mr. Benharosh. It will be
> necessary for the government to turn those tapes over to
> the defense and translation and transcripts prepared . . . .

5

> [I]t is estimated that discovery related issues to Mr.
> Benharosh will take at least 60 days to resolve, possibly
> longer depending on the cooperation of Israeli officials.

(ER 64-65; CR 454.)  The defense further indicated that it wanted to take the deposition of Mr. Waknine's brother, Assaf Waknine, in Israel.  (ER 167, CR 229.) Assaf Waknine's deposition would have supplied critical evidence necessary for Mr. Waknine's duress defense because, among other things, Assaf Waknine would testify that Benharosh made death threats against him and his family and that Hai Waknine took over the responsibility for Assaf Waknine's debts in an effort to save Assaf Waknine's life.  (ER 174; CR 229.)

The parties presented the Stipulation to the district court, which reviewed and considered the Stipulation on March 13, 2006.  (ER 27; 3/13/06 RT 20; CR 488)  Counsel for Mr. Waknine further explained the critical importance of the Israeli Intercepts as follows:

> More importantly with the change of plea of Mr.
> Benharosh, there are now tape recordings which the
> government had given us line notes for, and those are
> tapes of Assaf Waknine and Hai Waknine.  We don't
> have the tapes yet. . . . Those conversations have to do
> with threats by the now cooperating codefendant, Mr.
> Benharosh, threats to kill Mr. Assaf Waknine, Hai
> Waknine's brother, threats to kill Mr. Hai Waknine and
> others if they didn't get this money together and various
> other monies that were owed by Mr. Waknine's brother.
> Those tapes now become very relevant under <u>Giglio</u> and
> <u>Brady</u>. . . . We met with the government before court
> today . . . and we were all hopeful that the court would
> give us the time that we need to prepare this case given
> the recent change in circumstances.

(ER 29; 3/13/06 RT 22; CR 488)  Although the district court acknowledged reading and considering the parties' Stipulation (ER 30, 3/13/06 RT 23; CR 488),

the district court denied the parties' joint request for a continuance without any indication that the court had considered the constitutional issues at stake: "Well I don't think there is anything older than this case, and so your motion for continuance is denied. We will go forward." (ER 29; 3/13/06 RT 22; CR 488.)

### D.  MR. WAKNINE REPEATEDLY REQUESTED A TRIAL CONTINUANCE

On March 27, 2006, Mr. Waknine filed an unopposed ex parte application to continue his trial date until September 12, 2006. (ER 149; CR 229.)  When Mr. Waknine filed his application, neither Mr. Waknine nor the government had possession of the Israeli Intercepts and the government could not give a time estimate for their production. (ER 155; CR 229.)  The parties further understood that the conversations contained on the Israeli Intercepts would be primarily in Hebrew and, therefore, require translation before Mr. Waknine and his counsel could review and evaluate the material. (Id.)  Mr. Waknine supplied a declaration of a court certified Hebrew interpreter indicating that every minute of tape required, at a minimum, one-half hour to prepare a translated transcript. (ER 172; CR 229.)  Mr. Waknine's counsel also simultaneously filed a motion to take the deposition of Assaf Waknine in Israel, indicating to the Court, "counsel for Waknine would be constitutionally ineffective if they failed to present this testimony at trial." (ER 156; CR 229.)

On March 28, 2006, the district court agreed to continue the trial date, but only until June 6, 2006. (ER 23-24, CR 229.)  On the order continuing the trial, the court wrote in longhand, "No Further Continuances." (Id.)  The court's brief continuance, however, did not address issues raised in Mr. Waknine's application, namely that the government still had not produced the Israeli Intercepts and actively maintained that it would take at least sixty days to get them. (ER 64-65; CR 454.)

The district court held a status conference on May 16, 2006 at which Mr. Waknine orally renewed his motion for a continuance explaining that he still did not have the Israeli Intercepts. At the status conference, counsel for Mr. Waknine explained:

> There were some tapes that went to the core of the defense that the government was acquiring from Israel that had to do with duress and the threats to kill both Mr. Waknine and his brother, those tapes we have been informed . . . have been provided or are being provided today by Israel by diplomatic powers to Washington, after which they'll be turned over to the government, at some point afterwards they'll be turned over to us. . . . Your honor we are somewhat between a rock and a hard place. A: I don't know what the volume of material is, and B: I think we certainly need to at least review it before we are prepared to start the trial in this matter.

(ER 20-21; 5/16/06 RT 14-15; CR 490.)  The district court denied Mr. Waknine's motion without discussion, "No, we're going to go to trial as set." (Id. at 21.)

On May 18, 2006, Mr. Waknine filed a written memorandum in support of his May 16, 2006 oral request for a continuance that set forth the critical importance of the Israeli Intercepts to Mr. Waknine's trial defense.  (ER 142; CR 243.)  Mr. Waknine implored the district court to allow him the opportunity to receive the tapes and to have them translated before being forced to start trial. (ER 145; CR 243.)  The government, despite its acknowledgement of the importance of the Israeli Intercepts and its earlier drafting and signing of a stipulation to continue the trial to August 14, 2006, filed a Reply to Mr. Waknine's request objecting to the continuance of the trial date, arguing that foreign witnesses had been subpoenaed. (ER 138; CR 244.)

8

E.   MR. WAKNINE FILED A WRIT OF MANDATE SEEKING A TRIAL
     CONTINUANCE

On May 19, 2006, just eighteen days before the June 6, 2006 trial date, the
government provided the Israeli Intercepts to Mr. Waknine.  (ER 42; CR 454.)
The Intercepts consisted of over 70 hours of taped conversations in DVD format.
(ER 54-55; CR 454.)  There were over 2,400 separate conversations, the vast
majority of which were in Hebrew.  (Id.)  Counsel immediately began making
copies of the transcripts for the interpreters.  (Id.)  The first day that the tapes were
available for the interpreters was Monday, May 22, 2006.  (Id.)  Realizing that the
interpreters could not possibly translate the tapes in sufficient time, on May 24,
2006, Mr. Waknine filed an emergency petition for a writ of mandate in this Court
contending that, if forced to trial, he would be denied a fair trial, the right to
adequate cross-examination and his right to the effective assistance of counsel.[3]
(ER 40; CR 454, Ex. B.)   Mr. Waknine's emergency petition was denied on June
1, 2006 because this Court concluded there were adequate appellate remedies.  (ER
137.)

F.   THE TRIAL AND GUILTY PLEA

Mr. Waknine's trial began on June 6, 2006.  The government witnesses
testified to the threatening and dangerous nature of the Jerusalem Network and
Benharosh.  Government witness Elyhau Hadad claimed that he was afraid for his
life to testify against Benharosh.  (ER 132-133; 6/7/06 RT 101-102; CR 492.)  Mr.
Hadad, did not state that he was afraid of Mr. Waknine and even admitted that after
the alleged extortion, he contacted Mr. Waknine and requested that Mr. Waknine

---

[3] Defendant requests that this Court take judicial notice of the Writ of Mandate
filed in this Court on May 24, 2006, Waknine, et al v. USDC-CAC, 06-72707
(June 1, 2006).

9

enter into a separate real estate transaction with him. (ER 134; 6/7/06 RT 125; CR 492.)

Government witness, Yosef Atia, testified that Benharosh threatened him: "Yes. Later on. All of a sudden Gabi [Benharosh] started talking to me in a threatening manner. He told me 'I will put interest on you that you will never be able to pay back." (ER 126; 6/8/06 RT 132 ; CR 493.) He further testified about how Benharosh sent people to threaten his life: "I believe it is Gabi, because Hai, he's nothing. Gabi sent Micha and Fernania Ohana (phonetic) - - two guys that were murdered like a year or two ago - - to threaten me to pay the money back, and they gave me 30 days." (ER 127; 6/8/06 RT 137, CR 493.) Atia testified that he would be killed if he did not pay Benharosh back the money he owed and that he took these threats seriously since he knew of others who were murdered. (ER 121-123; 6/9/06 RT 8-10; CR 292.) Government witness Vic Keulyian testified that Hai Waknine told him that Benharosh was pressuring Waknine to get the money from Keulyian. (ER 116-118; 6/13/06 RT 24-25; CR 294.)

The government's primary witness against Mr. Waknine was co-defendant Benharosh. Without access to the Israeli Intercepts, the defense's cross-examination of Benharosh was severely hampered. (ER 55; CR 454.) During the testimony of Benharosh, Mr. Waknine entered a plea of guilty to one count of racketeer influenced and corrupt organizations conspiracy in violation of 18 U.S.C. § 1962(d). (ER 118; 6/13/06 RT 56; CR 294.)

After his guilty plea, the threats against Mr. Waknine escalated. One of Benharosh's associates went to Mr. Waknine's home and waited outside, frightening Mr. Waknine so severely that he no longer felt safe staying in the same location. (ER 105-107, 8/17/06 RT 6-8.)

Despite a non-binding plea agreement in which the parties stipulated that 108 months was an appropriate sentence, the district court sentenced Mr. Waknine

10

to a term of 121 months. (ER 103, 9/11/06 RT 5; CR 485.) At Mr. Waknine's sentencing, the district court refused to allow the government to be heard, violating Federal Rule of Criminal Procedure ("FRCP") 32, and did not acknowledge the 18 U.S.C. 3553(a) factors in rendering sentence. United States v. Waknine, 543 F.3d 546 (9th Cir. 2008). Mr. Waknine appealed his sentence to this Court. (ER 100-101.)

## G.    THE SECOND SUPERSEDING INDICTMENT

On July 23, 2008, while Mr. Waknine's first appeal was pending, a Second Superseding indictment, bearing the same case number as Mr. Waknine's case and charging a number of common defendants with racketeering, extortion, money laundering and drug violations, was filed before Judge Real. (ER 82; CR 403.) A number of wiretapped conversations by the Israeli National Police of the same nature as the Israeli Intercepts later provided to Mr. Waknine provided the basis for the charges in the Second Superseding Indictment. Not only was the Second Superseding Indictment replete with claims that Benharosh had threatened to kill people if they did not repay loans and assist in collecting money, it referenced numerous conversations between Mr. Waknine, Assaf Waknine and others discussing the threats against Hai and Assaf Waknine if they did not comply with Benharosh's instructions. (ER 82; CR 403.) For example, with respect to threats made against Mr. Waknine and his brother Assaf, the Second Superseding Indictment alleges the following:

- On May 17, 2003, by telephone in Spain, Benharosh and Defendant Barashay discussed that Hai Waknine owed money and that Benharosh and Defendant Barashay needed to maintain pressure on Hai Waknine in order to make Hai Waknine pay his entire debt.

11

- On May 21, 2003, by telephone, Benharosh told Defendant Barashay that Hai Waknine needed to bring him $2,000,000 and then Benharosh would see how much Hai Waknine still owed.

- On May 22, 2003, by telephone in Spain, Benharosh told Defendant EL-AL that Hai Waknine promised Defendant Itzhak Abergil that Hai Waknine would repay the money owed by Hai Waknine to the enterprise and that Defendant Itzhak Abergil should pressure Hai Waknine to repay the money.

- On May 28, 2003, by telephone in Las Vegas, Nevada, Defendant Barashay told Hai Waknine that Defendant Itzhak Abergil had checked his account and spoken with Defendant Meir Abergil and that Hai Waknine still owed $1,350,000.

- On June 3, 2003, by telephone in Los Angeles, Defendant EL-AL spoke to Hai Waknine about how Assaf Waknine needed to take responsibility for the money he had lost.

- On June 4, 2003, by telephone in Spain, Benharosh told Defendant EL-AL to fix the problem with Hai Waknine and to collect as much of the money as Defendant EL-AL could.

- On July 14, 2003, by telephone, Defendant EL-AL told Benharosh in Spain, that Hai Waknine would pay $15,000 per month of interest until he returned the $1,000,000 he owed.  Benharosh told EL-AL that if Waknine did not pay, then their friend, Defendant, Itzhak Abergil "would take care of it."

- On August 5, 2003, by telephone, Defendant EL-AL informed Benharosh in Spain, that Defendant EL-AL was solving the problem with Assaf Waknine and was speaking to Hai Waknine to finish the issue.

- On August 6, 2003, by telephone in Spain, Benharosh told Meier Abergil and Assaf Waknine about Assaf Waknine receiving $1,350,000 and not

returning the money.  Benharosh wanted Meier Abergil to collect the money from Assaf Waknine.

- On August 7, 2003, by telephone in Los Angeles, Hai Waknine told his brother Assaf Waknine, that they would be killed if they did not pay the $1,350,000 owed to the enterprise.

- On August 10, 2003, by telephone in Israel, Assaf Waknine spoke to his mother about being in trouble with people and owing money because of his brother Hai Waknine.  Assaf Waknine told his mother that Assaf Waknine needed $300,000-$400,000 quickly and asked his mother to help him find money in the United States to save his life.

- On August 12, 2003, by telephone in Los Angeles, California, Benharosh told Assaf Waknine that he "wanted Hai Waknine to pay $1,350,000."

- On August 13, 2003, by telephone in Los Angeles, California, Hai Waknine told Defendant EL-AL that Hai Waknine owed $1,350,000 and that Hai Waknine would pay $350,000 and $15,000 per month until the debt was paid.

- On August 16, 2003, by telephone, Defendant Barashay and Benharosh discussed with Hai Waknine, in Los Angeles, California, that time had expired for Hadad to repay his debts, and that Hai Waknine needed to take Hadad's house so that Hadad and his family would sleep in the streets.

- On August 21, 2003, by telephone in Los Angeles, California, Hai Waknine told an unindicted co-conspirator and his father that Hai Waknine had big problems with Benharosh and other co-conspirators and that Benharosh had been grateful for the $100,000 given to him by Waknine so that Assaf Waknine would not be killed.

- On October 18, 2003, by telephone in Los Angeles, California, Hai Waknine told Assaf Waknine that Hai Waknine received a message that if Assaf Waknine did not return the money, "they" were going to kill Assaf Waknine.

- On November 1, 2003, by telephone, Hai Waknine spoke to Benharosh about how much money had been received by Benharosh and that Hai Waknine had been collecting money in the United States in order to send Benharosh a large amount of money.

(ER 87 - 97; CR 403.)

## H.   MR. WAKNINE MOVED TO WITHDRAW HIS PLEA PRIOR TO HIS RE-SENTENCING

On September 10, 2008, this Court, in United States v. Waknine, 543 F.3d 546, 548 (9th Cir. 2008), vacated Mr. Waknine's sentence because the district court had not properly calculated the guideline sentence range, had not complied with FRCP 32, and had not considered the 18 U.S.C. § 3353(a) factors. Mr. Waknine, now back in the district court and with the benefit of the information contained in the Second Superseding Indictment, filed a motion to withdraw his guilty plea on July 1, 2009 under FRCP 11, on the grounds that the district court, by refusing Mr. Waknine the necessary time to translate the Israeli Intercepts, had denied Mr. Waknine his rights to due process and the effective assistance of counsel. (ER 33; CR 454.) Mr. Waknine included all of the issues with the Israeli Intercepts and provided the district court with the excerpts of the Second Superseding Indictment that directly discussed Mr. Waknine and directly supported Mr. Waknine's claim of duress. (Id.)

At the time of his re-sentencing, the district court addressed Mr. Waknine's motion to withdraw his guilty plea in a limited fashion, largely contending that Mr. Waknine, despite the impossibility of doing so, should have raised the issue on appeal. (ER 78; 7/1/09 RT 9; CR 473.) When defense counsel responded that the

14

Second Superseding Indictment, which was filed on July 23, 2008, came down after the defense had submitted the appeal, the district court responded "That indictment had nothing to do with this case. . . . It had nothing to do with this case. It had not thing to do with this case. That was a drug case, nothing to do with this case." (ER 79; 7/1/09 RT 10; CR 473.)  In so stating, the district court ignored the fact that the Second Superseding Indictment was filed as a superseding indictment by the government under the same case number as Mr. Waknine's case. The district court further ignored the paragraphs of the Second Superseding Indictment that referred to Mr. Waknine by name and contained evidence of the threats against Mr. Waknine and his family should he refuse to participate in Benharosh's activities. (ER 87-97; CR 403.)  When defense counsel attempted to explain these facts to the district court, he was interrupted by the court. The district court responded: "It was totally irrelevant to this case in which Mr. Waknine pleaded guilty to his conduct that was tried before a jury in this courtroom. . . ." (ER 79-80; 7/1/09 RT 10-11; CR 473.)  Mr. Waknine also personally addressed the district court and explained that Benharosh, who was present in the courtroom, had taken his hand and made a slicing gesture at his neck, meaning to Mr. Waknine: "I am going to kill you. . . . He's killed eight people already. This is the same thing he's doing. And this is the gist of this case, was from intimidation, Your Honor." (ER 75; 7/1/09 RT 4.)  The district court made no indication that it considered Mr. Waknine's comments. (ER 77; 7/1/09 RT 6.)  When discussing the substance of the motion, the district court stated only "[Mr. Waknine] pleaded guilty freely and voluntarily from that lectern." (ER 78; 7/1/09 RT 9.)

The district court also displayed a fundamental misunderstanding of the procedural history of the case when it claimed that Mr. Waknine had been found guilty by a jury, "the jury found that it's not as you stated." (ER 81; 7/1/09 RT16.)

15

Although the court corrected itself when reminded of the guilty plea, the hearing transcript reveals that the district court denied Mr. Waknine's motion to withdraw his guilty plea without any thoughtful or considered reasoning.

IV.

SUMMARY OF ARGUMENT

After this Court vacated Mr. Waknine's sentence, Mr. Waknine was in the procedural posture of a defendant pre-sentence. Mr. Waknine's motion to withdraw his guilty plea, therefore, was properly made pursuant to FRCP 11. Mr. Waknine presented a fair and just reason to the district court, namely that the content of the Israeli Intercepts as revealed by the Second Superseding Indictment was newly available evidence, for the withdrawal of his guilty plea. The district court, therefore, abused its discretion when it denied Mr. Waknine's motion without any consideration of whether the late disclosure of the newly available evidence was a fair and just reason for permitting the withdrawal of Mr. Waknine's guilty plea.

Although the government had provided the physical DVDs containing the Israeli Intercepts to Mr. Waknine before he entered his guilty plea, the contents of the DVDs were in Hebrew. The district court denied Mr. Waknine's repeated attempts to continue his trial in order to allow him to translate the Israeli Intercepts and forced him to proceed to trial. Therefore, although Mr. Waknine had constructive possession of the DVDs, Mr. Waknine did not have actual possession of the Israeli Intercepts. The contents of the DVDs, as revealed by the Second Superseding Indictment, provide substantial support for Mr. Waknine's affirmative defense of duress. Armed with the contents of the Israeli Intercepts it is probable, let alone "plausible," that Mr. Waknine would not have pleaded guilty. The Israeli Intercepts, therefore, justified Mr. Waknine's pre-sentence motion to withdraw his

# EXHIBIT 5

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

### CRIMINAL MINUTES - SENTENCING AND JUDGMENT

Case No.   **CR-04-373(A)-R**                          Date: December 11, 2006

====================================================================
PRESENT:   **HONORABLE MANUEL L. REAL, JUDGE**

| | | |
|---|---|---|
| **William Horrell** | **Leonore LeBlanc** | **Patrick McLaughlin** |
| **Courtroom Deputy** | **Court Reporter** | **Asst. U.S. Attorney** |

====================================================================
**U.S.A. vs (Dfts listed below)**                    **Attorneys for Defendants**

1)   **HAI WAKNINE**                         1)   **David Kenner**
     **X present    X custody**                   **X present    X retained**

**PROCEEDINGS:    HEARING RE DETERMINATION OF RESTITUTION ORDER**

**The Court hears arguments of counsel.**

**The Court Orders that defendant shall pay restitution in
the amount of $371,000.00 to victim Eli Haddad, and the
amount of $275,000.00 to victim Viken Keuylian, on such
payment schedule and in such amounts and increments as
shall be determined by the Probation Officer when defendant
is release on supervised release, and while incarcerated in
such amounts and increments as shall be implemented by
the Bureau of Prisons.**

**The government shall submit a proposed order.**

DOCKETED ON CM

DEC 15 2006

BY _____ 182

✓ Priority
___ Send
___ Clsd
___ Enter
___ JS-5/JS-6
___ JS-2/JS-3
cc: marshal
B.O.P.
Probation

7 min
Deputy Clerk Initials ____ WH ____

CR 90 (2/91) CRIMINAL MINUTES - SENTENCING AND JUDGMENT