**KENNER LAW FIRM**
**David E. Kenner, SBN 041425**
**Brett A. Greenfield, SBN 217343**
**16633 Ventura Boulevard, Suite 800**
**Encino, CA 91436**
**Ph: (818) 995-1195**
**Fx: (818) 475-5369**

**Attorneys for Defendant**

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | **CASE NO.: 04-373 (A) - RGK** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **DEFENDANT'S SENTENCING** |
| **v.** | ) | **MEMORANDUM AND POSITION RE** |
| | ) | **EVIDENTIARY HEARING FOR** |
| **HAI WAKNINE,** | ) | **RESTITUTION STIPULATED TO BE** |
| | ) | **HELD AFTER SENTENCING ON** |
| **Defendants.** | ) | **SEPTEMBER 26, 2011** |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

COMES NOW Defendant, Hai Waknine (hereinafter "Defendant"), by and through his attorneys of record, and hereby respectfully requests that this Court, after imposing sentence, schedule an evidentiary hearing to resolve certain factual disputes and arguments arising from the papers filed in support of the Government's Sentencing Position that they have not yet but will be filing.

On January 17, 2011 Defendant entered into a plea agreement with the United States Government under the provisions of Rule 11(c)(1)(C). The Government and the Defendant, in Paragraph 14 of the plea agreement, submit that an appropriate disposition of this case is that the

1

DEFENDANT'S SENTENCING MEMORANDUM

Court impose a sentence of 57 months imprisonment; three years supervised release with conditions to be fixed by the Court; a fine of $100,000 to be paid in 10 monthly installments of $10,000 with the first installment due within 30 days after sentencing; $100 special assessment; and restitution to be fixed and paid on a schedule to be determined by the Court. Both Defendant and the Government concur and request the Court to accept and impose this sentence. The Court has indicated that it will do so on September 26, 2011 at 1:30 pm.

After announcing the sentence, there will still remain an issue with regard to a purported claim of restitution under the Mandatory Victim Restitution Act ("MVRA"). With regard to restitution, the plea sets forth in Paragraph 7 that "there is no agreement on the amount of restitution except as discussed directly below in this paragraph." In other words, the agreement is that a hearing pursuant to MVRA will be held by the Court after imposing sentence. That evidentiary hearing must be held within 90 days from the imposition of the sentence, pursuant to 18 U.S.C. § 3664(d)(5). The Government has not yet filed its position regarding restitution and while the Defendant is filing concurrent herewith its position with regard to restitution, additional time is required to subpoena the witnesses necessary to conduct the hearing. The "victim" is represented by attorney Harland Braun who has by email, notified undersigned counsel that he intends to ask the Court not to impose a sentence until after the restitution is decided and paid. Mr. Braun further indicates that he will be filing documents to that effect with this Court. *See Exhibit G.*

An evidentiary hearing is necessary in the instant matter since Defendant will call into question the veracity of Viken Keuylian's claim against Defendant for restitution in the amount of $275,000 ($250,000 for attorney's fees and $25,000 for investigation fees). Additionally, Defendant will demonstrate to this Court that the Government has failed in its burden to establish by a preponderance of the evidence that Mr. Keuylian is in fact entitled to the amount requested. Further,

2

DEFENDANT'S SENTENCING MEMORANDUM

the decision entered by the United States Court of Appeals for the Ninth Circuit ("Ninth Circuit") at 543 F.3d 546 (9th Cir. 2008) specifically addresses this issue in favor of Defendant.  In light of the foregoing, it would serve the interests of justice to allow the parties to call witnesses to refute the disputed factual claims of Mr. Keuylian, cross-examine witnesses to test their foundation and veracity, and otherwise provide a clear factual record for this Court to then make its ruling on the restitution claimant's entitlement to the amount requested.

Based on the above and the statutory ability to set the restitution hearing within 90 days of announcing the sentence, it is stipulated, by and between the Government and the Defendant, that after imposing the sentence, the Court set a date of December 5, 2011 to conduct a restitution hearing.

This request will be based on the attached Stipulation, the Memorandum of Points and Authorities served and filed herewith, on such supplemental declarations, affidavits, memoranda of points and authorities as may hereafter be filed with this Court, on all the papers and records on file in this action, and on such oral and documentary evidence as may be presented at the evidentiary hearing.

Dated this 20th day of September, 2011

By:    /s/ David Kenner

      David E. Kenner
      Kenner Law Firm
      16633 Ventura Blvd., Suite 800
      Encino, CA 91436
      Ph: (818) 995-1195
      Fx: (818) 475-5369

DEFENDANT'S SENTENCING MEMORANDUM

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

On July 29, 2010, Viken Keuylian (hereinafter "Mr. Keuylian") filed a Declaration of Victim Loss in the instant matter claiming that he is entitled to receive restitution in the amount of $275,000. Mr. Keuylian attributes this amount to "legal representation and investigative services" he was required to pay in order to refute purported criminal charges filed against him by the United States Government in connection with his dealings with Defendant.  In its Sentencing Position memorandum, the Government notes that under Defendant's plea agreement, he agreed to litigate the restitution amount of Mr. Keuylian but that the amount of restitution imposed by this Court cannot exceed $275,000.  However, the Government did not indicate its position regarding restitution in this matter stating instead that it would file a separate position paper on this issue.

The undersigned strongly believes it necessary to schedule an evidentiary hearing regarding the calculation of the restitution amount Mr. Keuylian is entitled to receive, if any.  In fact, the Ninth Circuit has ordered that this Court "only award restitution of travel expenses and investigative costs, including attorneys' fees, [in this matter] if the government provides sufficiently detailed evidence to demonstrate by a preponderance of the evidence that these costs were incurred . . . in aid of [Defendant's] investigation or prosecution, and that such expenses and costs were reasonably necessary."  The Government has failed in its burden to demonstrate that Mr. Keuylian is a victim for purposes of restitution and/or has failed to demonstrate the amount of his purported loss.  Therefore, in order to allow Defendant the opportunity to establish his position pursuant with the Ninth Circuit's order, it is necessary that this Court at least schedule an evidentiary hearing in which the undersigned may call Mr. Keuylian and Joseph Cavallo, as witnesses.  If necessary, Defendant may call additional witnesses, named below, to establish the sales prices of cars that were sold by Mr. Keuylian.

DEFENDANT'S SENTENCING MEMORANDUM

## II.   PROCEDURAL HISTORY

On December 7, 2004, Defendant was indicted on 46 counts, along with four other co-defendants, for participation in a RICO conspiracy in violation of 18 U.S.C. § 1962(d), conspiracy to commit extortion in violation of 18 U.S.C. § 371, and money laundering in violation of 18 U.S.C. §§ 1956, 1957 among other charges.  Defendant first entered a plea of not guilty and trial commenced on June 6, 2006.  However, after five days of trial and on June 13, 2006, Defendant entered a guilty plea to one count of RICO conspiracy pursuant to a plea agreement.  At the sentencing hearing on September 11, 2006, Defendant was sentenced to 121 months of imprisonment even though the government had explicitly recommended that the Court impose a term of 108 months.

Shortly thereafter, on December 11, 2006, the Court considered the restitution claims submitted by the government.  In its claim, the government requested that Defendant pay restitution to Eliyahu Hadad and Mr. Keuylian.[1]  More specifically, the Government requested that Defendant pay a total of $131,000 in restitution to Eliyahu Hadad: $100,000 in attorneys' fees, $25,000 in interest on a mortgage taken out by Eliyahu Hadad to repay a loan he received from Defendant and his co-conspirators, and $6,000 in travel costs incurred from participating in Defendant's investigation and prosecution.  However, at the restitution hearing, the Court ordered that Defendant pay $371,000 in restitution to Eliyahu Hadad.

In relation to the restitution claim against Defendant for Mr. Keuylian, the Government requested that Defendant pay $275,000: $250,000 in attorneys' fees and $25,000 in investigator's fees.  Subsequently, at the restitution hearing, the Court ordered that Defendant pay Mr. Keuylian $275,000 in restitution.

---

[1] It is undisputed that Defendant has previously satisfied the restitution claim entered against him for Eliyahu Hadad.  As such, the remaining restitution claim at issue is the prospective claim against Defendant by Mr. Keuylian.

5

DEFENDANT'S SENTENCING MEMORANDUM

Defendant filed a timely notice of appeal challenging both his sentence and the restitution order entered by the Court. Following his appellate proceedings, the U.S. Court of Appeals for the Ninth Circuit ("Ninth Circuit") entered an order vacating Defendant's guilty plea and requiring that the District Court "only award restitution of travel expenses and litigation costs, including attorneys' fees, if the government provides sufficiently detailed evidence to demonstrate by a preponderance of the evidence that these costs were incurred by Hadad and Keuylian in aid of [Defendant's] investigation or prosecution, and that such expenses and costs were reasonably necessary." *See United States v. Hai Waknine*, 543 F.3d 546 (9th Cir. 2008).

Upon remand and on or about January 17, 2011, Defendant and the Government entered into a written plea agreement pursuant to Rule 11(c)(1)(C). Defendant is currently on bond and will appear before this Court to be sentenced on September 26, 2011 at 1:30 pm.

### III.    STATEMENT OF FACTS

Defendant, along with four other co-defendants, was indicted on charges of money laundering, racketeering, and conspiracy in connection with the Jerusalem Network, an Israeli based criminal organization. Although Defendant did in fact commit certain acts as alleged in the indictment, he was under threat of death to himself and his family members by the Jerusalem Network, during the course of the charged conspiracy.

Following his entry of a guilty plea pursuant to a plea agreement, Defendant was sentenced to serve 121 months in prison and ordered to pay restitution to Eliyahu Hadad in the amount of $371,000 and to Mr. Keuylian in the amount of $275,000. Defendant timely appealed the decision of the District Court to the Ninth Circuit challenging both the sentence imposed and the restitution orders. On or about October 22, 2010, the Ninth Circuit issued a decision vacating Defendant's guilty plea and remanded the case back to the District Court for reassignment and trial. Just a few

DEFENDANT'S SENTENCING MEMORANDUM

months later, on or about January 17, 2011, Defendant and the Government entered into a second plea agreement whereby Defendant pled guilty to count eight of the indictment, a violation of 18 U.S.C. §§ 1956(h), (a)(1)(B)(i). This second plea agreement calls for the Court to impose a term of imprisonment of 57 months, three years supervised release, a fine of $100,000 and a $100 special assessment, and the Court to determine the amount of restitution, if any, for Mr. Keuylian.

On or about August 8, 2011, the Government filed its *Sentencing Position for Defendant Hai Waknine and Exhibits* ("Sentencing Position") concurring with the plea agreement's sentence of 57 months imprisonment. The Government's Sentencing Position states that because Mr. Keuylian may need additional time to recover documents supporting his restitution claim, it intends to file a separate position paper regarding this issue, this document has yet to be received by Defendant. As set forth herein, given the facts of the instant matter, the insufficiency of the evidence offered in support of Mr. Keuylian's restitution claim, and the Government's failure to meet its burden on this issue, Defendant submits the instant request for an evidentiary hearing. An evidentiary hearing would allow this Court to more accurately determine the amount of restitution, if any, that Mr. Keuylian will be entitled to receive.

IV.    CLAIMANT IS NOT A VICTIM FOR PURPOSES OF RESTITUTION AND THEREFORE, IS NOT ENTITLED TO RECOVER

In its September 10, 2008 Opinion, the Ninth Circuit, as part of its review of Defendant's claims on appeal, evaluated Mr. Keuylian's restitution claim against Defendant. In its discussion on the issue, the Ninth Circuit described the government's burden as two-fold; first, the government must demonstrate that a person or entity is a victim for purposes of restitution and second, the government must prove the amount of the loss. *See United States v. Baker*, 25 F.3d 1452, 1455 (9th Cir. 1994); 18 U.S.C. § 3664(e). Here, Defendant will demonstrate that Mr. Keuylian is not a victim

DEFENDANT'S SENTENCING MEMORANDUM

for purposes of restitution and instead will show that his claim for restitution is consistent with his usual *modus operandi* and is nothing more than a fraudulent scheme to obtain unwarranted sums of money as is described in more detail below.

### A. CLAIMANT KNOWINGLY ENTERED INTO A BUSINESS VENTURE WITH DEFENDANT'S CONTACT

The applicable statute defines a "victim" for purposes of restitution as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered . . ." *See* 18 U.S.C. § 3663A(a)(2). The Ninth Circuit has clarified this definition to permit the payment of restitution "only for losses directly resulting from the defendant's offense." *United States v. Koenig*, 952 F.2d 267, 275 (9th Cir. 1991) (quoting *United States v. Kenney*, 789 F.2d 783, 784 (9th Cir. 1986). Mr. Keuylian should not receive any restitution from Defendant as he did not suffer any losses under the agreement and even if any losses were incurred, they did not directly result from Defendant's offense.

In *United States v. Rice*, the Ninth Circuit upheld a restitution order of $1,000,000 against a defendant who was convicted of conspiracy and mail fraud. *See United States v. Rice*, 38 F.3d 1536, 1539 (9th Cir. 1994). In that case, the defendant purchased aircraft parts from parts manufacturers and resold them to aircraft manufacturers. *Id.* The defendant fraudulently sold "reprocessed" parts as new and delivered the parts to his customers with false test reports. *Id.* One of the defendant's customers, Grumman, was a manufacturer of both civilian and military aircrafts. *Id.* Grumman claimed that its customers would not accept an aircraft unless all of the parts were properly tested and certified. *Id.* Because Grumman could not distinguish between its properly tested parts and the fraudulent parts supplied by the defendant, Grumman impounded its entire inventory of the defendant's supplied parts. *Id.* at 1540. The Ninth Circuit upheld the award of restitution to

DEFENDANT'S SENTENCING MEMORANDUM

Grumman for "the entire value of the contaminated merchandise which cannot be resold." *Id.* at 1541. The Ninth Circuit went on to explain that Grumman "had an obligation to protect its customers (and the public) by not using fasteners which did not comply with industry standards." *Id.* at 1542. This case is distinguishable from the instant matter as the victim in *Rice* and the purported "victim" in this case, Mr. Keuylian, have gone through completely different experiences.

Mr. Keuylian, the owner of a Lamborghini dealership in Beverly Hills, California, was looking for investors to provide funds to purchase 12 Ferraris. He planned to purchase these vehicles in Europe, convert them to United States specifications, and split the profits with the investor(s) at the time of the sale. He was short $950,000 to complete his transaction. Mr. Keuylian was introduced to co-defendant Gabriel Benharosh ("Benharosh") by Defendant Waknine. At the time of the introduction, co-defendant Benharosh was in escrow to invest $500,000 in a real estate project with Defendant. Mr. Keuylian criticized the deal, urging Benharosh that there would be a bigger and faster profit were he to invest that same money into his proposed purchase of 12 Ferraris. Mr. Keuylian convinced co-defendant Benharosh to cancel his escrow with Defendant and instead, to invest $950,000 with Mr. Keuylian pursuant to an oral agreement to purchase 12 Ferraris. The same day the deal was arranged, the $950,000 was remitted to Mr. Keuylian: $500,000 was paid by check from the escrow account, while the remaining $450,000 was wired by Defendant. None of that money has been seen or heard from since. Mr. Keuylian claims, but he has never provided any documentation to establish, that he in fact purchased the 12 cars, brought them to the United States, had them converted for resale, and sold them.

In or around January of 2003 and after Defendant returned to the United States from Mexico, there was a meeting to request an accounting from Mr. Keuylian for co-defendant Benharosh regarding the status of co-defendant Benharosh's investment. At that time and for the first time, Mr.

DEFENDANT'S SENTENCING MEMORANDUM

Keuylian had his attorney draft and provide to Benharosh a backdated Vehicle Purchase & Sales Agreement reflecting 6 specified Ferraris and setting forth that as each sold, the costs and expenses would be deducted, and the profits would be split between Mr. Keuylian and Benharosh.[2] *See Exhibit A.* During the meeting, Mr. Keuylian explained that 6 of the 12 vehicles were his cars and had already been sold, the remaining 6 vehicles were co-defendant Benharosh's cars and were those listed in the agreement. *See chart below for vehicle information.*

| VEHICLE TYPE | VIN # |
| --- | --- |
| Ferrari Spider F1 | 121871 |
| Ferrari 550 Barchetta | 124070 |
| Ferrari F1 Spyder | 124527 |
| Ferrari Spyder | 125357 |
| Ferrari Spyder | 125350 |
| Ferrari F1 Spyder | 125477 |

Of the vehicles listed in the above chart, Defendant arranged, himself, for the sale of one vehicle to Mark Babaut for $275,000. One vehicle was sold to Rod Stewart for $300,000 (this information is known to Defendant as he delivered the vehicle to Mr. Stewart). A third vehicle was purchased by Defendant for $175,000 (this vehicle was not converted and Defendant was therefore, forced to resell it for $110,000). At this point an accounting would look something like this:

//

_____

[2] By his own admissions, Mr. Keuylian has characterized Defendant's involvement in this deal as that of a mere facilitator. *See* 6/9/06 RT 172:21; 6/13/06 RT 6:14. Additionally, since the agreement was memorialized in a written contract prepared by Mr. Keuylian's attorney, it is clear that the deal constituted a formal business venture and that Mr. Keuylian was both an active and willing participant.

DEFENDANT'S SENTENCING MEMORANDUM

| TRANSFER OF FUNDS | AMOUNT OF FUNDS |
|---|---|
| Benharosh Check to Keuylian | $500,000.00 |
| Wire Transfer to Keuylian | $450,000.00 |
| **Total Transfer to Keuylian** | **$950,000.00** |
| Sale of Barbaut Vehicle | $275,000.00 |
| Sale of Stewart Vehicle | $300,000.00 |
| Sale of Defendant Vehicle | $175,000.00 |
| **Total Sales** | **$750,000.00** |
| **Total Receipts to Keuylian** | **$1,700,000.00** |
| **Total Receipts to Benharosh** | **$0.00** |

The above chart does not even take into account the 6 vehicles Mr. Keuylian stated he sold (but were his 6 and not co-defendant Benharosh's 6) or the other 3 vehicles listed on the Vehicle Purchase & Sales Agreement. As such, there are still 9 other vehicles that are unaccounted for, which means that there is also no accounting for any of the profits made on the sale of those vehicles.

Furthermore, based on representations made by Mr. Keuylian during his inducement of co-defendant Benharosh, he paid $100,000 for each Ferrari, shipping the cars from Europe was going to cost $2,500 per vehicle, and the cost of converting the cars to United States specifications was approximately $15,000 to $27,000. Therefore, using the most conservative calculation, the total cost to Mr. Keuylian for the 3 Ferraris that were sold was approximately $388,500. Thus, while Mr. Keuylian made at least $361,500 in profits on three vehicles alone, as indicated by the chart, none of this money was ever split with Benharosh as required under their agreement. In fact, to date, Mr. Keuylian has only paid back a total of $652,852 on the loan from Benharosh; he has not paid the full

11

principal of the loan, any interest on the loan, and has not paid any conversion expenses in connection with the agreement.[3]

Due to Mr. Keuylian's failure to pay under the terms of the original Vehicle Purchase & Sale Agreement, Benharosh and Mr. Keuylian entered into a Settlement Agreement and Mutual General Release ("Release Agreement") (also drafted by Mr. Keuylian's attorney) in which it was noted that Mr. Keuylian had paid back $324,348 to Benharosh.[4] *See Exhibit C.* The Release Agreement called for Mr. Keuylian to pay Benharosh a total of $652,852, the remaining balance on the $950,000 loan; this accounting was made after the parties added additional charges incurred by Mr. Keuylian in the amount of $27,200.

In order to expedite Mr. Keuylian's payment to co-defendant Benharosh, Defendant provided Mr. Keuylian with over $300,000, the difference between Mr. Keuylian's transferred funds and the remaining $652,852 balance. Because Defendant was under duress and was receiving threats of death to himself and his family members by members of the Jerusalem Network, specifically by co-defendant Benharosh, he visited Mr. Keuylian at his dealership with other co-conspirators, pressured Mr. Keuylian in providing immediate repayment of the loan, and ultimately provided funds to Mr. Keuylian in order to help him pay his debt. Mr. Keuylian was aware of these threats and the pressure Defendant was receiving from Benharosh and others involved in the Jerusalem Network.[5] The subsequent indictment of other members of the cartel reflects threats to kill Defendant and his brother Assaf Waknine if the money was not recovered by co-defendant Benharosh. All of the overt acts

---

[3]Despite attempting to disguise the $652,852 payment as personal funds from his children's trust account, on cross-examination it was revealed that Mr. Keuylian transferred money from his car company to the trust account prior to wiring it to Benharosh. *See* 6/13/06 RT 15:7, 18, 22, 25.

[4] Interestingly, a review of Mr. Keuylian's accounting reveals that the majority of these credits constitute Mr. Keuylian's deduction of items purchased by Defendant even though Mr. Keuylian did not have permission from Benharosh to take such action. *See* 6/9/06 RT 187:18; 6/13/06 RT 10:16.

[5] During the jury trial in the instant matter, Mr. Keuylian admitted to being aware that Defendant was receiving such pressure from Benharosh. *See* 6/9/06 RT 178:13-15; 6/13/06 RT 25:7.

12

DEFENDANT'S SENTENCING MEMORANDUM

made against Defendant by these individuals were in the form of recorded phone calls of threats to Defendant and his brother. The inability of Defendant to obtain discovery in his first trial to support his imperfect duress defense ultimately led the Ninth Circuit to allow Defendant to withdraw his plea. In fact, the Government's Sentencing Position concedes the fact that substantiation for Defendant's duress defense was not available to Defendant at the time of the taking of his initial plea. *See* Sentencing Position at 2-3 & 6-7. Both the Government's concession and Mr. Keuylian's trial testimony lend credibility to Defendant's imperfect duress defense and further demonstrate that Mr. Keuylian was not the "victim" in this case.

Furthermore, Mr. Keuylian's accounting of the funds he received from Benharosh demonstrates that some money was used for personal items and not used in furtherance of his agreement with Benharosh. *See Exhibit D.* Mr. Keuylian also expensed purchases made by Defendant without Benharosh's acquiescence and/or knowledge. In addition, Mr. Keuylian caused Defendant to incur unnecessary losses as a result of Mr. Keuylian's own mismanagement. Defendant purchased two vehicles from Mr. Keuylian that had to be resold at a loss by Defendant due to Mr. Keuylian's failure to obtain the proper paperwork for the vehicles: the Mercedes SL 500 Defendant purchased had to be sold at a $30,000 loss while the G 500 Defendant purchased had to be sold at a $12,000 loss. Additionally, Defendant offered to sell these vehicles in an effort to expedite Mr. Keuylian's repayment of the loan after becoming aware that Mr. Keuylian had credited their sale to Defendant against his balance owed to Benharosh. *See* 6/9/06 RT 195:2-5.

On relative terms, Mr. Keuylian has pulled off an even better fraud in this case than he did against Volkswagen, described in more detail below. Mr. Keuylian has now come to this Court to characterize himself as a "victim" for purposes of restitution. However, as has been made clear via the above, Mr. Keuylian did not suffer any loss under this agreement; if anything, Mr. Keuylian

13

DEFENDANT'S SENTENCING MEMORANDUM

realized at least $350,000 in profits that he kept for himself. Additionally, as is evidenced by the attached exhibit, Mr. Keuylian was friendly with Defendant and Benharosh; Defendant flew Mr. Keuylian out to Mexico twice and celebrated with him in Las Vegas. *See Exhibit H.* In fact, Mr. Keuylian has even testified to inviting Defendant and his girlfriend to his home for a Valentine's Day party. *See* 6/9/06 RT 179:21. Simply stated, Mr. Keuylian is not a victim for any purpose.

### B. CLAIMANT IS NOT ENTITLED TO RECOVER FOR HIS OWN FRAUDULENT CONDUCT

In evaluating whether Mr. Keuylian should be entitled to receive any restitution against Defendant, this Court must take into account his fraudulent conduct, both related and unrelated to the instant matter. In fact, Mr. Keuylian has been involved in numerous fraudulent schemes and has been sued multiple times for various causes of action such as breach of contract, fraud, conversion, etc. Several civil judgments have been imposed as a result of these actions ranging in amounts from $4,099 to $27,657. In addition, Mr. Keuylian was sued by East-West Bank for defaulting on a $3 million loan.

Most notably, however, Mr. Keuylian has pled guilty to committing wire fraud in violation of 18 U.S.C. § 1343 after defrauding Volkswagen for over $12 million. *See Exhibit E.* As noted in the Stipulated Factual Basis of Mr. Keuylian's Plea Agreement, Mr. Keuylian operated one of the largest Lamborghini dealerships. Most of the vehicles on his lot were purchased using borrowed funds from Volkswagen Credit Inc. ("VCI"). Pursuant to his agreement with VCI, Mr. Keuylian would borrow money to purchase the vehicles and as each car was sold, he was required to pay VCI back the money it loaned him for that specific vehicle.[6] However, much like what transpired in the instant matter, Mr. Keuylian failed to pay VCI back and instead used the proceeds from his sales to pay off other

---

[6] The terms of Mr. Keuylian's agreement with VCI strikingly resembles his agreement with Benharosh for the purchase of 6 Ferraris.

14

DEFENDANT'S SENTENCING MEMORANDUM

obligations.  In fact, Mr. Keuylian has admitted to selling at least 54 vehicles subject to VCI's flooring line of credit for less than he borrowed from VCI to purchase said vehicles; VCI had loaned Mr. Keuylian a total of $12,560,314 to purchase the 54 cars, while Mr. Keuylian received $8,163,275 in cash from the sales of those cars and received $853,770 in trade-in vehicles.  None of the funds Mr. Keuylian received were used to pay VCI back the money it had originally loaned him to purchase these 54 vehicles.

In short, Mr. Keuylian can in no way be characterized as a victim for purposes of restitution. In fact, with regard to the agreement between himself and Benharosh, Mr. Keuylian was always the individual in control; Mr. Keuylian had the money and the cars.[7]  Additionally, the way in which Mr. Keuylian managed his purchase and sale of the 6 vehicles in question is reminiscent of the fraud he perpetrated against Volkswagen.  An individual in the position of Mr. Keuylian who knowingly enters into a loan agreement whereby he fails to pay back the principal of the loan, fails to pay any interest on the loan, fails to pay for any expenses incurred on the loan, fails to perform under the agreement by not obtaining the proper paperwork for certain vehicles and only selling half of the vehicles purchased, and who has a history of defrauding car makers and banks, should not be considered a victim for any purpose.  Given the above referenced facts, Mr. Keuylian should not be able to recover any amount of restitution against Defendant as he is not a victim for any purpose.

//

//

//

_____

[7] Mr. Keuylian has conceded this fact as he described Benharosh and Defendant as "lenient" and stated that "[he] decided how many cars and which cars was part [of] the list." *See* 6/9/06 RT 168:22-25.  This concession adds further support to Defendant's rendition of the events leading up to the drafting of the Vehicle Purchase & Sales Agreement, specifically, the fact that Mr. Keuylian only listed 6 Ferraris in the agreement and directed that those were co-defendant Benharosh's vehicles.

15

DEFENDANT'S SENTENCING MEMORANDUM

## V.    THE GOVERNMENT HAS FAILED TO ESTABLISH THE AMOUNT OF LOSS, IF ANY, TO CLAIMANT

Alternatively, even if Mr. Keuylian is deemed a victim for purposes of restitution, the government has failed to meet its burden of establishing by a preponderance of the evidence the restitution claimant's entitlement to the amounts requested, thereby necessitating an evidentiary hearing on the matter. Although courts are afforded flexibility in the accounting of a victim's complete loss, 18 U.S.C. § 3664 minimally requires that facts be established by a preponderance of the evidence, and "the district court [may] utilize only evidence that possesses 'sufficient indicia of reliability to support its probable accuracy.'" *United States v. Garcia-Sanchez*, 189 F.3d 1143, 1148-49 (9th Cir. 1999); *see also United States v. Brock-Davis*, 504 F.3d 991, 1002 (9th Cir. 2007) ("[T]he government must provide the district court with more than just . . . general invoices . . . ostensibly identifying the amount of their losses.")

Here, as recognized by the Ninth Circuit, the declaration drafted by Mr. Keuylian and evidence in support of his restitution claim are insufficient to establish that it was reasonably necessary for Mr. Keuylian to incur attorneys' and investigator's fees to participate in the investigation or prosecution of the instant offense. In fact, the loss summary provided by Mr. Keuylian is completely inadequate under the standard noted above; Mr. Keuylian did not/could not offer information regarding the time spent by his attorney, the activities engaged in by his attorney, and/or his attorney's credentials and billable rate. The only information Mr. Keuylian provides is that he retained an attorney, Joseph Cavallo ("Attorney Cavallo") for "a flat, non-refundable retainer of $275,000 for legal representation and investigative services." However, Mr. Keuylian has not made available a copy of said retainer agreement with Attorney Cavallo or even an affidavit from Attorney Cavallo indicating the same. Additionally, Mr. Keuylian's mere conclusory statements are not

16

DEFENDANT'S SENTENCING MEMORANDUM

sufficiently reliable to hold Defendant responsible for the payment of the purported $275,000 in attorneys' fees.[8]

Furthermore, Mr. Keuylian can only prove that he paid Attorney Cavallo a total of $150,000. Mr. Keuylian's bank records indicate that he made three checks payable to Attorney Cavallo each for $50,000. Mr. Keuylian claims to have established payment of $200,000 in fees to Attorney Cavallo, however, the documentation he has provided proves otherwise. The cashier's check Mr. Keuylian references in his declaration as evidence of payment of another $50,000 to Attorney Cavallo was actually used to pay for one of the $50,000 checks already noted, check no. 2553. Therefore, it can only be said that Mr. Keuylian paid Attorney Cavallo a total of $150,000 for his representation.[9]

Nevertheless, even if one was to assume that Mr. Keuylian did in fact pay Attorney Cavallo $200,000 or even $275,000 for his services, the only indication in the record is that these costs were incurred by Mr. Keuylian to protect himself from prosecution and were not incurred by Mr. Keuylian directly relating to Defendant's conduct. In fact, in his declaration, Mr. Keuylian explicitly states that Attorney Cavallo "obtained the dismissal of all charges against [him]."With regard to attorneys' fees and investigation costs, generally those "incurred by private parties as a 'direct and foreseeable result' of the defendant's wrongful conduct 'may be recoverable.'" *See United States v. Gordon*, 393 F.3d 1044, 1057 (9th Cir. 2004). Thus, since the fees paid by Mr. Keuylian were incurred by him in order to protect himself from criminal prosecution, the attorneys' fees and investigative costs were only

---

[8] It is important to note that prior to Defendant's appellate proceedings, Mr. Keuylian claimed that he was entitled to receive $1,050,000 in restitution from Defendant. As part of this claim, Mr. Keuylian indicated that he paid $250,000 to Attorney Cavallo for legal representation and separately paid out $25,000 to Tom Davis for investigative services. At the present, Mr. Keuylian claims to have been charged a flat retainer of $275,000 by Attorney Cavallo for "legal representation and investigative services."

[9] It is unclear as to whether Mr. Keuylian even paid this amount to Attorney Cavallo for purposes of protecting himself from prosecution relating to his deal with co-defendant Benharosh as Mr. Keuylian has had several cases filed against him unrelated to this agreement.

17

DEFENDANT'S SENTENCING MEMORANDUM

tangentially related to Defendant's conduct and therefore, Mr. Keuylian should be prevented from recovering for said costs against Defendant.

### A. THERE IS A QUESTION AS TO THE LEGITIMACY OF ATTORNEY CAVALLO'S PURPORTED FEE

Pursuant to California, Business and Professions Code § 6148(a), a contract for attorney services must be made in writing if it is reasonably foreseeable that the total expense to the client will exceed $1,000.00. The written contract must state "any basis of compensation" including hourly rates, flat fees, and other standard fees and charges applicable to the case. *Id.* Although a statutory or flat fee agreement is not in itself unenforceable, issues of unconscionability may arise where a large sum is agreed and the matter is resolved quickly. The California, Rules of Professional Conduct regulating fees for legal services prohibit the charging of an unconscionable fee and direct that in evaluating the unconscionability of a fee, several factors must be taken into account. These factors include, but are not limited to: "the amount of the fee in proportion to the value of the services performed; the relative sophistication of the member and the client; the amount involved and the results obtained; the nature and length of the professional relationship with the client; the experience, reputation, and ability of the member performing the services; whether the fee is fixed or contingent; and the time and labor required." *See* Cal. R. Prof. Conduct 4-200.

Here, there is no indication in the record that a written fee agreement was ever entered into by Mr. Keuylian and Attorney Cavallo. Furthermore, save Mr. Keuylian's own self-serving statements, there is no evidence in the record to suggest that Attorney Cavallo charged a retainer of $275,000 or that this sum was ever actually paid by Mr. Keuylian. In his declaration, Mr. Keuylian concedes that Attorney Cavallo does not support his claim and that he does not possess "paperwork evidencing the entire $275,000 payment." *See Exhibit F.*

DEFENDANT'S SENTENCING MEMORANDUM

Moreover, given Mr. Keuylian's sophistication as a wealthy business man and the minimal amount of services that were actually performed by Attorney Cavallo pursuant to their purported agreement, the $275,000 retainer may be considered unconscionable as such a fee is not proportional to the service he received. Although Mr. Keuylian was initially charged in an information, he was never actually indicted on those charges. In fact, Mr. Keuylian's matter resolved rather quickly; he made one court appearance and shortly thereafter, agreed to cooperate with the government against Defendant.[10]

In addition, despite Mr. Keuylian's claim that Attorney Cavallo is a reputable Orange County criminal defense attorney, his disciplinary record proves otherwise. In fact, a printout of Attorney Cavallo's California Bar profile indicates that he has been disciplined on three occasions and actually suspended from the practice of law in 2007 and 2009. One such suspension resulted from Attorney Cavallo's conviction for three felony counts of conspiracy to commit the crime of attorney capping and attorney recommendation by bail licensee and the actual crime of attorney recommendation by bail licensee. Attorney Cavallo was only recently reinstated in December of 2010.

Based on the lack of documentation to support his restitution claim against Defendant, the government's failure to provide sufficiently detailed evidence to demonstrate by a preponderance of the evidence that these costs were incurred by Mr. Keuylian in aid of Defendant's investigation or prosecution, and the probable unconscionability of Attorney Cavallo's fee, Defendant should not be required to pay Mr. Keuylian's claimed restitution. At the very least, this Court should require an evidentiary hearing on this issue so that the undersigned may call Mr. Keuylian and Attorney Cavallo as witnesses in order that they may clarify their relationship and their purported agreement.

---

[10] There is no indication by Mr. Keuylian or in the record that he ever attempted to recover any amount of the purported $275,000 fee from Attorney Cavallo himself. Instead, Mr. Keuylian has made it a point to go after Defendant for said sum.

DEFENDANT'S SENTENCING MEMORANDUM

## VI.    DEFENDANT HAS NO CUSTODIAL TIME REMAINING

As noted above, pursuant to the January 17, 2011 plea agreement, Defendant should only be required to serve a term of imprisonment of 57 months which is consistent with the low-end of the Sentencing Guidelines for Defendant's total offense level of 25 and criminal history category I. However, because Defendant has already served more than 85% of his sentence, there is no further custodial time remaining for him to serve.

Defendant was initially arrested on March 24, 2004 and subsequently released on bond on June 3, 2004. *See Exhibit I.* As such, Defendant served approximately two months in prison. Following a second arrest, Defendant was remanded into custody on August 17, 2006. *See Exhibit J.* According to records from the Bureau of Prisons, Defendant was not released from custody until February 3, 2011. *See Exhibit K.* Consequently, Defendant had served over 55 months. Therefore, Defendant's total time served is *over* 57 months.

Defendant should only be required to serve 85% of his sentence as stated under the current plea agreement. Given the above relayed information, it is undisputed that Defendant has more than satisfied this requirement; 85% of Defendant's 57-month term of imprisonment calculates to approximately 48 months of custody. Defendant has already served more than 57 months in custody. As such, if the Court accepts this plea, Defendant has already served 9 more months that the maximum custodial time required under the plea agreement.

//

//

//

//

//

DEFENDANT'S SENTENCING MEMORANDUM

VII.   CONCLUSION

WHEREFORE, Defendant respectfully requests that this Court schedule an evidentiary hearing in order to evaluate the veracity of Mr. Keuylian's restitution claim against Defendant.

Respectfully Submitted on this 20th day of September, 2011,

By:   /s/ David Kenner

    David E. Kenner
    Attorney for Plaintiff

21

DEFENDANT'S SENTENCING MEMORANDUM

PROOF OF SERVICE

STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is:

KENNER LAW FIRM, APC
16633 Ventura Boulevard, Suite 800
Encino, CA 91436
Ph: (818) 995-1195
Fx: (818) 475-5369

On September 20th, 2011, I served the foregoing document described as Defendant's Sentencing Memorandum and Position Re Evidentiary Hearing for Restitution After Sentence, on the interested parties:

SEE ATTACHED SERVICE LIST

_____    BY MAIL – I deposited such envelope in the mail at Los Angeles County, California. The envelope was mailed with postage thereon fully prepaid.

_____    I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles County, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

___x____    (STATE) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

___x____    (FEDERAL) I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

EXECUTED under penalty of perjury this 20th day of September, 2011, at Encino, California.

/s/ David Kenner
David Kenner

22

DEFENDANT'S SENTENCING MEMORANDUM

LIST OF PARTIES SERVED

Via Electronic Service & Hand Delivery
MARK CHILDS, AUSA
1400 United States Courthouse
312 N. Spring Street
Los Angeles, CA 90012

Via Electronic Service & Hand Delivery
PATRICK MCLAUGHLIN, AUSA
1400 United States Courthouse
312 N. Spring Street
Los Angeles, CA 90012

Via Email
HARLAND W. BRAUN
1880 Century Park E., #170
Los Angeles, CA 90067
Email: Harland@braunlaw.com

Via Electronic Service & Hand Delivery
Lori Pascover
U.S. Probation Office
312 North Spring Street, 6th Floor
Los Angeles, CA 90012

DEFENDANT'S SENTENCING MEMORANDUM