# EXHIBIT F

FILED

2009 MAR 11  AM 10: 21

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. SA CR 09-**SACR 09-0056** |
| Plaintiff, | I N F O R M A T I O N |
| v. | [18 U.S.C. § 1343: Wire Fraud] |
| VIKEN KEUYLIAN, | |
| Defendant. | |

The United States Attorney charges:

[18 U.S.C. § 1343]

At all times relevant to this information:

A.   INTRODUCTION

1.   At all relevant times, VIKEN KEUYLIAN ("defendant") was the owner of two automobile dealerships: Platinum Motors, LLC d.b.a. Lamborghini of Orange County and Calabasas EuroAutoGroup, LLC d.b.a Lamborghini of Calabasas ("defendant's dealerships").

2.   Most of the Lamborghinis on the lot of defendant's dealerships were purchased using funds borrowed from Volkswagen Credit Inc.("VCI") pursuant to a flooring line of credit.  Under this agreement, defendant's dealership would borrow money from

Case 2:04-cr-00373-RGK    Document 598-3    Filed 09/20/11    Page 3 of 32    Page ID
#:2892
Case 8:09-cr-00056    Document 1    Filed 03/11/2009    Page 2 of 4

VCI to purchases cars.  As each car was sold, defendant was obligated pay VCI back the money it loaned defendant for that specific vehicle.  VCI maintained a security interest in the unsold cars.

B.    SCHEME TO DEFRAUD

3.    Beginning no later than September 2007, defendant KEUYLIAN became financially overextended.  Defendant KEUYLIAN was unable to continue to meet his debt obligations related to his various holdings, including his vineyard, a commercial building on Pacific Coast Highway in Newport Beach, California, and his Lotus dealership in Beverly Hills, California.  To help meet these obligations, defendant KEUYLIAN began selling cars that VCI had a security interest in, and instead of using the proceeds from the sale to pay VCI back as required, defendant KEUYLIAN used the funds to pay for his other obligations.  Defendant KEUYLIAN, and others, deceived VCI into believing that certain cars VCI had loaned defendant KEUYLIAN the money to purchase that were subject to a security interest were still unsold, when in truth and in fact, as defendant KEUYLIAN well knew, these cars had been sold and the proceeds from those sales had been misappropriated to pay defendant's other obligations.

4.    Beginning in October 2008, defendant KEUYLIAN sold at least 54 vehicles, mostly Lamborghinis, subject to VCI's flooring line of credit for less than defendant borrowed from VCI to purchase the cars.  Defendant KEUYLIAN took the proceeds from these sales and used them to pay back some of the funds that defendant KEUYLIAN have previously misappropriated from VCI.  VCI had loaned $12,560,314 to defendant KEUYLIAN to purchase the 54

2

cars that defendant sold.  Defendant KEUYLIAN received $8,163,275 in cash from the sales of these cars.  None of the funds defendant received were used to pay back VCI the money it loaned defendant KEUYLIAN to purchase these 54 cars.

5.    Throughout the scheme, defendant KEUYLIAN, acting with the intent to defraud, misled VCI into believing that the cars that he sold remained as collateral for the money VCI had lent

C.    **EXECUTION OF THE SCHEME**

6.    Beginning no later than September 2007, in Orange County, within the Central District of California, and elsewhere, defendant KEUYLIAN, and others, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud VCI by means of materially false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

7.    On or about the date set forth below, in Orange County, within the Central District of California, and elsewhere, defendant KEUYLIAN, for the purpose of executing and attempting to execute the above-described scheme to defraud, caused the

///

///

///

///

3

following to be transmitted by means of wire communication in interstate commerce:

| COUNT | DATE | WIRING |
|-------|------|--------|
| ONE | 10/23/2008 | Wiring of $122,660 of funds from VCI's JP Morgan account in Dearborn, Michigan to Wells Fargo Bank, in Santa Ana, California to purchase a 2006 Bentley Continental |

THOMAS P. O'BRIEN
United States Attorney

CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division

ROBB C. ADKINS
Assistant United States Attorney
Chief, Southern Division

ANDREW STOLPER
Assistant United States Attorney

4

NOV. 29. 2006  2:31PM

COPY

NO. 0304   P. 2

2006 NOV 29  AM 11: 24

GEORGE S. CARDONA
Acting United States Attorney
THOMAS P. O'BRIEN
Assistant United States Attorney
Chief, Criminal Division
THOMAS P. SLEISENGER (State Bar No. 100254)
Assistant United States Attorney
Asset Forfeiture Section
     United States Attorney's Office
     1400 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-0637
     Facsimile: (213) 894-7177
     e-mail: tom.sleisenger@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ) | No. CR 04-373(A)-R |
|---|---|---|
| Plaintiff, | ) | ADDENDUM TO MEMORANDUM RE: RESTITUTION; EXHIBIT |
| v. | ) | |
| HAI WAKNINE, | ) | Date:   December 11, 2006<br>Time:   1:30 p.m. |
| Defendant. | ) | |

Plaintiff, United States of America, by and through its counsel of record, Assistant United States Attorney Thomas P. Sleisenger, hereby files an addendum to it memorandum re: restitution in the above-entitled case.  The memorandum consists of the attached exhibit which is the Declaration of Victim Losses submitted by victim Viken Keuylian.  Mr. Keuylian and Mr. Hadad,

whose claim has already been submitted, are similarly situated. The government would rely on the arguments made in the original memorandum in addressing the merits of Mr. Keuylian's claims.

DATED: November 29, 2006

Respectfully submitted,

GEORGE S. CARDONA
Acting United States Attorney

THOMAS P. O'BRIEN
Assistant United States Attorney
Chief, Criminal Division

THOMAS P. SLEISENGER
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA



2

PROB 72
(11/96)

## UNITED STATES PROBATION OFFICE
## CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA | CASE NUMBER |
|---|---|
| Plaintiff | CR- 04-373 |
| vs. | |
| HAI WAKNINE, | DECLARATION OF VICTIM LOSSES |
| Defendant | |

I, **VIKEN KEUYLIAN**, residing at _____,
in the city (or county) of **ORANGE**, in the state of **CALIFORNIA**,
am victim in the above-referenced case and I believe that I am entitled to restitution in
the total amount of $ **1,500,000**.

My specific losses as a result of this offense are summarized as follows (attach receipts
whenever possible):

_____ I have been compensated by insurance or another source with respect to all or a
portion of my losses in the amount of $_____. The name and address of my insurance
company and the claim number for this loss is as follows:

I declare under penalty of perjury that the foregoing is true and correct.

_____
(Signature)

**( 949 ) 261-8972**
(Telephone No.)

Executed on
**1/7/06** day of _____,_____

*(Additional Pages May be Attached)*

NOV. 29. 2006  2:31PM                                                        NO. 0304   P. 5

NO. 0304   P. 5

TO:         Tom Sleisenger
            U.S. Attorney's Office

            Dolores Y. Perez

FAX:        213-534-7375

FROM:       Viken Keuylian

## Breakdown of the Claim

Joe Cavallo - Attorney at Law                                    $250,000

Tom Davis - Investigator                                         $25,000

Bail / Bond related Expenses                                     $50,000

Due to this matter we were pressured                            $1,000,000   *Tim Okane*
to sell our Lamborghini Beverly Hills Franchise                              *Bentley B.H.*
at under market value (Discounted $1,000,000).

Legal fees related to issues arising from this                  $300,000
matter impacting my Porsche Franchise
Resulting in loss of Franchise

Loss of Actual Porsche Franchise      Priced at   $10,000,000

Loss of Credibility and damage to reputation      Priceless
with customers and manufacturers

Loss of credibility and damage to reputation      Priceless
in social and political circles

**My Specific losses as a result of this offense are summarized as follows (attach receipts whenever possible)**

1. Attorney Fees
2. Investigators fees
3. Loss of Business due to serious interruption from this matter
4. Damage of critical business relationships
5. Damage of reputation in the industry
6. Recently hired a PR company to combat all and any negative fallout that the business has been and continues to experience from this incident.
7. Damage to critical business information removed by investigators from our place of business including computers important customer documents.

## VICTIM'S IMPACT STATEMENT

### How have you and your family been impacted by the crime?

All family members went through a traumatic and stressful experience. Humiliation, fear, easily distracted by thoughts of the incident. Loss of sleep. At times feelings of shame, dealing with the arrest, court appearances, interrogation, visits to attorney, questioning of our integrity personal and professional.

We felt harassed though constant phone calls from the media to the residence and business. Phone hang ups at the residence. The threat of facing criminals that threaten the livelihood of the family members. Inability to focus on the business. All of us remain haunted by these memories.

I make deliberate efforts to avoid thoughts or feelings about the traumatic event and to avoid activities or situations which may remind me of the event.

And fear is constant especially when we go back to our business location where the treats happened and where we were victimized by the offense.

**How has the crime affected you and your family lifestyle?**

Often it is hard to go about conducting our normal daily routines such without constantly looking over our shoulders such as  dropping off the kids at school without being paranoid. Always watching who is following us or our car. Not trusting for the kids with anyone without immediate family members being present.

**Has the crime affected your family's livelihood? If so how?**

We have seriously entertained the thought of hiring guards for protection at our residence and place of business.

Inability to get loans approved because of the record on the case reflecting my alleged involvement and having to explain the situation to the bankers and loan officers.

**Have you or members of your family received Counseling or therapy as a result of this crime?**

We have not sought any formal therapy and tried to deal with this traumatic event on our own within the family. But this does not mean that the emotional and traumatic experiences were insubstantial. We carry a heavy burden with us.

**Do you relate to people differently since the crime?**

Yes. I am less trusting of people and feel I hold back from forging into what sometimes could be beneficial and profitable business partnership on potential ventures with others. I also question the intent of people's questions.

UNITED STATES v. HAI WAKNINE    Case Number: CR 04-373

Victim Name:

## VICTIM IMPACT STATEMENT    Page 1

How have you and members of your family been affected by this crime?

Please continue this statement on an additional sheet of paper if you wish.

Have you or members of your family received counseling or therapy as a result of this crime? Please explain. If this was a violent crime, do you wish future counseling to assist you and/or your family in recovering from the crime?

Have you filed a civil suit against the defendant? If yes, please list the case name, court location, and docket number.

_Not At This Time_

Have you been assessed any additional taxes. penalties or interest by the federal government as a result of this case? If yes, please explain.

_No_

Do you relate to people differently since the crime?  Have your feelings about yourself changed? Please explain.

_____

_____

_____

How has the crime affected you and your family's lifestyle?

_____

_____

Has the crime affected your family's livelihood? If so, how?

_____

_____

Have you experienced any of the following reactions to the crime:
PLEASE REALIZE THESE ARE NORMAL REACTIONS TO A TRAUMATIC EVENT.

X Anger __ Anxiety X Fear __ Grief __ Guilt __ Numb __ Repeated Memory of Crime

X Sleep Loss X Nightmares __ Appetite Change __ Unsafe __ Chronic Fatigue

__ Trouble Concentrating __ Easily startled __ Forgetfulness __ Depression

X Fear the Defendant Will Return __ Uncontrolled Crying

Please describe any other reactions to the crime committed.

_____

_____

If a victim consents, the Court may also make restitution in services in lieu of money, or make restitution to a person or organization designated by a victim.  If you are interested in this option, please explain. _____

_____

Do you feel the defendant is or will be a threat to you, your family or the community? X Yes ___ No  Please explain.

_HE WILL BE A THREAT TO ME & MY FAMILY_

_I AM ALSO CONCERNED ABOUT HIS GROUP._

What else would you like the Judge to know about the defendant or your situation as a result of the crime?

_OUR FAMILY WENT THRU A LOT OF HARD TIME. I_

_LOST OUR FAMILIES PORSHE MARCH K to I WHICH IS_

_WORTH OVER $100 MILLION_

NOV. 29. 2006 12:32PM    US ATTORNEYS OFFICE    213 NO. 030414    P. 10/7

Case Number: _____

### VICTIM IMPACT STATEMENT (Business or Corporate Version)

Company Name: _____    Company Address: _____
_____

How has your company and other employees been affected by this crime?

_____

_____

_____

_____

_____

_____

_____

_____

_____

Please continue this statement on an additional sheet of paper if you wish.

What else would you like the Judge to know about the defendant, or your company's situation as a result of the crime?

_____

_____

_____

_____

Have you filed a civil suit against the defendant? If yes, please list the case name, court location, and docket number.

_____

_____

_____

_____

TOTAL P.06

## CERTIFICATE OF SERVICE

I, STELLA GONZALES, declare:

That I am a citizen of the United States and resident or employed in Los Angeles County, California; that my business address is the Office of United States Attorney, United States Courthouse, 312 North Spring Street, Los Angeles, California 90012; that I am over the age of eighteen years, and am not a party to the above-entitled action;

That I am employed by the United States Attorney for the Central District of California who is a member of the Bar of the United States District Court for the Central District of California, at whose direction I served a copy of:

ADDENDUM TO MEMORANDUM RE: RESTITUTION; EXHIBITS

service was:

[ ] Placed in a closed envelope, for collection and interoffice delivery addressed as follows:

[X] Placed in a sealed envelope for collection and mailing via United States Mail, addressed as follows:

[ ] By hand delivery addressed as follows:

[ ] By facsimile as follows:

[ ] By messenger as follows:

[ ] By federal express as follows:

David Kenner, Esq.
16000 Ventura Blvd.,
Suite 1208
Encino, California 91436

Michael Barrett
USPO
312 N. Spring Street, 6th Fl.
Los Angeles, CA 90012

This Certificate is executed on November 29, 2006, at Los Angeles, California. I certify under penalty of perjury that the foregoing is true and correct.

STELLA GONZALES

PROB 72
(11/96)

## UNITED STATES PROBATION OFFICE
## CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA | CASE NUMBER |
|---|---|
| Plaintiff | CR- 04-00373 |
| vs. | |
| Waknine, Hai | DECLARATION OF VICTIM LOSSES |
| Defendant | |

I, Viken Keuylian _____, residing at (withheld for safety concerns), in the city (or county) of _____, in the state of _____, zip___, am a victim in the above-referenced case and I believe that I am entitled to restitution in the total amount of $ 275,000.00 _____.

My specific losses as a result of this offense are summarized as follows (attach receipts whenever possible):

_____ I have been compensated by insurance or another source with respect to all or a portion of my losses in the amount of $ -0- _____. The name and address of my insurance company and the claim number for this loss is as follows:

I declare under penalty of perjury that the foregoing is true and correct.

_____
(Signature)

(withheld for safety concerns)
(Telephone No.)

Executed on
29 day of July, 2010

(Additional Pages May be Attached)

170283

## DECLARATION OF VIKEN KEUYLIAN

I, Viken Keuylian, declare as follows:

1.      I am the same person described in Attachment A to the plea agreement for defendant Hai Waknine. Mr. Waknine, introduced me to Gabi Benharosh, as a successful Israeli businessman rather than an organized crime member who was attempting to hide stolen money from the Israel National Police. At the time I was looking for investors to provide funds to purchase vehicles, and Mr. Benharosh agreed to invest in my company and gave my company $950,000, by wire and check. Per the agreement, I purchased six vehicles with the funds, but was unable to sell them for the profit that was contemplated due to changing market conditions.

2.      As described in Waknine's plea agreement, in March 2003 I was visited at my dealership by Mr. Waknine and three other thugs who came to collect the loan I had received from Benharosh. Their appearance was ominous and El-Al showed me scars on his leg from a bomb and implied that if I did not immediately repay the money something similar would happen to me. Later in a voice mail, Waknine told me that if I didn't immediately pay, they would come and take two million dollars from me.

3.      In response to these threats, in April 2003, at the direction of Waknine, I transferred substantial sums as described in Attachment A.

4.      A the time that I accepted the loan from Benharosh, I did not know that I was dealing with the Israeli organized crime, commonly called the Israeli mafia. I genuinely believed that I could purchase automobiles with the funds

170284

loaned to me, sell them at a profit, share the profit with Benharosh, and repay the loan. The multiple transfers made by me after the visits from the "thugs" were a direct result of the threats made to me.

5. As the court can see from Attachment A, it turns out that I received illegal money from Israel through the Israeli mafia that disguised itself as legitimate businessmen. After I had been threatened, I engaged in multiple transfers of money back to the very people who gave me the original money. From the outside, it would appear that I was engaged in some form of money laundering disguising illegal money from Israel and returning the money to various members of the Israeli mafia. In fact, I was a victim of extortion and serious threats.

6. As a result of the transactions in which I engaged under threat of injury, I was investigated by the United States government which believed at that time that I might be a party to money laundering. Because of these transactions, I was charged with serious federal felonies which could have resulted in me spending the rest of my life in prison.

7. I was not in Los Angeles at the time that an arrest warrant was issued for me and federal agents came to my home. When I learned of the arrest warrant, I knew that I had to retain reputable criminal counsel to defend me against the charges which I faced. These charges were an understandable and predictable result of the various financial transaction in which I engaged as a result of the threats from the Israeli mafia.

8. I retained Joseph Cavallo, a well known Orange County criminal

2

lawyer, to handle the entire matter. Mr. Cavallo charged me a flat, non-refundable retainer of $275,000 for legal representation and investigative services. Mr. Cavallo contracted to handle the entire matter whether it got dismissed, settled, or tried to a full trial. There was no arrangement for Mr. Cavallo to be paid by the hour. Mr. Cavallo immediately intervened in the case, and after meetings with agents and the United States Attorney's Office, convinced the government that I was in fact an innocent victim of extortion and not a member of Israeli organized crime. Mr. Cavallo obtained the dismissal of all charges against me, and arranged for me to become a government witness. Mr. Cavallo met with government agents and me while I was debriefed in preparation for testimony.

9. At the trial Hai Waknine in front of the Honorable Manuel L. Real, I testified as a government witness, thereby seriously endangering my safety and the safety of my family. I testified and during the trial, Mr. Waknine entered a guilty plea to two charges as part of a case settlement.

10. At Mr. Waknine's sentencing, Judge Real ordered $275,000 of restitution for me to compensate me for the legal services and investigative services required as a result of Mr. Waknine's conspiracy and extortion. Due to the passage of time, I have difficulty in producing paperwork evidencing the entire $275,000 payment, however, I remember clearly that the total amount of money paid Mr. Cavallo was $275,000.

11. I have attached proof of $200,000 which I paid Mr. Cavallo. The court will see my bank statement of April 30, 2004, which shows three checks, 2552, 2553, and 2554, totaling $150,000. Also attached are the three cashier's

3

checks which were purchased with the three $50,000 withdrawals. The statement also shows an April 13, 2004, withdrawal of $50,000 which was purchased with the $50,000 April 13th cash withdrawal. The notation on the cashier's check that it replace check 2553 is incorrect. The documentation indicates that check 2553 cleared the account on April 9, 2004, whereas the $50,000 withdrawal occurred four days later on April 13, 2004.

12.     I have been unable to produce the documentation or reconstruct the balance of $75,000 that I paid Mr. Cavallo. I approached Mr. Cavallo to obtain documentation but he was uncooperative. Through my counsel I inquired of the government whether it could produce the original paperwork used to make a submission to Judge Real, but the government seemed neither to be able to locate it or recall where that documentation would be. However, there is no question in my mind that the total amount paid to Mr. Cavallo was $275,000.

13.     As the court can see from the scheme outlined in Attachment A, I was put in the middle of an Israeli mafia money laundering scheme which made it appear to the government that I was in fact criminally involved rather than an innocent victim. As a result of the nature of the crimes, I was understandably indicted. I found it absolutely necessary to employ counsel to save me from possibly a lifetime in prison, and had no experience in employing criminal counsel. The arrangement with Mr. Cavallo appears to be similar to many other arrangements of which I now have knowledge, and I understand it is customary for some criminal lawyers in Orange County to charge flat, non-refundable fees. I did not ask for any refund from Mr. Cavallo because I believe he acted

4

170287

competently and efficiently in obtaining a dismissal of the charges against me, and assisting me to cooperate as a government witness.

14.    Because I had to spend $275,000 out of my own funds to protect me as a result of Mr. Hai Waknine's criminal conduct, I ask the court to order Mr. Hai Waknine to pay me $275,000 as restitution.

15.    I understand that Mr. Waknine faces deportation after sentencing in this matter. I ask the court to make sure that Mr. Waknine pays whatever restitution the court orders prior to accepting the plea agreement between the government and Mr. Waknine.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __21__ day of July, 2011, at Los Angeles, California.

VIKEN KEUYLIAN

5

170288

### Attachment A to Statement of Hai Waknine

Defendant Hai Waknine ("defendant") admits that, as alleged in count eight of the superseding indictment, in the Central District of California, defendant conspired with others to launder money in violation of 18 U.S.C. §§ 1956(h) and 1956(a)(1)(B)(i). Defendant, Gabi Benharosh, Sasson Barashy, Yoram El-Al and others committed the following overt acts to accomplish the conspiracy and in furtherance of the conspiracy:

In early 2002 and before, Gabi Benharosh ("Benharosh"), Sasson Barashy ("Barashy"), and others, were "gray market" money lenders and debt consolidators. In early 2002, monies that were embezzled from a financial institution in Israel (the "Trade Bank") were laundered to Benharosh and Barashy through a series of financial transactions that occurred in Israel ("embezzled funds"). In early 2002, Benharosh transferred proceeds of embezzled funds from his accounts in Israel to accounts of financial institutions in the United States, and also traveled to the United States with cash representing proceeds of embezzled funds.

With the assistance, aid and agreement of defendant, who was aware that the source of the loans was proceeds from embezzled funds, Benharosh made loans to Eli Hadad and Yossef Atia in, Miami, Florida, and later, to Viken Keuylian, in Los Angeles, California. The source of these loans was, in fact, proceeds of embezzled funds. During all relevant times of the conspiracy, defendant was aware that the loans to Hadad and Keuylian were a means to conceal Benharosh's ownership of the money in order to hide the money from the Israel National Police.

Yosef Atia ("Atia") would testify that in early 2002, in Florida, Atia introduced Benharosh and defendant to Hadad. Hadad tried to get Benharosh and defendant to invest in real estate deals in South Florida. During Benharosh's first visit in March, 2002, Atia was asked to find apartments in Miami for Benharosh, Barashy and defendant. During a second trip with defendant, Hadad took Benharosh and defendant to look at various "real estate projects" while Barashy joined Atia and another person at a United States Customs seized goods auction.

In 2002, Atia owed money to Benharosh and creditors in Israel. After arrangements were made to send money to Israel on Atia's behalf, in 2002, Atia recalls going with Hadad to defendant's apartment in Miami, Florida. After getting to the apartment, defendant, Benharosh, Hadad and Atia went out on the balcony to talk. At some point, Benharosh took Atia aside and told him that Benharosh wanted his money back, stating, "I want



1

170289

Case 2:04-cr-00373-RGK   Document 598-3   Filed 09/20/11   Page 23 of 32   Page ID
Case 2:04-cr-00373-RGK   Document 590-1   Filed 08/08/11   Page 48 of 77   Page ID #:2757
#:2912

you to return my money. You took money from people." Benharosh
added that he wanted the money back by the following morning or,
as Atia interpreted it, Atia would be harmed.

The next morning, Atia saw Benharosh, who acted like nothing
had happened and appeared friendly. A day later, Atia and Hadad
took Benharosh to the airport. Atia recalls Benharosh handing a
check from a financial institution[1] to Hadad.

At all relevant times during the conspiracy, Atia, like
defendant, was aware that Benharosh was loaning money in order
for Benharosh to hide the proceeds of embezzled funds that were
under Benharosh's control. In early 2002, Atia recalls that the
embezzlement from the Trade Bank was reported on an Israeli news
channel in the United States around the time of Benharosh's visit
to Miami. Four or five days later, Atia received a series of
calls from Benharosh renewing his threats if Atia did not repay
the money. Micha Aslan, who Atia believed was Benharosh's
partner, called Atia and told him to pay the money back. Atia
was unable to repay his part of the loan from Benharosh, and fled
the United States

Eliyahu Hadad, a real estate investor in Miami, would
testify that in May 2002, Atia introduced him to defendant and
Benharosh. On May 3, 2002, Hadad would testify he received a
wire transfer from a financial institution of $75,000 which was
an initial "good faith" loan payment from Benharosh and defendant
in support of future business dealings. On May 7, 2002, Hadad
received a cashier's check for $250,000 drawn on Benharosh's
"Amir Elad" account at a financial institution in Israel. Hadad
spent part of these monies on renting apartments in the Miami
area and an investment of United States Customs seized clothing.
Hadad also learned from Atia, his partner, that Atia had received
money from Benharosh in Israel that had been sent to Atia's
creditors in Israel.

After Atia fled the United States, Hadad was held
responsible for the entire loan amounts given to Atia and Hadad
from Benharosh and defendant. In late April 2003, defendant,

---

[1] The terms "financial institution," "City National Bank"
and "Wells Fargo Bank" used herein are each a "financial
institution" as that term is defined by 18 U.S.C.
§§ 1956(c)(6); the term "financial transaction" used herein is a
"financial transaction" as that term is defined by 18 U.S.C.
§ 1956(c)(4); and the term "proceeds" used herein are "profits"
as that term is defined by United States v. Santos, 508 U.S. 507
(2008).



2

170290

Case 2:04-cr-00373-RGK   Document 598-3   Filed 09/20/11   Page 24 of 32   Page ID
Case 2:04-cr-00373-RGK   Document 590-1   Filed 08/08/11   Page 49 of 77   Page ID #:2758
#:2915

Barashy, Yoram El-Al, and Thanh Nguyen, came to Florida and summoned Hadad to a meeting at the Sheraton Bal Harbour Hotel. A note was given to Hadad by defendant guaranteeing that he would return from the meeting.  At the Sheraton Bal Harbour, a co-conspirator, acted as, among other things, a "mediator," declaring that Hadad would pay $330,000 (at that point, Hadad had already paid part of the money back).  Walking out of the mediation, El-Al showed Hadad scars he had sustained from a bomb blast inferring that Hadad could suffer a similar injury if he didn't pay.  Following the "mediation," with the aid of defendant, Hadad was taken to Mark Cohen, one of defendant's lawyers, who drafted and executed documents, including a mortgage note, obligating Hadad to pay $336,000 ($6,000 for filing fees) unless the debt was paid after September 25, 2003, in which case the balance would be increased to $500,000.  The defendant did not witness these events but accepts them.

DEA agents would testify about surveillance conducted on April 24 and April 25, 2003, including surveillance conducted on meetings between defendant, Barashy, Yoram El-Al, and other co-conspirators and Hadad, at attorney Mark Cohen's office in Miami and at the Sheraton Bal Harbor Hotel, Bal Harbor, Florida.  At the hotel, one of the agents saw El-Al yelling at Hadad and pointing his finger at Hadad's chest.  The defendant did not witness the yelling by El-Al but does object to these facts.

On May 8, 2002, as evidenced by subpoenaed bank records, Benharosh wire transferred $500,000 from his "Amir Elad" account to an account belonging to Nettie Becker Escrow Company in Los Angeles, California.  An employee from the escrow company would testify that defendant had an account at the escrow company relating to real estate investments.  On May 9, 2002, Benharosh wire transferred $450,000 to 522 Landfair LLC.  Defendant was seeking to invest in real estate through 522 Landfair LLC.

Viken Keuylian, the owner of a Lamborghini car dealership in Beverly Hills, California would testify that in 2002 he told defendant that he was looking for investors to provide funds for the purchase of high-end vehicles.  He also told defendant that he could purchase vehicles in Europe, convert them to United States specifications, sell the vehicles at his dealership, and split the profits with the investors.

Keuylian would testify that in May 2002 defendant introduced him to Benharosh and told him that Benharosh was a successful Israeli businessman who was in the construction business. Shortly thereafter, Benharosh agreed to give defendant $950,000 toward the purchase of six vehicles.  Keuylian expected to turn a profit of between $40,000 and $70,000 per vehicle. Approximately one week later, defendant caused a wire transfer of



3

$450,000 to Keuylian from Landfair LLC.  Shortly thereafter, Keuylian received a $500,000 check from Nettie Becker Escrow. Keuylian imported the six vehicles and attempted to convert the vehicles, but encountered problems.

In March 2003, defendant, Barashy, El-Al, and Thanh Nguyen came to Keuylian's car dealership to collect the money that had been loaned to Keuylian by Benharosh.  While a repayment contract would be drafted by lawyers, the group began to demand immediate repayment.  El-Al showed Keuylian scars on his legs from the bomb blast and implied that something similar could happen to him if he did not cooperate with defendant.  In a subsequent voicemail message sent to Keuylian's cell phone, defendant told Keuylian that if he didn't pay immediately, "they" would come and take $2,000,000.  Keuylian contacted the Orange County Sheriff's Department after he received the threatening voicemail message and similar messages.

On April 30, 2003, in response to the aforementioned threats, at the direction of defendant, Keuylian wire transferred (1) $652,852 from Wells Fargo Bank ("WFB"), account number #XXXXXXX736, in the name of "Keuylian Children's Trust," to City National Bank ("CNB"), account number #XXXX705, of the trust account of a California attorney and (2) on May 6, 2003, Keuylian caused approximately $45,000 to be wire-transferred from WFB, account number #XXXXXXX736, to CNB, account number #XXXX705.  In order to launder the funds extorted by Keuylian, as evidenced by subpoenaed bank records, (1) on May 2, 2003, defendant caused check number #417, in the amount of $652,812, to be drawn on CNB, account number #XXXX705, and made payable to "Gabriel Harroch" aka Benharosh and (2) on May 7, 2003, defendant caused check number #418, in the amount of $44,988, to be drawn on CNB, account number #XXXX705, and made payable to "Gabriel Harroch" aka Benharosh.

In order to further launder the extortion proceeds from Keuylian, in May 2003, defendant caused CNB cashier's checks #XXXXXX374, #XXXXXX375 and #XXXXXX411 in the amounts, respectively, of  $500,000, $152,812, and $44,988 made payable to "Gabriel Harroch," to be created and, subsequently, delivered to Benharosh in Spain.  As evidenced by subpoenaed bank records, Benharosh later deposited these checks in an account at the Banco de Andalucia in Spain.

Defendant knew that the monies that he transferred to and from the aforementioned accounts at CNB, WFB and Banco de Andalucia were proceeds from acts of extortion against Hadad and Keuylian.  Defendant also knew that the financial transactions discussed above were designed in whole or in part to conceal or disguise the nature, location, source, and ownership of said proceeds.

4

170292

In March 2003, defendant, Barashy, El-Al, and Thanh Nguyen came to Keuylian's car dealership to collect the money that had been loaned to Keuylian by Benharosh. While a repayment contract would be drafted by lawyers, the group began to demand immediate repayment. El-Al showed Keuylian scars on his legs from the bomb blast and implied that something similar could happen to him if he did not cooperate with defendant. In a subsequent voicemail message sent to Keuylian's cell phone, defendant told Keuylian that if he didn't pay immediately, "they" would come and take $2,000,000. Keuylian contacted the Orange County Sheriff's Department after he received the threatening voicemail message and similar messages.

On April 30, 2003, in response to the aforementioned threats, at the direction of defendant, Keuylian wire transferred (1) $652,852 from Wells Fargo Bank ("WFB"), account number #XXXXXXX736, in the name of "Keuylian Children's Trust," to City National Bank ("CNB"), account number #XXXX705, of the trust account of a California attorney and (2) on May 6, 2003, Keuylian caused approximately $45,000 to be wire-transferred from WFB, account number #XXXXXXX736, to CNB, account number #XXXX705. In order to launder the funds extorted by Keuylian, as evidenced by subpoenaed bank records, (1) on May 2, 2003, defendant caused check number #417, in the amount of $652,812, to be drawn on CNB, account number #XXXX705, and made payable to "Gabriel Harroch" aka Benharosh and (2) on May 7, 2003, defendant caused check number #418, in the amount of $44,988, to be drawn on CNB, account number #XXXX705, and made payable to "Gabriel Harroch" aka Benharosh.

In order to further launder the proceeds from Keuylian, in May 2003, defendant caused CNB cashier's checks #XXXXXX374, #XXXXXX375 and #XXXXXX411 in the amounts, respectively, of $500,000, $152,812, and $44,988 made payable to "Gabriel Harroch," to be created and, subsequently, delivered to Benharosh in Spain. As evidenced by subpoenaed bank records, Benharosh later deposited these checks in an account at the Banco de Andalucia in Spain.

Defendant knew that the monies that he transferred to and from the aforementioned accounts at CNB, WFB and Banco de Andalucia were proceeds from acts of extortion against Hadad and Keuylian. Defendant also knew that the financial transactions discussed above were designed in whole or in part to conceal or disguise the nature, location, source, and ownership of said proceeds.

Defendant admits that United States Sentencing Guidelines § 2B1.1(b)(1)(I) is the value of the laundered funds involved in the conspiracy.





KEUYLIAN SPECIALTY ENTERPRISES LLC

PAGE 2 of 2
Account Number:          600-0337029
Statement End Date:        04/30/04

WITHDRAWALS AND DEBITS

| DATE | TRANSACTION DETAIL | AMOUNT |
|---|---|---|
| APR 13 | | |
| APR 13 | WITHDRAWAL MADE IN A BRANCH/STORE | - 50,000.00 |
| APR 15 | | |
| APR 26 | | |
| APR 30 | | |

CHECKS PAID

| CHECK # | DATE | AMOUNT | CHECK # | DATE | AMOUNT |
|---|---|---|---|---|---|
| 2487 | APR 19 | | 2565* | APR 05 | |
| 2547* | APR 01 | | 2566 | APR 26 | |
| 2552* | APR 05 | 50,000.00 | 2567 | APR 06 | |
| 2553 | APR 09 | 50,000.00 | 2568 | APR 21 | |
| 2554 | APR 20 | 50,000.00 | 2569 | APR 15 | |
| 2555 | APR 05 | | 2570 | APR 13 | |
| 2556 | APR 08 | | 2572* | APR 26 | |
| 2557 | APR 02 | | 2573 | APR 26 | |
| 2558 | APR 08 | | 2575* | APR 23 | |
| 2559 | APR 07 | | 2576 | APR 27 | |
| 2560 | APR 09 | | 2577 | APR 22 | |
| 2561 | APR 05 | | 2579* | APR 30 | |

* GAP IN CHECK SEQUENCE

DAILY BALANCE SUMMARY

WELLS FARGO BANK STATEMENT.

170294



Case 2:04-cr-00373-RGK   Document 590-1   Filed 08/08/11   Page 54 of 77   Page ID #:2763





Newport Coast Branch                    21103 Newport Coast Dr.
                                        Newport Coast, CA 92657

May 18, 2011

To Whom It May Concern:

We are unable to retrieve a better copy of check number 2553, dated 04/09/04, payable to Joseph G. Cavallo in the amount of $50,000.00.

Unfortunately, the camera was out of focus and a clearer copy is not available.

If you have any further questions, please feel free to contact me at 949-219-0457.

Sincerely,

Sandy Siegeler
Customer Service Manager

170297



13997       -11-24                              **CASHIER'S CHECK**              · SERIAL #:
co AU #      1210(8)                                                            ACCOUNT#:

Isser:      KEUYLIAN SPECIALTY ENTERPRISES
Isser Account: 6000337029
stor I.D.:   cu011121        cu011121                                           April 13, 2004

' TO THE ORDER OF       ***JOSEPH G. CAVALLO***
                        ***RE: REPLACE CK#2553***

'Fifty thousand dollars and no cents***                                        **$50,000.00**

. LS FARGO BANK, N.A.            NOTICE TO PURCHASER – IF THIS INSTRUMENT IS LOST,    VOID IF OVER US$  50,000.00
E CORPORATE BUSINESS CENTER     STOLEN OR DESTROYED, YOU MAY REQUEST CANCELLATION
MAIN ST                         AND REISSUANCE. AS A CONDITION TO CANCELLATION AND    **NON-NEGOTIABLE**
E, CA 92614                     REISSUANCE, WELLS FARGO BANK MAY IMPOSE A FEE AND
NQUIRIES CALL (480) 394-3122    REQUIRE AN INDEMNITY AGREEMENT AND BOND.

**Purchaser Copy**

M4t00

3997       11-24                              **CASHIER'S CHECK**              · 0399704419 ·
e AU #      1210(8)

xor I.D.:  cu011121      cu011121

TO THE ORDER OF   ***JOSEPH G. CAVALLO***                                       April 13, 2004
                  ***RE: REPLACE CK#2553***

Fifty thousand dollars and no cents***                                         **$50,000.00**

S FARGO BANK, N.A.                                                              VOID IF OVER US$  60,000.00
CORPORATE BUSINESS CENTER
MAIN ST
CA 92614
QUIRIES CALL (480) 394-3122                                                    AUTHORIZED SIGNATURE

⑈0399704419⑈ ⑆121000248⑆486⑈ 505295⑈

170299