# EXHIBIT L

FILED

2008 JUL 23 PM 2:47

CLERK U.S. DISTRICT COURT
CENTRAL DIST OF CALIF.
LOS ANGELES

BY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

December 2007 Grand Jury

UNITED STATES OF AMERICA,

    Plaintiff,

    v.

ITZHAK ABERGIL,
    aka Itzhak Abergel,
    aka Yitzhak Abergel,
    aka the Friend,
    aka the Big Friend,
    aka the Man From the
      South,
MEIR ABERGIL,
    aka Meir Abergel,
SASSON BARASHY,
    aka Sasson Barashi,
YORAM EL-AL,
    aka Yoram Alal,
    aka the Wounded,
MOSHE MALUL,
    aka Eliyahu Ben Naim,
    aka Eli Adawi,
    aka Yochay Malul,
    aka Shimon Ohana,
    aka Moses Malul
ISRAEL OZIFA,
    aka Israel the Tall,
    aka the Tall One,
LUIS SANDOVAL,
    aka Barney Twin,
    aka Hog,

          Defendants.

No. CR 04-373(B)-R

S E C O N D

S U P E R S E D I N G

I N D I C T M E N T

[18 U.S.C. § 1962(d): Racketeer
Influenced and Corrupt
Organizations Conspiracy;
18 U.S.C. § 371: Conspiracy
to Commit Extortion; 18 U.S.C.
§ 894: Collection of Extensions
of Credit by Extortionate Means;
18 U.S.C. § 1951: Interference
with Commerce by Threats of
Violence; 18 U.S.C. § 1956(h):
Conspiracy to Commit Money
Laundering; 18 U.S.C.
§ 1956(a)(1)(B): Laundering of
Monetary Instruments; 18 U.S.C.
§ 1957: Engaging in Monetary
Transactions in Property Derived
from Specified Unlawful Activity;
18 U.S.C. §§ 1959(a)(1), (a)(5):
Violent Crimes in Aid of
Racketeering Activity; 21 U.S.C.
§ 846: Conspiracy to Distribute
MDMA; 21 U.S.C. § 952(a):
Importation of Controlled
Substances; 21 U.S.C.
§ 963: Conspiracy to Import
Controlled Substances; 18 U.S.C.
§ 2: Aiding and Abetting;
Causing an Act to Be Done]

403

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 1962(d)]

RICO CONSPIRACY

A.    THE RACKETEERING ENTERPRISE

At times relevant to this Second Superseding Indictment:

1.    Defendants ITZHAK ABERGIL, also known as ("aka") Itzhak Abergel, aka Yitzhak Abergel, aka the Friend, aka the Big Friend, aka the Man From the South ("ITZHAK ABERGIL"), MEIR ABERGIL, aka Meir Abergel ("MEIR ABERGIL"), SASSON BARASHY, aka Sasson Barashi ("BARASHY"), YORAM EL-AL, aka Yoram Alal, aka the Wounded ("EL-AL"), and others known and unknown to the Grand Jury, were members and associates of a criminal organization engaged in, among other things, bank embezzlement, extortion, kidnaping, and money laundering.  At all relevant times, this criminal organization contained members and associates of the "Abergil Family" and the "Jerusalem Network."  This criminal organization operated in the Central District of California and elsewhere.

2.    The criminal organization, including its leadership, membership and associates, constituted an "enterprise," as defined by Title 18, United States Code, Section 1961(4) (hereinafter "the Enterprise"), that is, a group of individuals associated in fact.  The Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise. The Enterprise was engaged in, and its activities affected, interstate and foreign commerce.

2

B.    GENERAL BACKGROUND OF THE RACKETEERING ENTERPRISE

At times relevant to this Second Superseding Indictment:

1.    The Abergil Family was among the most powerful crime families in Israel.  The Abergil Family engaged in bank embezzlement, loan sharking, money laundering, and illegal gambling in California, Florida, other parts of the United States, Israel, and Europe.  Although the Abergil Family was comprised of relatively few members, it wielded substantial power among other Israeli crime families because of its propensity for violence in Israel and around the world.

2.    The Jerusalem Network was a powerful criminal organization that conducted loan sharking, extortion, money laundering, and illegal gambling in Israel and Europe, and has worked to expand its influence over illegal activity conducted in other parts of the world including California, Nevada, Florida, and other parts of the United States.  The Jerusalem Network was formed through alliances and associations with crime families in Israel.  It has gained influence in the United States by cultivating ties with criminal elements in California, Florida, and Nevada, members of the business and legal community, as well as Israeli-born business persons, some of whom have been victimized by extortion rackets jointly controlled by the Enterprise.

3.    Members and associates of the Jerusalem Network and the Abergil Family, including defendant ITZHAK ABERGIL, defendant MEIR ABERGIL, and defendant BARASHY, joined forces and were jointly involved in the largest bank embezzlement scheme in the history of Israel.  As the Abergil Family is more powerful than

3

the Jerusalem Network, members and associates of the Enterprise followed the directives of defendant ITZHAK ABERGIL.  The Enterprise engaged in illegal activities in the United States, in part, as an attempt to launder the proceeds from the embezzlement of funds from bank accounts in Israel and their respective illegal gambling and loan sharking activities in Europe and Israel.  Members and associates of the Enterprise conducted extortion, loan sharking, and money laundering in California, Nevada, Florida, other parts of the United States, Israel, and Europe.

4.    Defendant ITZHAK ABERGIL was the leader of the Abergil Family and the Enterprise.  To further the power and influence of the Abergil Family, defendant ITZHAK ABERGIL conducted criminal activities in Israel and around the world through the use of, and alliances with, other criminal organizations based in Israel, including the Jerusalem Network.  For instance, the Abergil Family allied itself with the Jerusalem Network in order to embezzle millions of dollars worth of funds from the Tel Aviv Trade Bank located in Israel and, later, to loan part of these embezzled funds to businessmen in the United States and to extort repayment of these loans from the businessmen.

5.    Defendant MEIR ABERGIL, the brother of defendant ITZHAK ABERGIL, aided defendant ITZHAK ABERGIL in running the Abergil Family and the Enterprise.  Defendant MEIR ABERGIL, among others, was responsible for handling the finances of the Abergil Family, including collecting debts owed to the Abergil Family.

6.    Co-conspirator Gabriel Benharosh ("Benharosh") was among the highest ranking members of the Jerusalem Network and

4

the Enterprise.  Benharosh directed the criminal activities of other members and associates of the Jerusalem Network, including defendant BARASHY, defendant EL-AL, and co-conspirator Hai Waknine ("Hai Waknine").  Benharosh made loans of monies belonging to the Enterprise to businessmen in the United States. Benharosh also updated defendants ITZHAK ABERGIL and MEIR ABERGIL about the joint criminal activities of the Enterprise.

7.  Defendant BARASHY, defendant EL-AL, Hai Waknine, and others known and unknown to the Grand Jury, were part of and were directly associated with the Enterprise.  Defendant BARASHY and Hai Waknine made loans of monies belonging to the Enterprise to businessmen in the United States.  Defendant EL-AL was an enforcer for the Enterprise who intimidated businessmen in the United States in order to extort repayment of loans provided to the businessmen by defendant BARASHY and Hai Waknine, on behalf of the Enterprise.

8.  The Enterprise promoted discipline among its members and associates by the use of intimidation, violence, and threats of violence against persons who pose a threat to the Enterprise. The Enterprise also used intimidation, violence, and threats of violence to maintain their positions of power among other Israeli crime families.  Persons who cooperated with law enforcement authorities against the Enterprise were subject to intimidation, violence, and threats of violence.

C.  PURPOSES OF THE ENTERPRISE

1.  Among the purposes of the Enterprise were the following:

a.  Enriching the members and associates of the Enterprise through, among other things, embezzlement, extortion,

5

loan sharking, and money laundering.

b.    Preserving, protecting, and expanding the power of the Enterprise through the use of intimidation, violence, and threats of violence.

c.    Promoting and enhancing the Enterprise and the activities of its members and associates.

D.    MEANS AND METHODS OF THE ENTERPRISE

1.    Among the means and methods by which the defendants and their associates conducted and participated in the conduct of the affairs of the Enterprise were the following:

a.    In Israel, defendant ITZHAK ABERGIL, defendant MEIR ABERGIL, defendant BARASHY, Benharosh, and others, would take over the gambling debts that an individual named Ofer Maximov ("Maximov") owed to creditors.  They thereafter would collect these debts from Maximov and from his sister, Esther Alon. Esther Alon would embezzle funds from the Tel Aviv Trade Bank located in Israel (hereinafter "the embezzled funds"), in order to pay off her brother's debts to defendant ITZHAK ABERGIL, defendant MEIR ABERGIL, defendant BARASHY, and Benharosh.  Some of the embezzled funds would be deposited in bank accounts controlled by defendant BARASHY and Benharosh.  In order to conceal the embezzled funds from the Israeli authorities, defendant ITZHAK ABERGIL, defendant MEIR ABERGIL, defendant BARASHY, and Benharosh would transfer the stolen money to co-conspirator Assaf Waknine ("Assaf Waknine") and to others, including to individuals in the United States.  Defendant BARASHY, Benharosh, and Hai Waknine would use the embezzled funds to engage in loan sharking activities by making loans to

6

individuals in the United States, including Eliyahu Hadad ("Hadad") and Yosef Atia ("Atia") in Miami, Florida, and to Viken Keuylian ("Keuylian") in Los Angeles, California.  After the funds were transferred to the individuals in Florida and California, and to Assaf Waknine, defendant ITZHAK ABERGIL, defendant MEIR ABERGIL, defendant BARASHY, defendant EL-AL, and others, would use intimidation and threats of violence to collect repayment of the money.

b.    In order to conceal it from law enforcement authorities, the Enterprise would provide approximately $1,350,000 in United States currency from the embezzled funds to Assaf Waknine in Israel.  After the funds were transferred to Assaf Waknine in Israel, defendant ITZHAK ABERGIL, defendant MEIR ABERGIL, defendant BARASHY, defendant EL-AL, and others, would use intimidation and threats of violence against Assaf Waknine to collect repayment of the money from Assaf Waknine.

c.    Members of the Enterprise and their associates would use, attempt to use, and conspire to use extortion, affecting interstate and foreign commerce, for the purpose of generating and acquiring money and other things of value.

d.    Members of the Enterprise and their associates would commit, attempt to commit, and threaten to commit physical acts of violence, kidnaping, and extortion to protect and expand the criminal operations of the Enterprise.

e.    Members of the Enterprise and their associates would promote a climate of fear through threats of physical violence against individuals and in retaliation for failure to pay legal and illegal debts.  Members and their associates would

7

commit such acts: (i) to enrich the Enterprise and its associates and members by acquiring things of value including cash, luxury vehicles, and real estate; (ii) to enforce discipline and loyalty among associates and members of the Enterprise; (iii) to protect the Enterprise and its associates and members from retaliation by others, and from detection, apprehension, and prosecution by law enforcement; and (iv) to promote and enhance the reputation and standing of the Enterprise and its associates and members.

f.    Defendant ITZHAK ABERGIL, the principal leader of the Enterprise, would direct other members of the Enterprise in carrying out unlawful and other activities in furtherance of the conduct of the Enterprise's affairs.

g.    Defendant MEIR ABERGIL, a leader of the Enterprise, would direct other members of the Enterprise in carrying out unlawful and other activities in furtherance of the conduct of the Enterprise's affairs.  Defendant MEIR ABERGIL would approach Maximov in Israel about repayment of debts Maximov owed to the Enterprise, and would receive in return the embezzled funds that he knew had been embezzled from the Tel Aviv Trade Bank in Israel.  Defendant MEIR ABERGIL also would receive from Hai Waknine repayment of the embezzled funds that the Enterprise provided to Assaf Waknine.

h.    Benharosh, a leader of the Enterprise, would direct other members of the Enterprise in carrying out unlawful and other activities in furtherance of the conduct of the Enterprise's affairs.  Benharosh would align a faction of the Jerusalem Network with the Abergil Family.

i.    Defendant BARASHY, defendant EL-AL, and Hai

8

Waknine would participate in unlawful and other activities in furtherance of the conduct of the Enterprise's affairs.

j. After receiving embezzled funds in payment of Maximov's debt owed to the Enterprise, defendant BARASHY, Hai Waknine, and other members of the Enterprise would loan those funds to individuals in the United States.

k. Defendant ITZHAK ABERGIL, defendant MEIR ABERGIL, defendant EL-AL, defendant BARASHY, and other members of the Enterprise would collect repayment of loans that defendant BARASHY and Hai Waknine made to individuals in the United States.

l. In order to intimidate victims, defendant ITZHAK ABERGIL, defendant EL-AL, and other members of the Enterprise would accompany defendant BARASHY in extorting the repayment of loans from debtors in the United States.

m. Defendant BARASHY, defendant EL-AL, and other members and associates of the Enterprise would then launder the extortion proceeds back overseas to defendant MEIR ABERGIL, defendant ITZHAK ABERGIL, Benharosh, and other members and associates of the Enterprise.

E. THE RACKETEERING CONSPIRACY.

1. Beginning on an unknown date and continuing to in or about September 2004, in Los Angeles County, within the Central District of California, and elsewhere, defendant ITZHAK ABERGIL, defendant MEIR ABERGIL, defendant BARASHY, and defendant EL-AL, together with others known and unknown to the Grand Jury, being persons who were employed by and associated with the Enterprise, which engaged in, and the activities of which affected, interstate and foreign commerce, knowingly and intentionally

9

conspired to violate 18 U.S.C. § 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity, as that term is defined in Sections 1961(1) and 1961(5) of Title 18, United States Code, consisting of multiple acts indictable under the following provisions of federal law:

        a.    Title 18 U.S.C. § 894 (collection of extensions of credit by extortionate means);

        b.    Title 18 U.S.C. § 1951 (interference with commerce by threats of violence);

        c.    Title 18 U.S.C. § 1952(a) (interstate and foreign travel or transportation, or use of a facility in interstate or foreign commerce, in aid of racketeering enterprises);

        d.    Title 18 U.S.C. § 1956(a)(1)(B) (laundering of monetary instruments);

        e.    Title 18 U.S.C. § 1956(h) (conspiracy to launder monetary instruments);

        f.    Title 18 U.S.C. § 1957 (engaging in monetary transactions in property derived from specified unlawful activity);

and multiple acts involving extortion, which is chargeable under California Penal Code §§ 519, 31, and 182.

    2.    It was part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

F.    <u>OVERT ACTS</u>

In furtherance of the conspiracy, the defendants, and other co-conspirators known and unknown to the Grand Jury, committed the following overt acts, among others, on or about the following dates, within the Central District of California and elsewhere:

1.    Beginning on or about March 6, 1997, to approximately April 25, 2002, Esther Alon embezzled approximately 250 million New Israeli Shekels ("NIS") from the Tel Aviv Trade Bank to help her brother, Maximov, cover his gambling debts owed to various criminal groups in Israel, including the Enterprise.  Esther Alon caused the embezzled funds to be transferred to members of the Enterprise, among others.

2.    On January 21, 2002, in Israel, defendant BARASHY directed that two bank checks totaling 1,980,000 NIS, worth approximately $450,000 in United States currency, be deposited into bank accounts controlled by defendant BARASHY.

3.    On January 22, 2002, by telephone in Israel, unindicted co-conspirators ("UC-1" and "UC-2") discussed Maximov delivering bank checks approximating 300,000 NIS in increments of 100,000 NIS.

4.    On January 22, 2002, by telephone in Israel, UC-1 and UC-2 discussed the fact that Benharosh was in charge of collecting all of Maximov's debts on behalf of all illegal creditors.

5.    On January 23, 2002, by telephone in Israel, UC-1 told UC-2 that Benharosh wanted them to "protect" Maximov.

6.    On January 24, 2002, in Israel, defendant BARASHY caused 100,000 NIS to be deposited into a account under the control of UC-1.

11

7. On January 30, 2002, by telephone in Israel, UC-2 told a creditor of Maximov's that Benharosh would transfer 700,000 NIS into the creditor's account.

8. On January 31, 2002, Benharosh caused a 700,000 NIS check made payable to a creditor of Maximov's to be drawn on his "Amir Elad Limited" account at Bank Hapoalim.

9. In February 2002, by telephone, Benharosh spoke to Maximov.

10. On February 3, 2002, defendant BARASHY and Benharosh drove with Maximov to the Sheraton City Tower Hotel in Ramat-Gan, Israel.

11. On February 3, 2002, defendant BARASHY and Benharosh drove with Maximov to the David Citadel Hotel in Jerusalem, Israel.

12. On February 5, 2002, at the David Citadel Hotel, Jerusalem, Israel, Benharosh met Maximov.

13. On February 5, 2002, defendant MEIR ABERGIL, UC-1, Benharosh, and others met at the David Intercontinental Hotel in Tel Aviv, Israel.

14. On February 6, 2002, UC-1 entered the lobby of the David Citadel Hotel, Jerusalem, Israel.

15. On February 7, 2002, defendant BARASHY reserved rooms at the Inbal Hotel in Jerusalem, Israel.

16. On February 11, 2002, Maximov departed Israel for Romania.

17. On February 18, 2002, by telephone from Acapulco, Mexico, Benharosh told UC-1 that Maximov needed to be held until "he solve[d] his problems."

12

18. On March 11, 2002, by telephone, defendant BARASHY and Benharosh discussed a person who, on behalf of the Enterprise, was watching Maximov in Bucharest, Romania.

19. On April 24, 2002, in Bucharest, Romania, Benharsosh met with UC-1, Maximov, and others at the Marriott Grand Hotel.

20. On April 26, 2002, defendant BARASHY left Israel for the Netherlands.

21. On April 27, 2002, Benharosh left Israel for the Netherlands.

22. On April 29, 2002, defendant BARASHY and Benharosh arrived in Miami, Florida, on Northwest Airlines Flight 57, and met with Hai Waknine.

23. In May 2002, in Israel, co-conspirators gave Assaf Waknine $1,350,000 in proceeds from the embezzlement from the Tel Aviv Trade Bank.

24. On May 2, 2002, defendant ITZHAK ABERGIL and defendant MEIR ABERGIL left Israel for Romania.

25. On May 2, 2002, from a bank in Mexico, Benharosh and Hai Waknine wire-transferred $75,000 to Commercial Bank of Florida, account number #XXXXXXXX91, in the name of Hadad.

26. On or about May 3, 2002, Benharosh caused the transfer of $280,000 and $920,000, approximately, from a Bank Hapoalim account in Israel, in the name of "Amir Elad," to a Bank Hapoalim account in Miami, Florida.

27. On or about May 5, 2002, in Miami, Florida, Benharosh provided Hadad and Atia with approximately $250,000.

28. On May 6, 2002, in Miami, Florida, Benharosh threatened to kill Atia if he did not repay the $250,000 that had been

13

loaned to him on May 5, 2002.

29. On May 7, 2002, Benharosh gave Hadad a $250,000 check drawn on a Bank Hapoalim account number XXXXXXX006 in the name "Amir Elad."

30. On or about May 7, 2002, from a Bank Hapoalim account in the name "Amir Elad," Benharosh caused a wire transfer in the amount of $500,000 to be sent to Comerica account number XXXXX238 an account belonging to Nettie Becker Escrow Company in Los Angeles, California.

31. On May 9, 2002, from a Bank Leumi account in Jerusalem, Israel, Benharosh caused a wire transfer in the amount of $450,000 to be sent to the City National Bank account of 522 Landfair LLC, 400 North Roxbury Drive, Beverly Hills, California.

32. On May 10, 2002, Hai Waknine instructed an employee at Nettie Becker Escrow Company to send a company check in the amount of $500,000 to Exclusive, Inc., Los Angeles, California.

33. On May 13, 2002, Hai Waknine and Benharosh caused $500,000 to be deposited into Wells Fargo Bank, account number XXXX-XXXX483, in the name of Exclusive, Inc.

34. On May 15, 2002, Maximov possessed the phone number of defendant MEIR ABERGIL.

35. On May 22, 2002, Hai Waknine and Benharosh caused a wire transfer of $450,000 from the 522 Landfair LLC account at City National Bank to Wells Fargo Bank, account number XXXX-XXXX483, in the name of Exclusive, Inc.

36. On June 28, 2002, Hai Waknine caused Hadad to wire-transfer $45,000 from Commercial Bank of Florida, account number #XXXXXXX891, to Banco De Credito Del Peru, for the benefit of

14

Enrique Itamar Con Noldauer, account #XXXXXXXXXXX154.

37. On July 15, 2002, Hai Waknine caused the Commercial Bank of Florida to process check #929, in the amount of $180,000, drawn on Commercial Bank of Florida, account number #XXXXXXX891, in the name of Hadad.

38. On July 15, 2002, Hai Waknine caused the Commercial Bank of Florida to issue cashier's check number #086218, in the amount of $180,000, and made payable to the client trust account of a California attorney.

39. On July 25, 2002, Hai Waknine caused check #979, in the amount of $80,000, drawn on Commercial Bank of Florida, account number #XXXXXXX891, in the name of Eli Hadad, to be made payable to the client trust account of a California attorney.

40. On or about December 1, 2002, by telephone, defendant ITZHAK ABERGIL, Benharosh, and a female discussed the testimony of Maximov and that Maximov stated that he was not kidnaped.

41. On December 2, 2002, Hai Waknine purchased round trip airline tickets for defendant MEIR ABERGIL and for himself in order to travel from Acapulco, Mexico, to Mexico City, Mexico.

42. On December 3, 2002, defendant MEIR ABERGIL and Hai Waknine traveled together from Acapulco, Mexico, to Mexico City, Mexico and then returned to Acapulco, Mexico.

43. On February 12, 2003, Hai Waknine caused check number #413, in the amount of $174,983, drawn on City National Bank, account number #XXXX705, a California attorney's client trust account, to be made payable to "Gabriel Harroch."

44. On April 3, 2003, defendant ITZHAK ABERGIL and an unindicted co-conspirator ("UC-3") arrived in Miami, Florida on

15

Swiss Air Flight 64 from Zurich, Switzerland.

45. On April 13, 2003, defendant EL-AL arrived in Atlanta, Georgia, aboard Delta Airlines flight #109 from Madrid, Spain.

46. On April 13, 2003, defendant EL-AL arrived in Los Angeles, California, aboard Delta Airlines flight #459 from Atlanta, Georgia.

47. On April 14, 2003, by telephone in Las Vegas, Nevada, Benharosh instructed defendant BARASHY that Benharosh had sent defendant EL-AL to Los Angeles to collect money.

48. On April 21, 2003, by telephone, defendant BARASHY and Hai Waknine confirmed plans to travel from Los Angeles, California, to Miami, Florida, the following day.

49. On April 21, 2003, by telephone, defendant BARASHY and Benharosh discussed defendant ITZHAK ABERGIL being in Miami, Florida, waiting for defendant BARASHY to arrive. Benharosh directed defendant BARASHY to update defendant ITZHAK ABERGIL.

50. On April 21, 2003, in Miami, Florida, defendant ITZHAK ABERGIL obtained a driver's safety certificate from the State of Florida.

51. On April 23, 2003, defendant BARASHY and Hai Waknine arrived in Las Vegas, Nevada, aboard America West flight #879 from Los Angeles, California.

52. On April 24, 2003, defendant BARASHY, defendant EL-AL, and Hai Waknine arrived in Miami, Florida, aboard America West flight #559 from Las Vegas, Nevada.

53. On April 24, 2003, by telephone, defendant BARASHY updated Benharosh by telling Benharosh that defendant ITZHAK ABERGIL was there and defendant ITZHAK ABERGIL knew his job.

16

54. On April 24, 2003, by telephone, defendant ITZHAK ABERGIL instructed defendant BARASHY to tell Hadad that defendant ITZHAK ABERGIL did not care with whom Hadad was friendly, that defendant ITZHAK ABERGIL was friendly with Benharosh, and that Hadad should bring the money he owed.

55. On April 24, 2003, by telephone, defendant BARASHY and Hai Waknine spoke to defendant ITZHAK ABERGIL about the collection of money from Hadad and how Hadad had put up his house as collateral for debts owed to the Enterprise.

56. On April 24, 2003, by telephone, defendant BARASHY told Benharosh that defendant ITZHAK ABERGIL settled the collection of money from Hadad, and that Hadad took responsibility for the debts owed by Hadad and Atia to the Enterprise.

57. On April 25, 2003, in the lobby of the Sheraton Bal Harbour Hotel, Bal Harbour, Florida, defendant ITZHAK ABERGIL, defendant BARASHY, defendant EL-AL, and others met with Hadad.

58. On April 25, 2003, defendant BARASHY and Hai Waknine, in the company of Hadad, entered the SunTrust Bank Building on Hollywood Boulevard, Hollywood, Florida.

59. On April 25, 2003, by telephone, defendant BARASHY told Benharosh that Hadad would pay "the entire fund, every shekel that you gave him, and he signed his house." Benharosh then instructed defendant BARASHY to update defendant ITZHAK ABERGIL on Hadad's agreement to pay the money owed to the Enterprise.

60. On April 25, 2003, by telephone in Miami, Florida, defendants BARASHY and EL-AL spoke to Benharosh about obtaining a check and about defendant EL-AL's excitement over defendant ITZHAK ABERGIL being present with them.

61. On April 25, 2003, by telephone, Hai Waknine left a voicemail message on the home answering machine of Keuylian.

62. On April 27, 2003, defendant BARASHY arrived in Las Vegas, Nevada, aboard America West flight #774 from Miami, Florida.

63. On April 28, 2003, defendant EL-AL and Hai Waknine visited Keuylian at his place of business in and around Beverly Hills, California.

64. On April 29, 2003, by telephone, Benharosh told defendant BARASHY to tell Keuylian that Keuylian should stand by his word and pay the debt.

65. On April 29, 2003, by telephone, defendant BARASHY urged Keuylian's father to pay off his debt to Benharosh and told Keuylian's father that Keuylian would have to answer to Benharosh even though defendant BARASHY did not like that Keuylian's father had received threats against both himself and his family.

66. On April 29, 2003, by telephone, defendant BARASHY told Hai Waknine that Keuylian said that Keuylian deposited $650,000 in a bank in order to pay Benharosh and that Hai Waknine threatened to kill Keuylian's wife and son.

67. On April 30, 2003, Hai Waknine caused a $652,852 wire transfer to issue from Wells Fargo Bank, account number #XXXXXXX736, in the name of "Keuylian Children's Trust," to City National Bank, account number #XXXX705, a California attorney's client trust account.

68. On May 1, 2003, by telephone, an unindicted co-conspirator ("UC-4") told defendant BARASHY that defendant EL-AL and UC-4 did not consider Keuylian's debt to have been paid, and

18

that Hai Waknine did not consider the Keuylian matter to be closed.

69. On May 1, 2003, by telephone, defendant BARASHY and UC-4 discussed that Keuylian had given Hai Waknine $650,000 of the $1.6 million that Keuylian owed to Benharosh. Defendant BARASHY also told UC-4 that Keuylian would provide two cars to Hai Waknine and one car to Benharosh.

70. On May 1, 2003, by telephone, defendant BARASHY and Benharosh discussed that Keuylian still owed money and perhaps should travel to Spain.

71. On May 2, 2003, by telephone, defendant BARASHY and defendant EL-AL discussed their efforts in collecting money from Keuylian.

72. On May 2, 2003, Hai Waknine caused check number #417, in the amount of $652,812, to be drawn on City National Bank, account number #XXXX705, a California attorney's client trust account, and made payable to "Gabriel Harroch."

73. On May 6, 2003, in Los Angeles, California, defendant ITZHAK ABERGIL applied for a California Driver's License in the name "Itzhak Abergel."

74. On May 6, 2003, by telephone, defendant BARASHY told his wife about getting a driver's license that day for the "Big Friend."

75. On May 6, 2003, Hai Waknine caused $45,000 to be wire-transferred from Wells Fargo Bank, account number #XXXXXXX736, in the name "Keuylian Children's Trust," to City National Bank, account number #XXXX705, a California attorney's client trust account.

19

76. On May 7, 2003, Hai Waknine caused check number #418, in the amount of $44,988, to be drawn on City National Bank, account number #XXXX705, a California attorney's client trust account, and made payable to "Gabriel Harroch."

77. On May 10, 2003, by telephone, defendant BARASHY told Hai Waknine that defendant BARASHY would dissuade Keuylian's father from going to the police.

78. On May 10, 2003, by telephone, defendant BARASHY told Hai Waknine that Keuylian's father was not going to the police. Defendant BARASHY told Hai Waknine that Keuylian's father cannot tell the police anything.

79. On May 17, 2003, by telephone in Spain, Benharosh and defendant BARASHY discussed that Hai Waknine owed money and that Benharosh and defendant BARASHY needed to maintain pressure on Hai Waknine in order to make Hai Waknine pay his entire debt.

80. On May 17, 2003, by telephone in Spain, Benharosh, and Hai Waknine discussed transferring $150,000 from Hai Waknine's bank account to Benharosh's BBVA bank account in Spain.

81. On May 18, 2003, by telephone, defendant BARASHY and Benharosh discussed that Hai Waknine had sent money to Benharosh, and that Hai Waknine told defendant ITZHAK ABERGIL that Hai Waknine would write a check by Friday.

82. On May 19, 2003, Hai Waknine arrived in Miami, Florida, aboard America West flight #555 from Las Vegas, Nevada.

83. On May 20, 2003, by telephone, Hai Waknine complained to defendant BARASHY that Hadad only had $100,000 that Hadad was prepared to give in two installments to Hai Waknine.

84. On May 21, 2003, by telephone, Benharosh told defendant

20

BARASHY that Hai Waknine needed to bring him $2,000,000 and then Benharosh would see how much Hai Waknine still owed.

85. On May 21, 2003, by telephone in Spain, Benharosh told an unindicted co-conspirator that Benharosh's partners were defendant ITZHAK ABERGIL and defendant MEIR ABERGIL.

86. On May 22, 2003, by telephone in Spain, Benharosh told his wife that Maximov had received money from Benharosh and had not paid it back.

87. On May 22, 2003, by telephone, defendant EL-AL told Benharosh, in Spain, that Hai Waknine collected $100,000 in Miami.

88. On May 22, 2003, by telephone in Spain, Benharosh told defendant EL-AL that Hai Waknine promised defendant ITZHAK ABERGIL that Hai Waknine would repay the money owed by Hai Waknine to the Enterprise, and that defendant ITZHAK ABERGIL should pressure Hai Waknine to repay the money.

89. On May 22, 2003, Hai Waknine and Beharosh caused a City National Bank cashier's check, dated May 21, 2003, in the amount of $50,000, to be deposited in the client trust account of a Florida attorney.

90. On May 27, 2003, Hai Waknine and Benharosh caused City National Bank cashier's check #XXXXXX374, in the amount of $500,000, made payable to "Gabriel Harroch," to be deposited in an account at the Banco de Andalucia in Spain.

91. On May 27, 2003, Hai Waknine and Benharosh caused City National Bank cashier's check #XXXXXX375, in the amount of $152,812, made payable to "Gabriel Harroch," to be deposited in an account at the Banco de Andalucia in Spain.

21

92. On May 27, 2003, Hai Waknine and Benharosh caused City National Bank cashier's check #XXXXXX411, in the amount of $44,988, made payable to "Gabriel Harroch," to be deposited in an account at the Banco de Andalucia in Spain.

93. On May 27, 2003, by telephone, defendant BARASHY told UC-4 that defendant BARASHY would bring defendants ITZHAK ABERGIL and EL-AL into the discussion regarding money loaned by the Enterprise.

94. On May 28, 2003, by telephone, UC-4 told defendant BARASHY that Keuylian's check in the amount of $700,000 had bounced.

95. On May 28, 2003, by telephone, defendant BARASHY told Hai Waknine to call Benharosh and determine whether the problem with the bounced check had to do with Benharosh's account in Spain.

96. On May 28, 2003, by telephone in Las Vegas, Nevada, defendant BARASHY told Hai Waknine that defendant ITZHAK ABERGIL had checked his accounts and had spoken with defendant MEIR ABERGIL and that Hai Waknine still owed $1,350,000.

97. On May 30, 2003, by telephone in Spain, Benharosh and defendant BARASHY discussed amounts of money "they" gave to Hai Waknine, Keuylian, Hadad, Atia, and a jeweler in Los Angeles, California.

98. On June 2, 2003, Hai Waknine arrived in Los Angeles, California aboard America West flight #29 from Miami, Florida.

99. On June 3, 2003, by telephone in Los Angeles, California, defendant EL-AL spoke to Hai Waknine about how Assaf Waknine needed to take responsibility for the money he had lost.

22

100. On June 4, 2003, by telephone, defendant BARASHY asked his wife to read to him figures written on a collections tally sheet.

101. On June 4, 2003, by telephone in Spain, Benharosh told defendant EL-AL to fix the problem with Hai Waknine for him and to collect as much of the money as defendant EL-AL could.

102. On June 5, 2003, by telephone, Hai Waknine asked a California attorney to contact a Florida attorney and provide wire transfer instructions to the Florida attorney.

103. On June 8, 2003, by telephone in Spain, Benharosh, told defendant MEIR ABERGIL the status of the money loaned to Atia in Florida and the attempts by members of the Enterprise to get the money back.

104. On June 16, 2003, by telephone in Las Vegas, Nevada, defendant BARASHY spoke with Hai Waknine and Benharosh, who were traveling to Morocco, and Benharosh instructed defendant BARASHY to speak with Keuylian and either transfer a car to Benharosh, or send Benharosh a check for the amount of the car.

105. On June 18, 2003, Hai Waknine caused $50,000 to be wire-transferred from Union Bank of Florida, account number #XXXX59, in the name of a Florida attorney, to a California attorney's client trust account.

106. On June 19, 2003, Hai Waknine and Benharosh arranged to have $147,000 wire transferred from City National Bank, account number #XXXXX05, a California attorney's client trust account, to Banque BMCI, Marrakesh, Morocco, account number #XXXXXXXXXXXXXXXXXXXXXX27, in the name of "Ben Harosh Gabriel."

107. On June 24, 2003, Hai Waknine and Benharosh caused

23

$147,000 to be wire transferred from City National Bank, account number #2105705, a California attorney's client trust account, to BBVA Bank, Plaza De Africa, 1 Pont 29600, Marbella, Malaga, Spain, account number #XXXXXXXXXXXXXXXXXXXX32, in the name "M. Gabriel Harroch."

108.    On July 12, 2003, by telephone in Spain, Benharosh spoke to defendant ITZHAK ABERGIL about getting someone in Los Angeles to take care of "problems," and told defendant ITZHAK ABERGIL about the status of the loans to Keuylian, whom Benharosh referred to as one of the "Armenians."

109.    On July 14, 2003, by telephone, defendant EL-AL told Benharosh, in Spain, that Hai Waknine would pay $15,000 per month of interest until he returned the $1,000,000 he owed.  Benharosh told defendant EL-AL that if Hai Waknine did not pay, then their friend, defendant ITZHAK ABERGIL, "would take care of it."

110.    On July 15, 2003, defendant ITZHAK ABERGIL arrived in Belgium from Malaga, Spain, on Virgin Airlines flight #841.

111.    On July 23, 2003, by telephone in Los Angeles, California, Hai Waknine and defendant BARASHY spoke to Benharosh in Spain.  Defendant BARASHY told Benharosh that defendant BARASHY was going to Keuylian "to finish the issue," and Benharosh told defendant BARASHY to explain to Keuylian that Hai Waknine owed lots of money to Benharosh, and that the car was a form of payment to Benharosh.

112.    On July 30, 2003, by telephone, defendant BARASHY spoke to Hai Waknine and discussed the creation of a document to reflect how much money Hai Waknine paid and how much Hai Waknine owed to Benharosh.

113. On July 31, 2003, by telephone, defendant BARASHY spoke to Hai Waknine and told Hai Waknine that defendant BARASHY wanted a written list of how much money Hai Waknine owed to Benharosh. Hai Waknine informed defendant BARASHY that Hai Waknine would provide defendant BARASHY with money the following day.

114. On August 5, 2003, by telephone, defendant EL-AL informed Benharosh, in Spain, that defendant EL-AL was solving the problem with Assaf Waknine and was speaking to Hai Waknine to finish the issue.

115. On August 6, 2003, by telephone, Hai Waknine asked a California attorney about a promissory note in the amount of $400,000 from Hadad.

116. On August 6, 2003, by telephone in Israel, Assaf Waknine spoke to defendant EL-AL about Assaf Waknine being called to a meeting with defendant MEIR ABERGIL, and trying to arrange for a $300,000 payment to defendant MEIR ABERGIL.

117. On August 6, 2003, by telephone in Spain, Benharosh told defendant MEIR ABERGIL and Assaf Waknine about Assaf Waknine receiving $1,350,000 and not returning the money. Benharosh wanted defendant MEIR ABERGIL to collect the money from Assaf Waknine.

118. On August 7, 2003, by telephone in Spain, defendant ITZHAK ABERGIL spoke to an unindicted co-conspirator ("UC-5") regarding how some people received money that belonged to other people. Defendant ITZHAK ABERGIL described how his brother, defendant MEIR ABERGIL, told people that defendant MEIR ABERGIL keeps defendant ITZHAK ABERGIL's money and how defendant ITZHAK

25

ABERGIL is upset because "his brother is not in charge of his money."

119. On August 7, 2003, by telephone in Los Angeles, Hai Waknine told his brother, Assaf Waknine, that they would be killed if they did not pay the $1,350,000 owed to the Enterprise.

120. On August 8, 2003, by telephone, defendant ITZHAK ABERGIL in Spain told defendant MEIR ABERGIL he had criminals around him all day, and that only criminals and other things yield results.

121. On August 10, 2003, by telephone, defendant BARASHY told Hai Waknine that defendant BARASHY acted as a "diplomat" for Hai Waknine with Benharosh. Defendant BARASHY also told Hai Waknine that defendant ITZHAK ABERGIL, defendant MEIR ABERGIL, and Benharosh were under a lot of pressure.

122. On August 10, 2003, by telephone, defendant BARASHY told Hai Waknine that after defendant BARASHY left the United States, Hai Waknine's problems with Benharosh would be seven times more difficult.

123. On August 10, 2003, by telephone in Israel, Assaf Waknine spoke to his mother about being in trouble with people and owing money because of his brother, Hai Waknine. Assaf Waknine told his mother that Assaf Waknine needed $300,000 to $400,000 quickly and asked his mother to help him find money in the United States to save his life.

124. On August 12, 2003, by telephone in Los Angeles, California, Hai Waknine told Assaf Waknine that "he" wanted Hai Waknine to pay $1,350,000.

125. On August 12, 2003, by telephone in Los Angeles,

26

California, Assaf Waknine told Hai Waknine that defendant MEIR ABERGIL wanted all the money returned in "one shot" on the next day.

126. On August 13, 2003, by telephone in Los Angeles, California, Hai Waknine told Assaf Waknine about Assaf Waknine being called to a meeting with "both of your friends" about the money.

127. On August 13, 2003, by telephone in Los Angeles, California, Hai Waknine told defendant EL-AL that Hai Waknine owed $1,350,000 and that Hai Waknine would pay $350,000 and $15,000 per month until the debt was paid.

128. On August 13, 2003, by telephone, defendant EL-AL told Hai Waknine, in Los Angeles, California, that defendant EL-AL would give $300,000 so that "they" do not kill Assaf Waknine.

129. On August 14, 2003, by telephone, defendant EL-AL informed Benharosh, in Spain, that he finalized the issue and Benharosh will receive $350,000 the next day.

130. On August 14, 2003, defendant BARASHY arrived in Zurich, Switzerland, aboard American Airlines flight #17 from New York, New York.

131. On August 16, 2003, by telephone, defendant BARASHY and Benharosh discussed with Hai Waknine, in Los Angeles, California, that time had expired for Hadad to repay his debts, and that Hai Waknine needed to take Hadad's house so that Hadad and his family would sleep in the streets.

132. On August 18, 2003, by telephone in Spain, defendant ITZHAK ABERGIL told defendant EL-AL that in every gang, each person has a role and that role comes naturally, without anyone

27

assigning roles.

133. On August 18, 2003, by telephone in Spain, defendant ITZHAK ABERGIL told defendant EL-AL that when someone wanted to kill defendant EL-AL with a bomb, the police did not find the bombers and they have to watch over defendant EL-AL.

134. On August 18, 2003, by telephone in Spain, defendant ITZHAK ABERGIL directed an unindicted co-conspirator to get money from others and distribute it among other members of the Enterprise.

135. On August 18, 2003, by telephone in Israel, Assaf Waknine explained to a businessman in Arizona that Assaf Waknine and Hai Waknine owed $1.35 million, that Assaf Waknine and Hai Waknine took $1,000,000 to Los Angeles, and that Assaf Waknine lost $350,000.

136. On August 21, 2003, by telephone in Los Angeles, California, Hai Waknine told an unindicted co-conspirator ("UC-6") and UC-6's father that Hai Waknine had big problems with Benharosh and other co-conspirators, and that Assaf Waknine had been grateful for the $100,000 given to Assaf Waknine by UC-6 and UC-6's father so that Assaf Waknine would not be killed.

137. On August 21, 2003, by telephone, Hai Waknine told Hadad that he was "sick in the head" for trying to re-negotiate repayment of a loan.

138. On August 22, 2003, by telephone in Spain, defendant ITZHAK ABERGIL told an unindicted co-conspirator ("UC-7") that people, including defendant ITZHAK ABERGIL's brother, defendant MEIR ABERGIL, needed to know who gives the orders.

139. On August 22, 2003, by telephone in Spain, defendant

28

ITZHAK ABERGIL told UC-7 that defendant ITZHAK ABERGIL knew how to manage criminal operations and that defendant ITZHAK ABERGIL would use force against rivals.

140. On September 3, 2003, by telephone, Hai Waknine discussed with an unindicted co-conspirator ("UC-8") a plan to interfere with Keuylian's car dealership.

141. On September 5, 2003, by telephone, Hai Waknine and UC-8 discussed the need to talk to a DMV investigator about Keuylian's car dealership.

142. On September 7, 2003, by telephone in Los Angeles, California, Hai Waknine told Benharosh about a plan to revoke Keuylian's dealership license.

143. On September 8, 2003, by telephone in Los Angeles, California, Hai Waknine told defendant MEIR ABERGIL that Hai Waknine would send defendant MEIR ABERGIL money the next day and apologized for the problems caused by Assaf Waknine.

144. On September 9, 2003, by telephone in Los Angeles, California, Hai Waknine and Benharosh told Hadad that if Hadad did not then come up with $33,000, Hadad's house would be sold.

145. On September 19, 2003, by telephone, Hai Waknine and Benharosh told Hadad that Hadad had to pay all of the money and Hai Waknine and Benharosh did not care about Hadad's situation.

146. On September 19, 2003, a cashier's check from a Florida bank in the amount of $25,000 was drawn and, then, later, delivered to the client trust account of an attorney in Florida.

147. On September 23, 2003, by telephone, Hai Waknine told Hadad that Hai Waknine just wanted to deliver the money owed by Hadad to Benharosh so that Benharosh would take the pressure off

Hai Waknine.

148. On September 23, 2003, by telephone, Hai Waknine told a Florida attorney, in reference to Hadad, that Hai Waknine was going to put a "note on his ass too, with interest," and Hai Waknine would just "double" it.

149. On September 25, 2003, Hadad delivered four checks, in the amounts of $250,000, $25,000, $8,000 and $3,000, to a Florida attorney.

150. On September 30, 2003, $250,000 was wire-transferred from the client trust account of an attorney in Florida to "M. Ben Harosh Gabriel."

151. On October 16, 2003, a check drawn on the client trust account of an attorney in Florida, in the amount of $8,995, was deposited in to a Bank Leumi account number XXXXXXX606 in the name of Hai Waknine.

152. On October 18, 2003, by telephone in Los Angeles, California, Hai Waknine told Assaf Waknine that Hai Waknine received a message that if Assaf Waknine did not return the money, "they" were going to kill Assaf Waknine.

153. On October 18, 2003, by telephone, Hai Waknine told defendant MEIR ABERGIL that the money was available to him in Israel and promised to pay defendant MEIR ABERGIL the next day.

154. On November 1, 2003, by telephone, Hai Waknine spoke to Benharosh about how much money had been received by Benharosh and that Hai Waknine had been collecting money in the United States in order to send Benharosh a large amount of money.

155. On November 1, 2003, by telephone, defendant ITZHAK ABERGIL was informed by Hai Waknine that defendant ITZHAK ABERGIL

30

should receive "the thing" in the mail any day now. Defendant ITZHAK ABERGIL told Hai Waknine to keep his head into work and that if Hai Waknine continued to work with defendant ITZHAK ABERGIL and Benharosh, defendant ITZHAK ABERGIL would give Hai Waknine whatever he needed.

156. On November 5, 2003, by telephone, Benharosh and Waknine agreed to collect money for defendant BARASHY's bail in a criminal case in Israel.

157. On November 5, 2003, by telephone in Los Angeles, California, Hai Waknine told the wife of BARASHY, in Israel, to inform defendant BARASHY that Hai Waknine would send money for defendant BARASHY's bail in a criminal case in Israel.

158. On November 12, 2003, defendant ITZHAK ABERGIL, defendant MEIR ABERGIL, and Benharosh caused Hai Waknine to issue a check from First International Bank in Tel Aviv in the amount of $330,000, with the funds drawn from a Citibank account in New York, New York.

159. On May 5, 2004, by telephone, defendant ITZHAK ABERGIL and defendant EL-AL discussed a news article about the criminal charges against defendant BARASHY, defendant EL-AL, Benharosh, and Hai Waknine, and how defendant EL-AL was wanted in the case.

160. On May 31, 2004, by telephone, defendant ITZHAK ABERGIL, in Belgium, called Israel to inquire about the new law in Israel on organized crime.

161. In September 2004, in Belgium, defendant ITZHAK ABERGIL possessed the criminal complaint against defendant BARASHY, defendant EL-AL, Benharosh, and Hai Waknine, filed in the United States District Court for the Central District of

31

California.

All in violation of Title 18, United States Code, Section 1962(d).

COUNT TWO

[18 U.S.C. § 371]

A.    OBJECT OF THE CONSPIRACY

Beginning on an unknown date and continuing through in or about September 2004, in Los Angeles County, within the Central District of California, and elsewhere, defendant ITZHAK ABERGIL, also known as ("aka") Itzhak Abergel, aka Yitzhak Abergel, aka the Friend, aka the Big Friend, aka the Man From the South ("ITZHAK ABERGIL"), defendant MEIR ABERGIL, aka Meir Abergel ("MEIR ABERGIL"), defendant SASSON BARASHY, aka Sasson Barashi ("BARASHY"), defendant YORAM EL-AL, aka Yoram Alal, aka the Wounded ("EL-AL"), and others known and unknown to the Grand Jury, combined, conspired, and agreed to knowingly and intentionally commit an offense against the United States, namely, collections of extensions of credit by extortionate means, in violation of Title 18, United States Code, Section 894.

B.    MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE

ACCOMPLISHED

The object of the conspiracy was to be accomplished in substance as follows:

1.    The Grand Jury re-alleges and incorporates by reference Sub-paragraphs 1(a) through 1(m) of Subsection D of Count One.

C.    OVERT ACTS

In furtherance of the conspiracy and to accomplish the object of the conspiracy, the defendants, and other co-conspirators known and unknown to the Grand Jury, committed the following overt acts, among others, on or about the following dates, within the Central District of California and elsewhere:

33

1.    The Grand Jury re-alleges and incorporates by reference Paragraphs 1 through 161 of Subsection F of Count One.

COUNT THREE

[18 U.S.C. § 1962(d)]

RICO CONSPIRACY

A.    THE RACKETEERING ENTERPRISE

At times relevant to this Second Superseding Indictment:

1.    Defendant MOSHE MALUL, also known as ("aka") Eliyahu Ben Naim, aka Eli Adawi, aka Yochay Malul, aka Shimon Ohana, aka Moses Malul ("MALUL"), defendant ITZHAK ABERGIL, aka Itzhak Abergel, aka Yitzhak Abergel, aka the Friend, aka the Big Friend, aka the Man From the South ("ITZHAK ABERGIL"), and others known and unknown to the Grand Jury, were members and associates of a criminal organization engaged in, among other things, murder, conspiracy to commit murder, attempted murder, conspiracy to traffic in narcotics, narcotics trafficking, money laundering, and extortion, referred to herein as the "Drug Trafficking Organization" or "DTO."

2.    At all relevant times, the DTO, including its leadership, membership, and associates, constituted an "enterprise" as defined by Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact.  The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.  The enterprise was engaged in, and its activities, affected interstate and foreign commerce.

B.    GENERAL BACKGROUND OF THE RACKETEERING ENTERPRISE

At times relevant to this Second Superseding Indictment:

1.    The Malul Brothers were a criminal group consisting of brothers from Israel, and others, that engaged in narcotics

35

trafficking and violence, such as murder in furtherance of their narcotics trafficking. The Malul Brothers, including defendant MALUL, trafficked in 3,4-methylenedioxymethamphetamine ("MDMA"), also known as ecstasy, among other controlled substances, in Europe and the United States, including within the Central District of California. The Malul Brothers located sources of supply for MDMA in Europe and elsewhere, obtained financing for the purchase of MDMA, and coordinated the shipments of MDMA to the Central District of California and elsewhere.

2.    In and around Los Angeles, California, the Malul Brothers used members of the Vineland Boys street gang, including Luis Sandoval, aka the Barney Twin, aka Hog ("Sandoval"), to distribute narcotics and to assist the Malul Brothers by committing violent acts, including murder, conspiracy to commit murder, and attempted murder. Members of the Vineland Boys street gang also acted as enforcers and as security for the Malul Brothers.

3.    The Abergil Family was among the most powerful crime families in Israel. The Abergil Family conducted drug trafficking, murder, attempted murder, money laundering, extortion, and other crimes in California, other parts of the United States, Israel, Europe, and elsewhere. Although the Abergil Family was comprised of relatively few members, it wielded substantial power among other Israeli crime families because of its propensity for violence in Israel and around the world.

4.    Members and associates of the Malul Brothers and the Abergil Family, including defendant MALUL and defendant ITZHAK

36

ABERGIL, among others, joined forces to conduct drug trafficking and other crimes through the DTO. The DTO conducted the importation and distribution of MDMA, extortion, murder, attempted murder, conspiracy to commit murder and money laundering in California, other parts of the United States, Canada, Israel, Europe, and elsewhere.

5. Defendant MALUL was the leader of the Malul Brothers and was a leader of the DTO.

6. Defendant ITZHAK ABERGIL was the leader of the Abergil Family and was a leader of the DTO. Defendant ITZHAK ABERGIL maintained and expanded his power and influence over criminal activities in Israel and around the world through the use of and alliances with other criminal organizations based in Israel and elsewhere, including the Malul Brothers, to further the power and influence of the Abergil Family. For instance, defendant ITZHAK ABERGIL conspired with the Malul Brothers to murder a drug dealer, Sami Atias, and extort money from another individual in retaliation for Sami Atias and the other individual having attempted to steal MDMA from the Malul Brothers, in order to further the Abergil Family's alliance with the Malul Brothers. Because the Abergil Family was more powerful than the Malul Brothers, members and associates of the Malul Brothers followed the orders of defendant ITZHAK ABERGIL.

C. PURPOSES OF THE ENTERPRISE

1. The purposes of the DTO enterprise included, but were not limited to, the following:

a. Enriching the members of the DTO through, among other things, control of and participation in the importation of

37

MDMA into the United States and the distribution of narcotics, including MDMA, in the United States and elsewhere.

b. Expanding the sales of narcotics, including MDMA, to different countries throughout the world, including the United States.

c. Preserving, protecting, and expanding the power of the DTO through the use of intimidation, violence, threats of violence, assaults, and murders.

d. Promoting and enhancing the DTO and the activities of its members and associates.

D. MEANS AND METHODS OF THE ENTERPRISE

1. Among the means and methods by which defendants and their associates conducted and participated in the conduct of the affairs of the DTO enterprise were the following:

a. Defendant MALUL, the leader of the Malul Brothers and a leader of the DTO, would import MDMA into the United States and would distribute MDMA in Southern California and elsewhere. Defendant MALUL would exact retaliation and punishment on individuals who interfered with the Malul Brothers' narcotics trafficking. Defendant MALUL would murder, conspire to murder, and attempt to murder a drug dealer, Sami Atias, who attempted to steal MDMA from the MALUL Brothers. Defendant MALUL would align the Malul Brothers with the Abergil Family in order to maintain and enhance the power, prestige, and criminal operations of the Malul Brothers.

b. Defendant ITZHAK ABERGIL was the head of one of the most powerful crime families in Israel, the Abergil Family, and was a leader of the DTO. Defendant ITZHAK ABERGIL directed other

38

members of the DTO in carrying out unlawful and other activities in furtherance of the conduct of the DTO's affairs. Defendant ITZHAK ABERGIL would conspire with defendant MALUL, and others, to murder a drug dealer, Sami Atias, in Los Angeles in retaliation for Sami Atias attempting to steal MDMA from the MALUL Brothers.

c. Defendant ITZHAK ABERGIL assisted defendant MALUL in trying to extort money from others involved in the theft of MDMA belonging to the Malul Brothers.

d. Luis Sandoval and other members of the Vineland Boys street gang assisted defendant MALUL in the distribution of MDMA in Los Angeles.

e. Luis Sandoval conspired to commit murder and participated in the murder of Sami Atias at defendant MALUL's request. The DTO paid Luis Sandoval money to commit the murder of Sami Atias.

f. Co-conspirators Kobi Amsalem, Nury Atias, and others were members of the Malul Brothers, and assisted in the distribution of MDMA.

g. Members of the DTO would use the DTO criminal enterprise to commit, and attempt and threaten to commit, acts of violence, including murder and extortion, to protect and expand the DTO criminal enterprise's criminal operations, including the murder of Sami Atias and the intimidation of persons who disrupted the operations of the DTO.

h. Members of the DTO would use the DTO criminal enterprise to promote a climate of fear through violence and threats of violence.

39

i.    To generate income, participants in the DTO criminal enterprise would engage in the trafficking of controlled substances, including the importation of MDMA into the United States, and the distribution of MDMA and other controlled substances throughout the United States.

j.    To further the trafficking of controlled substances, the DTO criminal enterprise would ally itself with the Vineland Boys street gang in and around Los Angeles, California.

k.    To perpetuate the DTO criminal enterprise, participants in the DTO would attempt to conceal from law enforcement the existence of the DTO, the identity of its participants, the ways in which it conducted its affairs, and the locations at which it discussed and conducted its affairs.

E.    THE RACKETEERING CONSPIRACY.

1.    Beginning on an unknown date and continuing to in or about May 2006, in Los Angeles County, within the Central District of California, and elsewhere, defendant MALUL and defendant ITZHAK ABERGIL, together with others known and unknown to the Grand Jury, being persons who were employed by and associated with the DTO, an enterprise, which engaged in, and the activities of which affected, interstate and foreign commerce, knowingly and intentionally conspired to violate 18 U.S.C. § 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of that enterprise through a pattern of racketeering activity, as that term is defined in Sections 1961(1) and 1961(5) of Title 18, United States Code, consisting of multiple acts indictable under the

40

following provisions of federal law:

    a.   Title 18 U.S.C. § 894 (collection of extensions of credit by extortionate means);

    b.   Title 18 U.S.C. § 1952(a) (interstate and foreign travel or transportation, or use of a facility in interstate or foreign commerce, in aid of racketeering enterprises);

    c.   Title 18, U.S.C. § 1958(a) (use of interstate and foreign commerce facilities in the commission of murder-for-hire);

    d.   Title 21, U.S.C. § 841(a)(1) (distribution of MDMA);

    e.   Title 21, U.S.C. § 846 (conspiracy to distribute controlled substances);

    f.   Title 21, U.S.C. § 952(a) (importation of controlled substances);

    g.   Title 21, U.S.C. § 963 (conspiracy to import controlled substances);

and multiple acts involving murder chargeable under California Penal Code §§ 21a, 21, 182, 187, 189, 664, and 31.

2.   It was part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

F.   OVERT ACTS

In furtherance of the conspiracy, the defendants, and other co-conspirators known and unknown to the Grand Jury, committed the following overt acts, among others, on or about the following

41