# EXHIBIT M

1

UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

- - -

HONORABLE MANUEL L. REAL, U.S. DISTRICT JUDGE PRESIDING

UNITED STATES OF AMERICA,            )
                                     )
                PLAINTIFF,           )        *CERTIFIED COPY*
                                     )
VS.                                  )    CR 04-373(A)-R
                                     )
HAI WAKNINE,                         )
                                     )
                DEFENDANT.           )
_____)


TRIAL - DAY FOUR

REPORTER'S TRANSCRIPT OF PROCEEDINGS
FRIDAY, JUNE 9, 2006
P.M. SESSION
LOS ANGELES, CALIFORNIA


SHERI S. KLEEGER, CSR 10340
FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET, ROOM 440
LOS ANGELES, CALIFORNIA 90012
PH:   (213)625-5857


UNITED STATES DISTRICT COURT

# I N D E X

| GOVERNMENT'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| ATIA, JOSEF (Continued) | -- | 4 | -- | -- |
| LEWIS, CRAIG | 26 | 35 | -- | -- |
| ARONSKY, RICHARD | 47 | 52 | -- | -- |
| BENATAR, YEHUDA | 55 | -- | -- | -- |
| FARAMARZI, THEODORE | 93 | 108 | -- | -- |
| WALLACK, GORDON | 110 | 139 | 142 | 143 |
| KEUYLIAN, VIK | 149 | 208 | -- | -- |

# E X H I B I T S

| GOVERNMENT'S | RECEIVED |
|---|---|
| 52 | 30 |
| 54 | 33 |
| 56 | 34 |
| 48 | 40 |
| 49 | 42 |
| 50 | 43 |
| /// | |

*U.S. DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA*

Q.   Gabi had money to invest in the United States?

A.   Right.

Q.   Did the defendant tell you where Gabi got the money from that he wanted to invest here?

A.   I don't remember particularly, but we are talking how he was in the construction business, and I assume -- I'm assuming it's from the construction business.

THE CLERK:  Sir, you are going to have speak louder.  You have a soft voice, and it's very difficult to hear you.

BY MR. SLEISINGER:

Q.   Sorry about that.

A.   It's okay.

Q.   Now, what exactly was the business proposition involving the defendant and Gabi?

A.   It was for the purchase of Ferraris from Europe.

Q.   How many?

A.   There -- in the beginning there was no set amount. There was a set dollar amount.  It was $950,000 we ended up getting.

Q.   So basically $950,000 worth of Ferraris?

A.   Yes.  They were pretty lenient where I decided how many cars and which cars was part the list because I had already purchased some of the cars, and I was about to purchase more cars.  So this proposition came at the right time for me.  I

us to buy was about a million dollars.

Q.   Did you discuss the Maclaren with Gabi?

A.   I discussed it with Hai.

Q.   With the defendant?

A.   Yes.

Q.   What did you discuss about a Maclaren with the defendant?

A.   That we would like to buy a Maclaren, also.

Q.   Now, was there -- was there an agreement struck with you and Gabi?

A.   Yes.

Q.   Did you come to an agreement with Gabi?

A.   Yes.  Yes.

Q.   And this was after this meeting -- this initial meeting?

A.   Yes.

Q.   And was the defendant also making part of the investment?

A.   What do you mean by part of the investment?

Q.   Was he putting money up for the investment, to your knowledge?

A.   No.  He was just facilitating the transaction.

Q.   When did you first receive money from Gabi?

A.   I think it was the same day or next day when we received the money.

Q.   And how did you receive the money?

first time Hai's lawyer called us, we didn't know who he was. So I had to call Hai to find out -- or Gabi -- in fact, my dad first called Gabi and I called Hai; that's how we found out it was Gabi's lawyer.

Q.   Do you remember the name of the lawyer?

A.   I'm nervous now, I remember, but I saw him today.  He was here.

Q.   After he drafted a contract, what was the next thing that happened?

A.   It was a draft he did, and then took little bit of time. And then my sister reworked it, and then we kept -- but still took many, many months for this thing to -- for the cars to get legalized.  In the meantime, I started getting more pressure from Hai that Gabi is putting pressure on him that he needs the money.

Q.   All right.  But as far as this contract is concerned, was it signed by the parties?

A.   It was signed by Hai and by myself.

Q.   To your knowledge, did Gabi sign an agreement?

A.   I don't recall that right now.

Q.   Now, was there another contract that followed that contract?

A.   Yes.

Q.   What was the second contract for?

A.   That was when -- I paid them the money back, the

remaining of the money that I owed.

Q. And who prepared the second contract?

A. My lawyer.

Q. What was the name of your lawyer?

A. Debra Deitrich.

Q. How do you spell that?

A. D-e-b-r-a, Deitrich, D-e-i-t-r-i-c-h.

Q. Why was that contract prepared?

A. It was actually a settlement contract after we had a falling out.

Q. Now, turning your attention to the date of February 14, 2003, what happened on that date?

A. February 14, 2003?

Q. Yes.  Valentine's day.

A. Okay.  I had my annual Valentine's party at my house.

Q. Why did you throw a party?

A. Valentine's.

Q. Were you doing a promotion?

A. No.

Q. Who came to the party?

A. A lot of our friends, and also Hai and his girlfriend.

Q. Now, during the party did you talk to the defendant?

A. Of course.

Q. What did you talk about?

A. We talked about Porsche.  We talked about the party, and

Q.   Who is Tom Nguyen?

A.   He was working for Hai and Gabi here in Las Vegas.

Q.   And did he have anything to do with the receipt of the vehicle in Spain?

A.   Yes.

Q.   What?

A.   We put his name also on the title when we transferred it to ship the car so he could help Gabi get the car and do all the paperwork.

Q.   When did you send the ML 55 to Spain?

A.   It was in January '03, sometime around that time. December, January -- December '02, January '03.

Q.   Right.

So when you were doing these transactions, sending these vehicles to Spain, providing two vehicles to Hai, providing a Q45 to the person in Exhibit 11, were you telling the defendant about the accounting that you were making?

A.   No.

Q.   Were you communicating with the defendant about the fact that these vehicles were being provided in exchange for the money that was owed; that basically by giving the vehicles to either the defendant or Gabi or to their associates that some how this was being taken off the balance of the $950,000?

MR. PANCER:  Objection.  Asked and answered.

THE COURT:  Objection is overruled.

UNITED STATES DISTRICT COURT

# EXHIBIT N

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

———

THE HONORABLE MANUEL L. REAL, U.S. DISTRICT JUDGE PRESIDING

THE UNITED STATES OF AMERICA,   )
                                )
          Plaintiff,            )
                                )
     vs.                        )   No. CR 04-373(A)-R
                                )
                                )
HAI WAKNINE,                    )
                                )
          Defendant.            )
_____)

**REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS**

LOS ANGELES, CALIFORNIA

TUESDAY, JUNE 13, 2006

VOLUME VI OF VI

(SIDEBAR FILED UNDER SEAL)

DEBORAH K. GACKLE, CSR, RPR
United States Courthouse
312 North Spring Street, Room 402A
Los Angeles, California 90012
(213) 620-1149

*U.S. DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA*

151092

## I N D E X

| GOVERNMENT'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| KEULYIAN, VIK | -- | | | |
| (Continued) | | 5 | | |
| | | | 26 | -- |
| BENHAROSH, GABRIEL | 2 | -- | -- | -- |

## E X H I B I T S

(None Proffered.)

- - - - -

*U.S. DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA*

A.   Yes, it is.

Q.   And there is a signature line under that for Gabriel Benharosh, which is unsigned, and then a written-in signature line with the name "Hai Waknine for Gabriel Benharosh."

Do you see that?

A.   Yes.

Q.   So this agreement was to memorialize an agreement in writing that you had orally made with Mr. Benharosh, correct?

A.   With Benharosh and with Hai.

Q.   Sorry?

A.   With Hai also.  He was there.

Q.   Well, you told us that Mr. Benharosh -- that Hai was just a facilitator of the deal; isn't that correct?

A.   Yes.

Q.   Wasn't a deal with Hai and Mr. Benharosh, the deal was with Mr. Benharosh.  Hai introduced you to him, and Mr. Benharosh invested in this deal, correct?

A.   That is correct.

Q.   And that signature, then, "Hai Waknine for Gabi Benharosh," reflects that he was doing this on behalf of Mr. Benharosh, correct?

A.   That one, I don't know, because Mr. Gabi wasn't there to sign.  They were going to sign it later.

Q.   Now, if you would look at paragraph three of this agreement, paragraph three reflects or lists six different

BY MR. KENNER:

Q.   Isn't it true that you did not give credit for any profits for any of the vehicles that were sold, any of these Ferraris -- you didn't give any profit to Mr. Benharosh in the accounting; isn't that correct?

MR. SLEISENGER:  Objection, asked and answered.

THE COURT:  Objection is sustained.

BY MR. KENNER:

Q.   How long did you keep this $950,000 that Mr. Benharosh gave you before you returned money at all?

A.   I guess on September 25th, when the first car went to Hai, that's when I started paying it back.

Q.   And did you have -- you had no permission from Mr. Benharosh to charge things that went to Hai to his -- Mr. Benharosh's account, did you?

A.   No, I didn't.  My contact was Hai, though, it wasn't Mr. Gabi.

Q.   I'm sorry?

A.   My contact was also Hai.

Q.   But you never told Mr. Benharosh that you were, instead of following the deal you made with him, going to give cars to him and Hai at retail and ignore the agreement?

A.   Right, per my negotiation.  After the first time I met him was always with Hai, between my dad and Hai and me.

Q.   When you met Mr. Benharosh in Acapulco, as you told us

15

A.    Yes.

Q.    And the money that is reflected to be due on Exhibit 89, the $652,852, was paid primarily by a check from your children's trust account?

A.    Was a wire transfer.

Q.    From your children's trust account?

A.    Uh-huh.

Q.    Isn't it true that you transferred on April 28th, from your Platinum Motors Company money -- $175,000 into your Keulyian Children's Trust?

A.    I don't know.  I need to see the paperwork.

Q.    It's right there.

A.    Where does it say that?  Show me.

Q.    Look at -- the first entry is dated April 28, "online transfer Platinum Motors LLC to Keulyian Children's."

A.    Yes, on the last page.

Q.    $175,000, correct?

A.    Yes.

Q.    Also on April 28, there was an online transfer from Keulyian's Specialty to Keulyian Children's Trust for $152,000, correct?

A.    That's correct.

Q.    And on April 28, there was an online transfer from AKMM to Keulyian Children's Trust, correct, for $9000?

A.    That's what it shows, yes.

U.S. DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

25

you, to get this money?

A.    That's what Hai was telling me, yes.  I don't know for sure.  I was told by Hai.

Q.    In fact, for a long time, up until this phone call on April 25th, Mr. Waknine was telling you you had to get it done because he was getting pressured from Mr. Benharosh, correct?

A.    That's correct.

Q.    And at or about April 25th is the first time you got a message like the one that you got from Mr. Waknine --

A.    Even before that, I had visits, and he came by.

Q.    Visits from the people who were showing --

A.    No, from Hai being upset, that I got to pay the money that is protection --

Q.    Aside from visits where Hai said to you he was upset, what other visits did you get besides the one that you described, if any, from this group of people, including this fellow that pulled his pants leg up?

A.    The pants guy only came once, that I saw him, but few other times there were other people from Hai's side that came to the dealership.  Because when I used to go to the dealership, all of a sudden, somebody would walk in.  I guess they were watching me and my dad.

Q.    But those people didn't threaten you or bank the doors or do the things you described that happened where the fellow --

A.    They want the money, but, no, they didn't bank on the door